J. Mark Brewer (*Pro Hac pending*)
A. Blaire Hickman (*Pro Hac pending*)
**BREWER & PRITCHARD, P.C.**
Three Riverway, Suite 1800
Houston, TX 77056
Phone: (713) 209-2950
Brewer@bplaw.com
Hickman@bplaw.com

Troy B. Froderman (#012717)
Carlyle W. Hall, III (#026958)
**POLSINELLI PC**
CityScape
One East Washington St., Ste. 1200
Phoenix, AZ 85004
Phone: (602) 650-2000
Fax: (602) 264-7033
tfroderman@polsinelli.com
chall@polsinelli.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Regina Calisesi, Toi, and Jeffri Bolton, Ex Rel United States of America,<br><br>Plaintiffs,<br><br>vs.<br><br>HotChalk, Inc., Concordia University, University of Mary, Edward Fields, James Cheshire, and Mark Zinselmeier<br><br>Defendants. | CASE NO.<br><br>**QUI TAM COMPLAINT** |

## I.   INTRODUCTION

1.      This is an action to recover damages and civil penalties for false statements and claims made or caused to be made by Defendants HotChalk, Inc. ("HotChalk"), Concordia University ("Concordia"), University of Mary ("U. Mary"),[1] Edward Fields, James Cheshire and Mark Zinselmeier in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"). At issue are false claims and statements

---

[1] Defendants Concordia and U. Mary are collectively referred to as Defendant Institutions.

1

submitted by Defendant Institutions to the United States Department of Education ("DOE") in order to participate in federal programs for financial aid for students at Defendant Institutions' post-secondary internet-based degree programs.  The claims at issue with respect to HotChalk relate to its role as aider, abettor and conspirator with the Defendant Institutions.

2.      Originally enacted 150 years ago,[2] the False Claims Act ("FCA") (1986) is "the primary vehicle by the Government for recouping losses suffered through fraud."[3]  The FCA prohibits any "person" from "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a)(1). The Act also prohibits a variety of related deceptive practices involving government funds and property. 31 U.S.C. 3729(a)(2)-(7). A "person" who violates the FCA "is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains." 31 U.S.C. 3729(a). The Act empowers Plaintiffs (also referred to as "Relators") to bring an action on behalf of the United States and to share in any recovery because they possess information regarding false or fraudulent claims made to the government.

3.      Pursuant to the FCA, Plaintiffs Regina Calisesi ("Calisesi"), Toi ("Toi"), and Jeffri Bolton ("Bolton") seek to recover on behalf of the United States, damages and civil penalties arising from false and improper claims for payment that Defendants submitted, or caused to be submitted in connection with student loan applications under Title IV of the Higher Education Act of 1965 ("HEA") from at least August 1, 2009, to the date of filing of this complaint.

4.      Defendants are engaged in fraudulent conduct that violates the FCA in several ways:

---

[2] The False Claims Act was enacted in 1863 (see Act of Mar. 2, 1863 (1863 Act), ch. 67, 12 Stat. 696).

[3] H.R. Rep. No. 660, 99th Cong., 2d Sess. 18 (1986).

a.    In order to be eligible to participate and to continue to participate in any Title IV programs, the Defendant Institutions entered into Program Participation Agreements ("PPAs") with the DOE in which they falsely stated that they were obeying and would obey Title IV's incentive compensation ban, when in fact they were not and are not in compliance with that ban, and they knew that their statements were false;

b.    Every year, the Defendant Institutions knowingly falsely certify that they are complying with 20 U.S.C. § 1094(a)(20) by promising that they are not and that they will not provide any commission, bonus, or other incentive payment based directly or indirectly on securing enrollments to any person engaged in student recruiting or admission activities, when in fact

    i.    Defendant Institutions routinely and knowingly compensates and awards HotChalk based on the numbers of students enrolled; and

    ii.    Defendants HotChalk, Edward Fields, James Cheshire and Mark Zinselmeier routinely and knowingly compensates and awards its enrollment and admissions employees based on the numbers of students enrolled;

c.    Numerous times every year, the Defendant Institutions submit and cause students to submit loan applications to the DOE that are false and fraudulent in at least three ways:

    i.    The Defendant Institutions knowingly use, and cause students to use, the false PPAs and annual certifications, which are necessary prerequisites to the Defendant Institutions' eligibility for Title IV funds; and

      ii.     In each and every loan application, the Defendant Institutions falsely certify that they are in compliance with all statutory and regulatory requirements on which program eligibility and payment are conditioned, misrepresentations that the Defendant Institutions know to be untrue because of their ongoing knowing and intentional noncompliance with the incentive compensation ban. This noncompliance is carried out by Concordia and previously by U. Mary through and with the active participation and assistance of HotChalk.

      iii.     Defendants engage in substantial misrepresentations of the nature of their educational programs by deliberately concealing from students and prospective students the very existence of HotChalk, allowing HotChalk to provide a "turnkey partnership opportunity" – disguised as Concordia or U. Mary– consisting of recruitment, enrollment and admission, financial aid, curriculum and online course instructors. Defendants also engage in substantial misrepresentations concerning offers of scholarships to pay all or part of a course charge by falsely and deceptively offering non-existent "scholarships" or grants to make up for any shortfall between the course charge less available financial aid the student's ability to pay.

## II.    PARTIES

5.    Relators Calisesi, Toi, and Bolton are residents of Arizona and are United States citizens. Toi and Bolton were previously employed by Defendant HotChalk as enrollment specialists. Toi was an enrollment specialist (referred to as either "enrollment specialist" or "ES") for Defendant Concordia, and Bolton was an ES for U.

Mary.  Toi's employment commenced on December 15, 2011 and ended November 5, 2012.  Bolton's employment commenced on February 27, 2012 and ended February 4, 2013. Calisesi has been continuously employed by Defendant HotChalk as an ES for Defendant Institutions since October 25, 2010.  Toi and Bolton worked, and Calisesi currently works at HotChalk's Phoenix call center located at 4129 East Van Buren, Suite 240, Phoenix, Arizona 85008.

6.      Relators bring this action for violations of 31 U.S.C. §§ 3729 *et seq.,* on behalf of themselves and the United States.  Relators, through their work as enrollment specialists for HotChalk, have direct knowledge of the false records, statements and claims presented to the United States by HotChalk on behalf of the Defendant Institutions.

7.      HotChalk is a Delaware corporation with its principal offices at 1999 S. Bascom Avenue, Suite 1020, Campbell, California 95008.    It is registered to do business in Arizona and its registered agent is located at 300 W. Clarendon Avenue, Suite 240, Phoenix, Arizona 85013.  HotChalk is a for-profit operator of an online "university" and a call center through which it poses as the recruiting and admissions operation of its principals, Concordia and U. Mary.  Through its Phoenix call center, HotChalk has enrolled thousands of post-graduate students in its purported online courses.

8.      Concordia is a non-profit university with a location in Portland, Oregon. Its registered agent is Charles E. Schlimpert, 2811 NE Holman Street, Portland, Oregon 97211.

9.      U. Mary is a non-profit university based in Bismarck, North Dakota.  Its registered agent is Brent Winiger, 7500 University Drive, Bismarck, North Dakota 58504.

10.      Defendant Edward Fields resides in California and may be served at 14810 Clara St., Los Gatos, CA 95032-1702. Defendants James Cheshire and Mark Zinselmeier reside in Arizona.  Each may be served at 300 W. Clarendon Avenue, Suite

240, Phoenix, Arizona 85013.  As employees of HotChalk, Edward Fields, James Cheshire, and Mark Zinselmeier are principal actors in regard to the fraudulent conduct alleged herein.

**III.    JURISDICTION AND VENUE**

11.    This is an action brought pursuant to the FCA, 31 U.S.C. §§ 3279, et *seq*. Jurisdiction of this federal court is invoked pursuant to the Court's federal question jurisdiction, 28 U.S.C. § 1331 and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers original jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

12.    This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants can be found in and transact the business that is the subject matter of this lawsuit in the District of Arizona.

13.    Venue is proper in the United States District Court for the District of Arizona, pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C.§ 3732(a), because HotChalk is a corporation with its principal offices located in Phoenix, Arizona, and because HotChalk maintains and operates an online program within this District, and many of the acts that form the basis of this Complaint occurred in the District of Arizona.

14.    This case is not based on a public disclosure.  Toi, Bolton and Calisesi are each an original source and each of them have direct, personal knowledge of the matters alleged herein.

**IV.    FACTUAL BACKGROUND**

15.    Title IV of the HEA requires that to be eligible to participate in and receive payment from its loan and grant programs, educational institutions must agree and promise not to provide any commission, bonus or other incentive payment to their student recruiters based directly or indirectly upon success in securing enrollments. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22).  The Defendant Institutions entered

into such agreements (Program Participation Agreement or "PPA") and made such promises, and submitted and caused to be submitted to the DOE thousands of loan and grant applications.  Regardless of a signed Program Participation Agreement, HotChalk and the Defendant Institutions are deemed to have agreed to comply with the incentive compensation ban.  Defendant Institutions' agreements and promises, and each and every one of their applications, were and are false and fraudulent because, as this Complaint and Relators' first-hand experience, and Defendants' own documents show, Defendants tied their enrollment specialists' compensation directly to the number of students they enrolled. Over a period of years, in reliance on the Defendant Institutions' false and fraudulent agreements and promises, the DOE paid out millions of dollars in student grants, payments of loan interest, and repayment of defaulted guaranteed student loans, all used for tuition payments for the online programs of the Defendant Institutions. Each of these requests for payment of such funds constitutes an actionable false claim under the FCA.  Each dollar paid or guaranteed to be paid by the DOE constitutes a loss to the government.

### A.    The Higher Education Act Of 1965

16.    Pursuant to Title IV of the HEA of 1965, 20 U.S.C. §§ 1070 et seq., DOE provides financial assistance in the form of grants, loans, loan guarantees and interest subsidies to eligible students to help defray the costs of education, including, but not limited to, the Federal Perkins Loan Program, 20 U.S.C. § 1087aa *et seq.*, 34 CFR § 674 and the Federal Direct Student Loan Program, 20 U.S.C. §§ 1087a *et seq.*, 34 CFR § 685.

### B.    Eligibility for Title IV Loan and Grant Programs

17.    Each of the Title IV programs has specific requirements as a prerequisite to obtaining federal funds. One requirement is that in order to become eligible to receive Title IV funds under these programs, each institution must enter into a PPA with the DOE. 20 U.S.C. § 1094(a); 34 C.F.R. § 668. 14(a)(1).  Regardless of the existence of a PPA, however, HotChalk and the Defendant Institutions are deemed to have agreed to

have entered into a PPA with the DOE.  PPAs expressly "condition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

18.   The statute, regulation and PPA explicitly provide that an educational institution is prohibited from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance[.]"  20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22).   This is commonly referred to in the post-secondary education industry as "the incentive compensation ban."  Compliance with this ban is an express condition to the initial and continuing eligibility of schools to obtain Title IV funding.

19.   In each PPA, an institution certifies, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  Each PPA then states, inter alia, "By entering into this Program Participation Agreement, the Institution agrees that ... (22) It will not provide, nor contract with any entity that provides, -any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance ...."

20.   To maintain its eligibility to receive Title IV funds, each year the institution also must provide the DOE with an annual compliance audit and financial statements prepared by independent auditors. 20 U.S.C. § 1094(c); 34 C.F.R. §§668.23 and 668.25.  The audit reports are used to determine whether schools are adhering to applicable requirements for funding, including the incentive compensation ban.  As a required part of the audit, the Defendant Institutions certify compliance with the

1    requirements for eligibility to participate in Title IV programs, including the incentive
2    compensation ban.

3        21.    Congress enacted the prohibition against paying commissions, bonuses or
4    other incentive payments based on success in recruiting students because it determined
5    that such payments were associated with the enrollment of unqualified students to
6    receive federal student-aid funds and high loan default rates, which in turn resulted in a
7    significant drain on program funds where the government acts as a loan guarantor.
8    When Congress amended the HEA in 1992 to prohibit schools from paying these
9    incentives, it did so based on evidence of serious program abuses, of which incentive
10   compensation was a part. *See* S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991)
11   ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held
12   whereby sales representatives earned incentive awards for enrolling the highest number
13   of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10,
14   reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include
15   prohibiting the use of commissioned sales persons and recruiters").

16       22.    Congress has specifically prohibited educational institutions from using
17   deceptive practices, including misrepresentations which concern the nature of a school's
18   "financial charges."  Among the specified prohibited conduct, an institution shall not
19   engage in false, erroneous or misleading statements concerning offers of scholarships to
20   pay all or part of a course charge.  20 U.S.C. § 1094(c)(3)(A); 34 C.F.R. § 668.73.

21       23.    An educational institution is permitted to engage the services of a third-
22   party servicer provided it complies with 20 U.S.C.A. § 1094(c) and 34 C.F.R. § 668.25.
23   This statute and regulation requires that an educational institution require, in its contract
24   with the servicer, compliance with all statutory provisions of or applicable to Title IV of
25   the HEA, all regulatory provisions prescribed under that statutory authority, and all
26   special arrangements, agreements, limitations, suspensions, and terminations entered
27   into under the authority of statutes applicable to Title IV of the HEA, including the
28   requirement to use any funds that the servicer administers under any Title IV, HEA

program and any interest or other earnings thereon solely for the purposes specified in and in accordance with that program.  An institution also is required to include in its contract with the servicer, the servicer's agreement to report to the government violations of the law.  Essentially, the government prohibits eligible educational institutions from contracting away to third parties the compliance obligations imposed on the institutions.

### C.    Claims for Payment Under Title IV Programs

24.    After a school becomes eligible to receive Title IV funds by entering into a PPA, claims for payment of those funds can be made in various ways. Under some programs, students submit requests for funding directly to the DOE, or to the DOE with the assistance of schools, while under other programs, students and schools jointly submit requests for loans to private lenders which are guaranteed by state guaranty agencies that are, in turn, insured by the DOE, which pays only in the event of a student default.

25.    With respect to all Title IV programs, the disbursement of federal funds rests on required statements of eligibility made by schools that were necessary for requests for payment to be considered.

26.    By signing their PPAs, the Defendant Institutions each acknowledged their responsibilities to act as fiduciaries, to comply with all Title IV program requirements and to account for the federal funds entrusted to them.

### D.    Defendants' Participation in HEA Title IV Programs

27.    The Defendant Institutions sign and submit PPAs to the DOE, thereby certifying their compliance with the incentive compensation ban, their future compliance with all applicable statutory and regulatory provisions, and compliance with the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program.  The Defendant Institutions additionally certify that with certain exceptions, they will not provide any commission, bonus, or other

1  incentive payment based directly or indirectly upon success in securing enrollments or

2  financial aid to any person or entity engaged in any student recruiting or admission

3  activities or in making decisions regarding the awarding of title IV, HEA program

4  funds.  Thus, the Defendant Institutions certify that they will not engage in the payment

5  of incentive compensation based either on enrollments or financial aid.

6       28.    The Defendant Institutions are currently operating under approved PPAs

7  and cannot, in fact, operate in the Title IV environment without a current PPA.  As a

8  matter of law, each Defendant Institution is deemed to be operating under a PPA.  See

9  20 USC §1094 and 34 CFR § 668.14.   Each submits a variety of claims to the

10  government for Title IV funds that it knows to be false based upon its non-compliance

11  with the incentive compensation ban. During each academic year starting July 2010

12  through March 2013, the Defendant Institutions secured enrollments in their online

13  programs, and received Title IV funds for students enrolled in their online programs

14  marketed by HotChalk.   Additionally, during each academic year starting July 2010

15  through March 2013, students obtained loans guaranteed by the government, or in some

16  cases, financial aid directly from the government.

17       ***E.***     ***The Role of HotChalk and its Enrollment Specialists***

18       29.    HotChalk is a privately held, for-profit corporation.  Its operations include

19  a call center in Phoenix, Arizona, through which it aggressively solicits customers; *i.e.,*

20  students, on behalf of the Defendant Institutions from a "boiler room" sales-floor

21  environment.  HotChalk boasts that "Making the seven figure investment to grow your

22  programs online is risky — we eliminate the risk. From marketing and recruitment to

23  staffing the online Enrollment, Student Services and Adjunct Faculty departments, we

24  deliver risk-free results."  It further states that, "Our trained Enrollment Specialists will

25  faithfully represent your school and programs, identify potential students whose

26  academic goals and career aspirations align with your offerings, and deliver fully

27  documented applicants to you, per your specifications."[4]

28

---

[4] http://www.hotchalk.com/higher-education/services/ [accessed May 22, 2013]

30.     HotChalk is not an educational institution but is a third-party servicer as defined by 34 C.F.R. § 668.2 and hence, its activities are subject to 34 C.F.R. § 668.25, which governs third party servicers.  HotChalk also is not an accredited provider of academic degrees, courses or texts and is not accredited in any way in regard to any activities associated with a post-secondary educational institution except student recruitment.  Despite the fact that it is not an education institution but is merely a third-party servicer, HotChalk openly touts that it provides a "unique, turnkey partnership opportunity which removes the barriers to growing your degree programs online." HotChalk indeed provides what it describes as "all Adjunct Faculty" who it claims "participate in weekly professional development calls and receive performance feedback from their students via individual course assessments."[5]  These "adjunct faculty" personnel are actually employees of HotChalk's Campbell, California office who operate without oversight from or meaningful accountability by the Defendant Institutions.  In essence, when a student enrolls in a U. Mary or Concordia online curriculum, s/he does so unwittingly through HotChalk, and receives his or her "education" from HotChalk – not from U. Mary or Concordia.  Defendant Institutions have simply allowed HotChalk to use their name, accreditation status and program participation.

31.     As of May 30, 2013, HotChalk had enrolled 2,405 students into the online M.Ed. it marketed and operated under the Concordia name as Concordia's "turnkey" servicer and its activities using the Concordia name are ongoing.  As of April 17, 2013, HotChalk had enrolled several hundred students into the online masters degree in nursing it marketed and operated under the U. of Mary name as that school's "turnkey" servicer.  The relationship between U. of Mary and HotChalk terminated on April 17, 2013.  Each of the students enrolled by HotChalk in its online iterations of Concordia and U. Mary programs represents a separate violation of the FCA.

---

[5] *Id.*

32.     Defendants HotChalk, Fields, Cheshire and Zinselmeier were well aware of the incentive compensation ban and spoke openly to HotChalk employees of implementing "ways around" the ban.   HotChalk's Vice President of Enrollment, Thomas Corbett, who conducted the pre-employment interview of Calisesi for the position of enrollment specialist, was employed at University of Phoenix when that company was a defendant in a qui tam suit and paid approximately $75 million to settle allegations of its violations of the incentive compensation ban.

33.     Although both Defendant Institutions had existing online programs prior to contracting with HotChalk, each allowed HotChalk to create its own, separate online post-graduate degree programs together with the enrollment and financial aid operations necessary to provide students for those programs.   Using its clients' names with the clients' knowledge and consent, HotChalk conducts the full array of operations or functions in regard to post-secondary educational student recruitment, enrollment, financial aid, admissions and/or other activities.   HotChalk's enrollment specialists enroll students in HotChalk's online degree programs which HotChalk marketed as "Concordia University" or "University of Mary."

34.     Consistent with HotChalk's "turnkey partnership opportunity," each Defendant Institution allowed HotChalk to set up its own versions of their websites, albeit using different tuition rates in violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73.  HotChalk also touts this as one of its "services:"  "Our Engineering team will deliver seamless integration with your existing Learning Management System, or assist in the selection and deployment of an industry-standard LMS."[6]

35.     In violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73, with respect to U. Mary, a student who enrolled directly with U. Mary in 2012 paid a fee of $450 per credit hour while a student enrolling in 2012 through http://online.umary.edu/admissions/tuition[7] – the U. Mary website operated by

---

[6] *Id.*

[7] accessed December 30, 2012.

13

HotChalk – paid $750 per credit hour.  In either event, the money was paid to U. Mary which in turn paid a portion of it in the form of incentive compensation to HotChalk.  U. Mary paid HotChalk for each student enrolled by HotChalk – a direct violation of the incentive compensation ban by U. Mary.

36.   In the case of Concordia, each student's tuition money was paid to Concordia which in turn paid a portion of it in the form of incentive compensation to HotChalk.  Concordia paid HotChalk for each student enrolled by HotChalk – a direct violation of the incentive compensation ban by Concordia.

37.   In violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73, the Defendant Institutions allow HotChalk to operate from its Phoenix call center to use deceptively named email addresses for HotChalk's enrollment specialists, including Relators, with the domain names of "@education.cu-portland.edu" and "@online.umary.edu."   It also deceptively provides its customers (students) with Portland and Bismarck area codes (where the Defendant Institutions are located) to reach the HotChalk enrollment specialists.  The enrollment specialists are instructed not to say they are in Phoenix and to lie about their physical location if asked.   The enrollment specialists also are instructed never to say they are employed by HotChalk or even to identify HotChalk in any way.  Instead, the enrollment specialists are to say they are "with" U. Mary or "with" Concordia.  Each enrollment specialists is assigned to peddle degree programs for only one of these two institutions, presumably to avoid any slip-ups.

38.   Enrollment specialists, such as Relators, are Defendant Institutions' "recruiters" and are responsible for recruiting applicants for admission, including securing and managing new inquiries, achieving enrollment and start rate goals, participating in appropriate recruitment and enrollment activities. An enrollment specialist must stay in constant contact with potential students during the entire recruitment and enrollment process.

39.     An enrollment specialists' salary increases, number of stock options, and award of other incentives are all based on HotChalk's relentless and exclusive focus on the number of new students an enrollment specialist is able to recruit, and thus, are in direct violation of the Title IV incentive compensation ban.

40.     To boost its enrollment numbers, HotChalk urges each ES to enroll students before or without reviewing their transcripts to determine their academic qualifications for the online programs. Both Toi and Calisesi were told that they were to enroll students without having reviewed the prospective student's transcript.  Although the Defendant Institutions publish academic requirements for incoming students, using HotChalk, each accepts all potential students who complete an application and submit an essay which HotChalk refers to as a "letter of intent."  The essay requirement is a sham:  even a single paragraph at an average eighth grader's ability level will suffice and it is extremely rare for any student to be denied enrollment based on the essay's content or quality or lack thereof.  In any event, HotChalk employees determine the sufficiency of the "letter of intent" with the client Defendant Institution occasionally intervening where the deficiency is particularly egregious.

41.     On behalf of the Defendant Institutions, HotChalk enrollment specialists approve all student applications regardless of the applicant's college GPA.  In one instance, Toi enrolled a student whose initials are AHG because HotChalk supervisor, Michael Dearing, literally got in Toi's face and told her substantially the following words: You don't have any right to tell him he can't get in – despite the fact that AHG was not qualified or capable of performing in the Concordia program.   AHG later emailed another HotChalk ES that he did not feel capable to participate in the program.

42.     One tactic HotChalk supervisors use to make it appear that a low GPA is an issue is to artificially slow down the enrollment process.  Even obviously deficient students who submit woefully inadequate essays and credentials are admitted "by" the Defendant Institutions because all "admissions" decisions are in fact made by HotChalk.

43.     In the case of enrollment specialists for the U. Mary online program, the stated minimum GPA was 2.75 on a 4.0 scale. However, if a prospect had a GPA below 2.75, they were simply asked to write a short statement explaining why their GPA was below 2.75. In virtually no case where the student submitted the short explanation was the minimum GPA requirement adhered to; i.e., students whose GPAs were below 2.75 were routinely enrolled. Additionally, if a student was sufficiently far enough along in the enrollment process to enroll for the soonest available cohort, their enrollment was pushed through for that cohort.

44.     During their recruitment pitch, the enrollment specialists are instructed to fraudulently misinform potential students that they are "at" or "with" U. Mary or Concordia (depending on which school the enrollment specialist has been assigned to pitch for).  At the end of April or early May 2011, Toi was told by her then Director of Admissions, James Cheshire, to tell a prospective student that she was in Portland, Oregon.

45.     Enrollment specialists are instructed to create a false sense of urgency on the part of prospective students.  For example, enrollment specialists are required to tell prospective students that if they "sign up" now for "this cohort" they will receive a free iPad and textbooks.  The enrollment specialists were further instructed, in printed instructions, not to call the iPad and textbook give-away "free" but to say it is 'included" and not to refer to this as a "promotion" but as a "pilot program."   This activity directly violates 34 C.F.R. § 668.14(b)(22)(iii)(A) which defines an "incentive payment" as "a sum of money or something of value."

46.     When a student agrees to enroll, a Las Vegas style announcement is flashed on video monitors on the sales floor that comprises HotChalk's Phoenix premises.  One image that is flashed on the video screens whenever there is a new enrollment is that of a one hundred dollar bill with colorful animations.

47.     Provided that each ES meets his or her sales goal, s/he is retained and given increased pay.  When a prospective student tells the ES that s/he wants to delay

her/his start date, the ES is required to pressure the prospect to start classes even if there is no "course" and no instructor.  As stated previously, the instructors are actually HotChalk employees – not faculty of the client Defendant Institutions.  For example, if a student has enrolled and HotChalk has no course ready, the ES is required to falsely tell the students that the course start date is being "moved back."

48.     During the week before a cohort, called new start period or "cycle," enrollment specialists will receive approximately five confirmation reports per day updating them as to whether their students have confirmed enrollment. If an ES' student has not confirmed enrollment, the ES is required to remain in contact with the student via telephone calls and e-mails urging the student to confirm enrollment, even if a student expresses doubts about doing so.  After a student is confirmed as a "start", HotChalk is compensated by the Defendant Institutions and the ES earns credit for the enrollment for purposes of salary increase.

49.     Enrollment specialists are required to make sure the students complete all of their loan applications and submit them to the school and the federal government.  To do this, enrollment specialists follow a phone script provided by HotChalk (referred to at HotChalk as "the rubric"). Using the rubric, each ES is required to use high pressure sales tactics to "qualify" the student for financial aid by asking canned questions. Enrollment specialists are required to direct students to the federal financial aid website (FAFSA) and instruct them to fill it out and enter Concordia or U. Mary's school code.

50.     Once a student's financial aid forms are complete, a financial aid officer calculates the student's financial aid plan based on a DOE formula and informs the student. The student can accept or reject the financial aid plan. If a student rejects a financial aid plan, often because the student does not qualify for enough financial aid to cover the entire amount of tuition, it is the ES' job to convince the student to accept the financial aid package and enroll by misleadingly offering "scholarships" that in reality are nothing more than a HotChalk "discount" of the tuition prices set by HotChalk in the first place.  This is a misrepresentation concerning the nature of the Defendant

Institution's financial charges in violation of 20 USC§ 1094(c)(3)(A) and 34 CFR § 668.73.

51.     Enrollment specialists are instructed to offer "scholarships" for several reasons: (1) if the student is considering applying at another institution; (2) if the student complaints that the tuition is too high; (3) if the student wants to wait for another cohort because of personal reasons; or (4) if the students has a shortfall of financial aid coverage. Enrollment specialists are instructed to mislead students by telling them that the "scholarships" are only available if the student signs up now for the next cohort. However, in reality, "scholarships" are offered at any time.

52.     Students are not allowed to go part-time. Students are told that they must adhere to the one class every five weeks schedule and cannot for any reason detour from that set schedule because to do so will affect their financial aid period. If a student has plans, such as surgery or having a baby, enrollment specialists are instructed to tell the student that he or she will not be able to pay for school because he or she is disrupting his or her financial aid year. Although, in reality, a student would be allowed to return to school, enrollment specialists are instructed to advise students that it would not be likely.

53.     The "Study Buddy Scholarship" is awarded when a student refers someone who also enrolls and begins in the same cohort.  Each of the students is given a $2,000 "scholarship". In reality, this is not a scholarship, but merely another gimmick to get students to refer prospects.   These tactics of falsely and deceptively offering "scholarships" or grants to make up for any shortfall between the course charge and available financial aid is a substantial misrepresentation concerning offers of scholarships to pay all or part of a course charge in violation of 20 U.S.C. 1094(c)(3)(A) and 34 C.F.R. § 668.73.

. . .

. . .

18

*F.*      *Defendants' False Claims, Fraudulent Conduct and Violations of the Incentive Compensation Ban*

54.      Since approximately July 2010 and continuing through April 17, 2013 in the case of U. of Mary and at least May 2013 in the case of Concordia, HotChalk, acting on behalf of the Defendant Institutions, compensated enrollment specialists, including Relators, and their call-center supervisors based upon the number of new students enrolled. In direct violation of the ban on incentive compensation, Defendants have a "boiler room"-style sales culture, in which they not only pay incentive compensation, but they make the recruitment of students to their schools the sole focus of their compensation regime. Failure to enroll sufficient numbers of students results in termination. HotChalk fosters an environment of fear of losing one's job, tension and pressure to meet unreasonable sales goals of new student enrollments (these sales goals are referred to as the ES' "ramp rate") Defendant HotChalk knowingly violates HEA, Title IV regulations. In so doing, HotChalk breaks the promises made by its principals – U. Mary and Concordia – in the PPAs and the representations made by U. Mary and Concordia in connection with the annual compliance audits.

55.      The sales-culture of HotChalk's operation is typified by management's repeated emphasis that the salary of each ES is tied to the number of students s/he enrolls. The Vice President of Operations, Mark Zinselmeier, and Director of Enrollment, James Cheshire, have stated openly substantially the following words: "Make no mistake, we are in sales. This is a sales floor. This is what you have to get." HotChalk supervisor, Dearing, told Toi that she needed to stop acting like a "social worker." HotChalk managers have said to the enrollment specialists substantially the following words: "Imagine how much money you will make and how "wealthy" you will become from your HotChalk stock options." This statement is not true. In direct contradiction, enrollment specialists are instructed to explain to prospective students that they are "with" a non-profit institution; thus, they do not answer to stockholders.

*1.*      *"Overtime"*

56.    As a matter of corporate practice, enrollment specialists have been required to meet an enrollment quota, depending on how long they have been employed at HotChalk.  Those enrollment specialists, including each of the relators, who met their quotas received an initial raise of 10% of their starting base salary.  Then, in approximately the fall of 2012, each ES, was informed by HotChalk managers that they had been transformed into "hourly" wage employees so that they could have the opportunity to earn more money if they met or exceeded their quotas of new enrollments.

57.    There was so much buzz among the management staff the day of the "overtime" announcement. Toi recalls Zinselmeier stating substantially the following words: "Edward Fields wanted a way for us to be able to put more money directly in enrollment specialists' pockets for getting more enrollments and we have found it."

58.    Those enrollment specialists, including each of the Relators, who met their quotas and without regard to any other factors, were in fact granted "incentive" compensation in the form of "overtime hours" for the next five week cycle during which they would receive one and a half times their presumed hourly rate of pay.  Thus, "overtime" compensation was doled out solely on the basis of the number of new students which each ES, including the Relators, enrolled to incentivize the enrollment specialists, including the Relators, to enroll more students.

59.    Those employees who failed to meet their quotas for any five week cycle were told they were not eligible for "overtime."  Similarly, those employees who met their quota for a given five week cycle, but fell below the quota's minimum because too many students failed to stay in the program for more than eight days, were told they were not eligible for "overtime."

60.    On one occasion, Toi's manager, Dearing, stated to Toi substantially the following words: "Can you believe the nerve of that [expletive] to ask me for overtime after four of her [eight] new enrollments dropped out?  No one is taking that kind of money from me and getting away from it."  On another occasion, Dearing told Toi that

1  she was not eligible for overtime because she had not met her quota of new enrollments

2  for the five week cycle.

3      61.    HotChalk managers knew that the overtime scheme was an impermissible

4  violation of the incentive compensation ban:  Cheshire and Zinselmeier, as well as

5  Dearing and Ken Cook excitedly told the enrollment specialists, including the Relators,

6  that the overtime program was being implemented to compensate new student

7  enrollments. Zinselmeier went so far as to say that it was to "get around" the incentive

8  compensation ban.  In practice and as implemented, "overtime" pay is determined by

9  HotChalk solely on the basis of whether the number of students each ES enrolls meets

10  or exceeds his or her quota.

11      62.    Congress, the DOE and the Defendant Institutions' PPAs ban incentive

12  payments except the "payment of fixed compensation, such as a fixed annual salary or a

13  **fixed hourly wage**, as long as that compensation is not adjusted up or down more than

14  twice during any twelve month period, and any adjustment is not based solely on the

15  number of students recruited, admitted, enrolled, or awarded financial aid."

16      63.    Selectively granted overtime violates this ban in three ways:  First, it is

17  not a "fixed hourly wage" but is instead a variable hourly wage of one and a half times

18  the "normal" hourly rate of the ES.  Second, it was an adjustment that occurred "more

19  than twice during any twelve month period" because it was granted or denied at the end

20  of each five week enrollment cycle based on the number of students enrolled that cycle.

21  Third, whether an ES is allowed to work overtime at one and a half times his or her

22  "normal" hourly rate is determined solely on the number of students enrolled by each

23  particular ES, including the Relators, and on no other basis.

24            ***2.    "Core Values"***

25      64.    "Core values" (sometimes referred to by HotChalk's managers as "core

26  competencies") is merely a sham performance rating system. In spring or summer of

27  2012, Zinselmeier addressed the ES team. Toi, Bolton and Calisesi attended.

28  Zinselmeier stated that that because of what he referred to as the [qui tam] lawsuit

against the University of Phoenix, HotChalk could no longer openly compensate enrollment specialists for enrollments, and HotChalk would be changing its review process.  He further stated that reviews would be based purely on "soft skills."  This is the "core values" reviews. Zinselmeier said substantially the following words: "I know there are some people here who were going to get graduate bonuses and we can't do that anymore. Since we cannot give bonuses, the core values are a way to reward you for your hard work."  Each ES, including Relators, was required sign an acknowledgment to this effect and the team was told that the document would go into the personnel file. Zinselmeier made clear to the enrollment specialists that this was just for what he called "CYA" purposes.

65.    Subsequently, HotChalk implemented a list of "core values" – supposed quality factors – for use in evaluating the performance of each ES. The "core competencies" are:  "Adaptability/Flexibility",  "Be  Happy,  No  Drama", "Communication", "Results Focus" and "Sense of Urgency". From the time of the implementation of these "core values" and continuously thereafter, HotChalk management personnel has openly stated to each Relator and every other ES that so long as the minimum number of student enrollments is achieved, the "core values" do not matter and that they are nothing more than an effort to disguise the fact that performance and compensation are measured exclusively by reference to student enrollment. For example, to achieve the minimum core competencies, the enrollment specialists do not even have to meet basic job requirements such as being at work on time.  Instead and as openly stated by management, whether each ES, including the Relators, receive the minimum core values rating is based solely on whether the ES meets his or her quota of new enrollments.  HotChalk management makes it clear to the enrollment specialists that it is impossible to achieve successful ratings on the "core values" without meeting the ES' ramp rate.  Thus, in practice and as implemented, the "core values" of each ES are determined by HotChalk solely on the basis of the number of students each enrollment specialist enrolls.

22

### 3. *"Ramp Rate"*

66.     On or about January 7, 2011, the enrollment specialists received a document titled "Ramp Rate Policy."  The document explains HotChalk's definition of ramp rate, the number of students each ES is expected to enroll, the penalties for missing a goal, and the incentive for meeting a goal. The incentive explained in the January 7, 2011 "Ramp Rate Policy" was that enrollment specialists would receive $100 for every student that graduated who they enrolled.   Enrollment specialists were required to follow up with students to make sure they stay in the program into which they enroll.   This "policy" as implemented is an intentional violation of the incentive compensation ban.

67.     HotChalk's emphasis of, and reliance on, new student enrollment as the exclusive basis upon which it determines an ES' compensation is demonstrated by the extreme emphasis it places on training its enrollment specialists to "sell" enrollments. HotChalk meticulously tracks each ES' recruitment activities on a daily, weekly, monthly, quarterly and annual basis. Each ES' enrollment activity is then included in reports which are disseminated throughout HotChalk at the indicated intervals.  These reports contain only quantitative information, and focus exclusively on the applications and enrollments achieved. None of these reports, which HotChalk uses to manage, evaluate, and compensate its enrollment specialists, contains any information regarding any "core competencies."  The "core competencies" performance metric is nothing but a sham which HotChalk intentionally set up and uses to disguise its incentive compensation scheme.

### 4. *Initial Interviews by HotChalk*

68.     As explained by HotChalk to each Relator during the interview and hiring process, each ES' compensation is based on, and only on, the number of new students recruited.  During Toi's initial interview for her ES position with HotChalk, she asked what she had to do to earn a higher salary than what HotChalk was initially offering. She also asked what the criteria was for her future compensation and when she would

be given her first review.  This occurred at an in-person interview with HotChalk's then Director of Admissions, Cheshire and HotChalk's Manager of Human Resources and Recruiting, Wanda DeLoatche, in the last week of November 2011 and was followed by a telephone offer from DeLoatche of $50,000.  At the interview, Toi presented Cheshire with an email she had from her prior employment at University of Phoenix.  The email showed that she had a relatively good "lead conversion" rate.  Based on the email, Toi said she wanted $55,000.  Cheshire said that if she performed at HotChalk as well as she performed for University of Phoenix, HotChalk would give her a $5,000 increase in ninety days and at least a $5,000 increase every year thereafter.  Cheshire told Toi not share that ninety day review information with her training class peers because HotChalk does not normally give salary increases at ninety days. Toi responded that she did not know what she would have to work with at HotChalk and asked whether she would be provided with "the tools" she would need to hit five enrollments per cycle.  Cheshire said that there are people on the sales floor that are doing that well and they are well compensated.   Toi met her sales quota and was given the $5,000 increase in June 2012 – five months after her employment began.  When combined with subsequent overtime pay, this violates the incentive compensation ban's prohibition on more than two salary increases within a year.[8]

69.    Relator Bolton had similar conversations with her interviewers.  After she was hired and received her first review, she realized that the reviews were not meaningful and that if she failed to achieve her quota of five new enrollments per month, she would receive "reprimands" followed by termination.  If she met her sales quota, she would receive a good review on the "core competencies". If she did not meet the quota, she would be given a reprimand and receive a negative review on "core

---

[8] 34 C.F.R. § 668.14(b)(22)(ii)(A)(2010).

24

competencies". The "core competencies" reviews are merely a smokescreen to disguise that fact that HotChalk engages in incentive compensation.

70.     HotChalk offered Relator Calisesi a starting salary of $42,000 plus stock options.  Using an employment recruiter, John Murphy, HotChalk informed Calisesi of her salary and stock options.  Murphy set up an in-person interview with HotChalk's director of enrollment, Tom Corbett.  During the interview, Corbett reiterated the salary and benefits as explained by Murphy.  Following this, Calisesi was interviewed over the phone by HotChalk's Vice President of Operations, Mark Zinselmeier.  Neither Murphy, Corbett nor Zinselmeier asked any questions or made the slightest comment about Calisesi's qualifications to work in post-graduate recruiting and enrollment.  Instead, their sole focus was on HotChalk's sales culture.  Zinselmeier, for example, said he only wanted to make sure Calisesi would fit into HotChalk's "culture" by asking her what kind of culture she would like to work in.  Calisesi responded that she liked an environment of integrity where she could be part of a cohesive team without being micromanaged.

71.     As soon as she started work at HotChalk, it was made clear to Calisesi that her compensation was purely a function of her sales performance.  She was told, for instance, that if she failed to meet her quota of new enrollees, she would be terminated.  She was given two weeks of training before going onto the sales floor.  She began on November 25, 2010, and was told that her "ramp rate" was to get one enrollment in her first two weeks after training.  When she failed to get one enrollment within her first two weeks, Corbett turned on her and became hostile.  Calisesi's Assistant Director of Admissions at that time, James Cheshire, told her that she was ahead of the "curve" in training but now she had fallen below the "curve".

72.     Corbett, the former University of Phoenix employee, told Calisesi that after six months, she would have a salary increase eligibility review.  At the end of her first six months, Zinselmeier called Calisesi into his office and informed her that her salary was being raised to $50,000 per year.  She was then told it would go to $60,000

per annum if she continued to meet her "ramp rate."  This is an intentional and direct violation of the prohibition on more than two salary increases within a year.  Alternatively, when combined with HotChalk's overtime pay policy, it violates the prohibition on more than two salary increases within a year.[9]

73.    Each Relator was told at the commencement of her employment at HotChalk that she would receive additional stock in the company if she excelled at enrollments.  Calisesi did receive additional stock on July 26, 2012 from Zinselmeier in the presence of DeLoatche.  This is an intentional and direct violation of the prohibition on more than two salary increases within a year.

74.    On one occasion, Calisesi was present for a sales meeting with Zinselmeier and DeLoatche in which they told the enrollment specialists that they would be allowed to get up to a twelve percent increase if they got a five rating on the "core values."  Zinselmeier and DeLoatche told the enrollment specialists that this was a "CYA" tactic to disguise the fact that this was a way for paying enrollment specialists based on the number of students enrolled.

### 5.    Incentives

75.    In addition to salary, HotChalk recognizes *every* enrollment specialist in the form of all-expenses paid trips to Las Vegas, Nevada, paid lavish dinners at expensive restaurants with defendant Fields, HotChalk's CEO, free tickets to MLB games and the like.

76.    During the year, HotChalk managers send mass e-mails to the enrollment specialists on a weekly basis detailing the top performers for the previous week. The results and the rankings consist only of the number of appointments, interviews, and enrollments each ES secured.

77.    On one occasion, the ES sales team received free MLB tickets for the team obtaining 200 enrollments.

---

[9] *Id.*

78.     On another occasion at the 2011 Christmas Party, HotChalk CEO, Defendant Fields, announced that the HotChalk board was really pleased with the sales numbers being delivered by the enrollment specialists. He further stated that these types of numbers would enable HotChalk to "go public". He exhorted the employees to keep up the good work.  He then stated that because the sales team had met its quota, he wanted to reward them for their successes of new enrollments with a trip to Las Vegas. The trip to Las Vegas was for the ES and his or her spouse, and every ES and his or her spouse was given a fifty dollar gift card or cash to gamble while on the trip.

79.     In early 2012, in follow-up to Fields' comment about taking the enrollment specialists to Las Vegas, HotChalk management said that new hires would not be allowed to go to the Las Vegas trip. Toi expressed her disappointment in this regard to Cheshire because she was excited that Bolton would also be going on the trip. Cheshire responded to Toi that new enrollment specialists were not invited because they have not enrolled any students.

80.     On another occasion, because the sales team met its overall quota, HotChalk had Hummer limousines pick up all the enrollment specialists and other HotChalk employees.  The limousines took the entire team to lunch and presented all with a "gift bag."   On another occasion, Starbucks cards were passed out during phone "blitzes" by HotChalk supervisors to enrollment specialists who had the "most dials" and "most talk time." Additionally, enrollment specialists are routinely given free movie tickets, chair massages and lunches all based on their performance of signing up new student enrollments.  Each of these gifts and other incentives violates the incentive compensation ban.

81.     The top-recruiting ES for certain time periods or in particular offices wins bonuses, including but not limited to, Godiva Chocolate gift baskets, movie tickets, MLB baseball tickets, amusement park tickets, various restaurant gift cards, and free lunches and dinners. At other times, enrollment specialists with a large number of new students will be given permission to leave work early yet still be paid for an entire work

day.  Each of these gifts and other incentives violates the incentive compensation ban because the enrollment specialists are  rewarded by HotChalk directly and indirectly on the number of students they enroll.

82.    By regularly and repeatedly promoting the outings, dinners and trips, each ES is incentivized based on the number of students they enroll.  The trips are not designed to educate or improve the skills of the enrollment specialists, at least not in any way that complies with the incentive compensation ban.  Instead, these are simply incentive prizes used to spur enrollment specialists to compete against one another to achieve the most enrollments in the high pressure sales environment of HotChalk.

83.    In connection with paying incentives based directly or indirectly on the number of students enrolled, HotChalk acted in concert with Defendant Institutions. Defendant Institutions were aware of HotChalk's policy and practice of incentive compensation tied directly or indirectly to the number of students enrolled. Additionally, Defendant Institutions' compensation to HotChalk was based directly or indirectly on the number of students enrolled by HotChalk enrollment specialists.

84.    U. Mary conspired with HotChalk to violate the incentive compensation ban. U. Mary did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online U. Mary program.

85.    Concordia conspired with HotChalk to violate the incentive compensation ban. Concordia did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online Concordia programs.

### 6.    *Reprimands, or being Put on "Plan"*

86.    In addition to rewarding enrollment specialists who meet their sales goal ("ramp rate"), HotChalk closely monitors each ES for failure to meet his or her sales goal.  Enrollment specialists are terminated for failing to achieve an acceptable number of new enrollments, without regard to the so-called "core values."  Also, as alleged

above, HotChalk makes it clear to the enrollment specialists that it is impossible to achieve successful ratings on the "core values" without meeting the enrollment specialists' ramp rate.

87.    If an ES fails to meet her individual enrollment goal, HotChalk issues a written warning of disciplinary action.  This is known as being put on "plan."  The ES is given a specific period of time within which to achieve her "ramp rate" before being subject to further "disciplinary action."  If the ramp rate is met, the ES will not be terminated or given further "disciplinary action."

88.    Defendants are liable to the United States under the FCA because of their use of false statements to obtain HEA, Title IV loan funds. Specifically, in requesting and receiving millions of dollars annually, Defendant Institutions falsely represented that they were in compliance with the HEA's prohibitions against using incentive payments for enrollments, a key pre-condition to the receipt of any HEA Title IV funds.

89.    The Defendant Institutions falsely certified that they were in compliance with the ban on incentive compensation for enrollments and without such certifications of compliance, Defendant Institutions would not have been permitted to continue to participate in Title IV HEA activities nor to receive Title IV funds from the government.  In submitting PPAs which falsely certified compliance, each Defendant Institution knew the PPAs were false and acted knowingly or in reckless disregard of the truth or falsity of the information provided to the United States.  The Defendant Institutions thereby fraudulently caused the United States to pay Title IV HEA funds to themselves by false and fraudulent PPAs, compliance audit and financial statement audit opinions.  Defendant Institutions certified to the DOE their compliance with the ban on incentive compensation in order to collect federal funds for which they were ineligible, in violation of 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

90.    HotChalk violated the law by knowingly receiving incentive compensation from the Defendant Institutions – both Concordia and U. Mary – for each student its enrollment specialists enrolled, and by knowingly paying incentive

1   compensation to its enrollment specialists in the form of salary increases, "overtime"

2   compensation, per-enrollment bonuses, prizes, gifts and other incentives.

3   **V.     COUNT I – THE FALSE CLAIMS ACT, 31 §§ U.S.C. 3729(a)(I),(a)(2) and 3732 (b)**

4

5          91.     Plaintiffs/Relators re-allege and incorporate by reference the allegations

6   made in the preceding paragraphs of this Complaint as though fully set forth herein.

7          92.     This is a claim for treble damages under the False Claims Act, 31 U.S.C.

8   §§ 3729, *et seq.* as amended.

9          93.     Through the acts described above, Defendants knowingly submitted or

10  caused to be submitted to the United States government false or fraudulent claims for

11  student financial aid. The United States, unaware of the falsity, paid the Defendants for

12  claims that would otherwise not have been allowed.

13         94.     By reason of the Defendants' fraudulent acts, the United States

14  government has been damaged and continues to be damaged in the amount of millions

15  of dollars.

16         *WHEREFORE,* Plaintiffs/Relators Regina Calisesi, Toi, and Jeffri Bolton pray

17  for judgment against Defendants HotChalk, Inc., Concordia University, University of

18  Mary, Edward Fields, James Cheshire and Mark Zinselmeier and that this Court grant

19  them all monetary and equitable relief available under each statute, including but not

20  limited to actual damages, trebled damages, statutory penalties, prejudgment and

21  postjudgment interest and attorneys' fees and costs. In addition, Plaintiffs/Relators

22  request such other and further relief to which they are entitled.

23  . . . . .

24  . . . . .

25  . . . . .

26  . . . . .

27  . . . . .

28  . . . . .

1

**Jury Demand**

2        Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators

3   hereby demand trial by jury.

4   Dated this 6th day of June, 2013.

5                                        Respectfully Submitted,

6                                        **POLSINELLI PC**

7
                                         _/s/ **Carlyle W. Hall, III**_
8                                        Troy B. Froderman
                                         Carlyle W. Hall, III
9                                        One East Washington Street, Suite 1200
                                         Phoenix, Arizona 85004
10                                       (602) 650-2343
                                         tfroderman@polsinelli.com
11                                       chall@polsinelli.com

12
                                         **BREWER & PRITCHARD, P.C.**
13

14                                       _/s/ **J. Mark Brewer**_
                                         J. Mark Brewer, Texas Bar #02965010
15                                       (_Pro Hac Pending_)
                                         A. Blaire Hickman, Texas Bar #24074407
16                                       (_Pro Hac Pending_)
                                         Three Riverway, Suite 1800
17                                       Houston, Texas 77056
                                         (713) 209-2950
18                                       brewer@bplaw.com
19                                       hickman@bplaw.com

20
                                         _Attorneys for Plaintiffs_
21

22

23

24

25

26

27

28