Bonnie E. Spencer
Texas Bar No.: 06366100
Fed Bar No.: 7343
Dawn R. Meade
Texas Bar No.: 13879750
Fed Bar No.: 15180
The Spencer Law Firm
4635 Southwest Freeway, Suite 900
Houston, Texas 77027
Telephone: 713-961-7770
Facsimile: 713-961-5336
bonniespencer@spencer-law.com
dawnmeade@spencer-law.com

Attorneys for Relators, Toi and
Jeffri Bolton

## IN THE U. S. DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Regina Calisesi; Toi and Jeffri Bolton United States of America Ex Rel<br><br>v.<br><br>Hotchalk, Inc.; Concordia University; University of Mary; Edward Fields; James Cheshire and Mark Zinselmeier<br>_____ | CASE NO. 2:13-cv-01150-NVW<br><br><br><br>TOI AND JEFFRI BOLTON'S FIRST AMENDED QIU TAM COMPLAINT |

Relators Toi and Jeffri Bolton, on their own behalf and on behalf of the United States of America, bring this suit pursuant to 31 U.S.C. §3729, et seq., against Defendants HotChalk, Inc. ("HotChalk"), Concordia University ("Concordia"), University of Mary ("U. Mary"), Edward Fields, James Cheshire and Mark Zinselmeier. This suit concerns violations of the False Claims Act ("the Act") as a result of false claims and statements submitted by Defendant Institutions to the United States Department of Education ("DOE") for the purpose of participating in federal programs for financial aid for students at Defendant Institutions' post-secondary internet-based degree programs.

### I. PARTIES

1.      Relator Toi is a resident of Arizona and is a United States citizen. She was

**EXHIBIT A**

1    employed by HotChalk during the periods relevant to this suit.

2    2.    Relator Jeffri Bolton ("Bolton") is a resident of Arizona and is a United
3    States citizen. She was employed by HotChalk during the periods relevant to this suit.

4    3.    Defendant HotChalk is a Delaware corporation with its principal offices
5    at 1999 S. Bascom Avenue, Suite 1020, Campbell, California 95008. It is registered to
6    do business in Arizona. It may be served with summons and process by serving its
7    registered agents The Company Corporation, 2711 Centerville Rd., Suite 400, Wilmington,
8    DE 19808 and ISL Inc., 300 W. Clarendon Avenue, Suite 240, Phoenix, Arizona 85013.

9    4.    Concordia is a non-profit university with a location in Portland, Oregon.
10   Its registered agent is Charles E. Schlimpert, 2811 NE Holman Street, Portland, Oregon
11   97211.

12   5.    U. Mary is a non-profit university with its principle place of business is
13   Bismark, North Dakota. It may be served with summons and process by servings its
14   registered agent Elizabeth S. Condic, 7500 University Drive, Bismarck, North Dakota
15   58504-9634.

16   6.    Defendant Edward Fields ("Fields") resides in California and may be
17   served at 14810 Clara St., Los Gatos, CA 95032-1702.

18   7.    Defendant James Cheshire ("Cheshire") is an individual who resides in
19   Arizona. He may be served at his place of employment, 4129 E. Van Buren, Suite 200,
20   Phoenix, AZ 85008.

21   8.    Defendant Mark Zinselmeier ("Zinselmeier") is an individual who resides
22   in Arizona. He may be served at his place of employment, 4129 E. Van Buren, Suite
23   200, Phoenix, AZ 85008.

24   II. JURISDICTION AND VENUE

25   9.    This suit is brought pursuant to the Federal False Claims Act, 31 U.S.C.
26   §§ 3279, et seq. The case presents a federal question under the Act, and thus original
27   jurisdiction over the matter exists pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. §
28   3732, the latter of which specifically confers original jurisdiction on this Court for

1 actions brought pursuant to 31 U.S.C. § 3730.

2     10.    Further, this Court has in personam jurisdiction over the Defendants

3 pursuant to 31 U.S.C. § 3732(a), which authorizes suit to be filed in any judicial district

4 in which a defendant, or multiple defendants can be found, reside, transact business or

5 wherein any act under 31 U.S.C. § 3729 occurred.  Since Defendants Cheshire and

6 Zinselmeier both live and work in the Arizona District, and because acts complained of

7 herein occurred in this District, jurisdiction is proper.

8     11.    Pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C.§ 3732(a), venue is

9 proper in the United States District Court for the District of Arizona because (1)

10 HotChalk is a corporation with its principal offices located in Phoenix, Arizona; (2)

11 HotChalk maintains and operates an online program within this District; and (3) many

12 of the acts that form the basis of this Complaint occurred in the Arizona District.

13 ### III.  PLEADING SPECIFICS

14     12.    For continuity and flow purposes, Relators will not include paragraphs in

15 each section of this pleading incorporating previous pleadings into the section.

16 However, this pleading is intended to be read in its entirety with all previous paragraphs

17 related to and supporting all subsequent paragraphs so that individual sections are not

18 to be considered individually, but as part of the pleading as a whole.

19     13.    Relators in this case do not provide information based upon public

20 disclosure.  Instead, Toi and Bolton are each an original source and each of them have

21 direct, personal knowledge of the matters alleged herein.

22 ### IV.  *QUI TAM* ACTION AND TITLE IV

23     14.    The United States is no stranger to fraud perpetrated against it by those

24 claiming to do honest business with the government.  Over 150 years ago, Abraham

25 Lincoln signed the False Claims Act into law, mainly as a vehicle to bring U.S. civil war

26 defense contractors to justice for fraud perpetrated against the government during the

27 war.  In the subsequent century, the law was modified.  The last major modification

28 occurred in 1986, when President Reagan and the Congress amended the Act to

strengthen the *qui tam* provision so that the law was more effective in prosecuting parties for procurement fraud and government waste in the 80's. In the 28 years since then, $6 billion has been recovered for the U.S. Treasury as a result of claims made under the Act.[1]

15. The Act prohibits any "person" from "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a)(1). The Act also prohibits a variety of related deceptive practices involving government funds and property. 31 U.S.C. 3729(a)(2)-(7). A "person" who violates the FCA "is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains." 31 U.S.C. 3729(a).

16. The Act further empowers Plaintiffs, referred to as "Relators" in *qui tam* actions, who possess information regarding the false or fraudulent claims to bring an action on behalf of the United States, and to share in any recovery for their efforts. Pursuant to the Act, Relators Toi and Bolton seek to recover on behalf of the United States, damages and civil penalties arising from false and improper claims for payment that Defendants submitted, or caused to be submitted, in connection with student loan applications under Title IV of the Higher Education Act of 1965 ("HEA") from at least August 1, 2009, to the date of filing of this complaint.

17. Chapter 28 of Title IV of the Higher Education Act regards financial assistance to help students pay for higher education. The purpose of Chapter 28 is to provide grants, loans, money to States, assistance institutions of higher education and special programs to make postsecondary education available to qualified students. 20 U.S.C. § 1070 (2009). In obtaining assistance from the Department of Education

---

[1] B. Nathaniel Garrett, Editor-in-Chief, University of Cincinnati Law Review, "150th Anniversary of the False Claims Act," March 4, 2013, University of Cincinnati Law Review Blog.

("DOE"), institutions of higher learning are required to enter into Program Participation Agreements ("PPAs") 20 U.S.C. §1094 (2009).

18.     All PPAs "shall condition the initial and continuing eligibility of an institution to participate in a program upon compliance with the following requirements:"

> "(20) The institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance, except that this paragraph shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal student assistance."

> "(22) The institution will comply with the refund policy established pursuant to section 1091b of this title."

20 U.S.C. § 1094(a)(2009).

19.     An institution that participates in Title IV programs must enter into a written PPA. Participation is conditioned upon initial and continued compliance with the operative statutes, regulations, and any additional conditions specified in the PPA. 34 CFR 668.14(a)(1) (1994). The institution agrees that it will comply with all statutory provisions of, or applicable to Title IV. 34 CFR 668.14(b)(1) (1994).

20.     An eligible institution under Title IV may contract with a "third party servicer" to "administer, through either manual or automated processing, any aspect of the institution's participation in any Title IV HEA program..." 34 CFR 668.2 (1994). In such a third party contract, the third party servicer "...shall agree to comply with all regulatory provisions of or applicable to Title IV of the HEA, all regulatory provisions prescribed under that statutory authority, and all special arrangements, agreements, limitations, suspensions, and terminations entered into under the authority of statutes applicable to Title IV of the HEA..." 34 CFR 668.25(a) and (c)(1) (1994).

21.     Defendant HotChalk is a third party servicer, hired by Defendants Concordia and U. Mary, to administer their Title IV participation. HotChalk acted by and through its officers/managers Defendant Edward Fields ("Fields"), Defendant James

Cheshire ("Cheshire") and Defendant Mark Zinselmeier ("Zinselmeier"). When administering Concordia and U. Mary's Title IV Programs, HotChalk routinely violates the law, as well as institutions' PPAs, by knowingly compensating its enrollment and admissions employees based upon the numbers of students enrolled.

22.    Concordia and U. Mary knew about HotChalk's violations but allowed HotChalk to violate the PPA. Further, Concordia and U. Mary falsely certified that they were obeying, and would obey, Title IV's incentive compensation ban, when they were not and are not in compliance with that ban. They knew their statements to the U.S. were false when they made them. Every year, Concordia and U. Mary knowingly and falsely certified that they were complying with 20 U.S.C. § 1094(a)(20) by promising that they are not, and that they will not, provide any commission, bonus, or other incentive payment based directly or indirectly on securing enrollments to any person engaged in student recruiting or admission activities.

23.    In fact, both institutions routinely and knowingly compensate and award HotChalk based on the numbers of students enrolled. Numerous times every year, the institutions submit and cause students to submit loan applications to the DOE that are false and fraudulent in at least two ways: (a) Concordia and U. Mary knowingly use, and cause students to use, false annual certifications of compliance with the PPAs, which are necessary prerequisites to their eligibility for Title IV funds; and (b) in each and every loan application, Concordia and U. Mary falsely certified that they are in compliance with all statutory and regulatory requirements on which program eligibility and payment are conditioned, misrepresentations that they know to be untrue because of their ongoing knowing and intentional noncompliance with the incentive compensation ban. This noncompliance is carried out by Concordia and previously by U. Mary through and with the active participation and assistance of HotChalk.

24.    Concordia and U. Mary engage in substantial misrepresentations of the nature of their educational programs by deliberately concealing from students and prospective students the very existence of HotChalk, allowing HotChalk to provide a

"turnkey partnership opportunity" - disguised as Concordia or U. Mary- consisting of recruitment, enrollment and admission, financial aid, curriculum and online course instructors. Defendants also engage in substantial misrepresentations concerning offers of scholarships to pay all or part of a course charge by falsely and deceptively offering non-existent "scholarships" or grants to make up for any shortfall between the course charge less available financial aid the student's ability to pay.

## V. Factual Background

25.     Defendant HotChalk is a for-profit operator of an online "university." It also operates a call center, through which it poses as Concordia and U. Mary recruiting and admissions office. Students applying to the institutions never know that they are dealing with a completely different company. Through its Phoenix, Arizona call center, HotChalk has enrolled thousands of post-graduate students in its purported online courses.

26.     Edward Fields ("Fields") founded HotChalk and is its CEO. James Cheshire ("Cheshire") is HotChalk's Assistant Director of Admissions who was promoted to Director of Admissions. Mark Zinselmeier ("Zinselmeier") is HotChalk's Senior Vice President of Operations. Michael Dearring ("Dearring") is HotChalk's Floor Manager and was Toi's immediate supervisor. Dr. Mary Jane Pearson ("Pearson") is HotChalk's Vice President of Curriculum & Academic Affairs. Messrs. Fields, Cheshire, Zinselmeier and Dearring are all located in Phoenix. Pearson's office is located in Campbell, California.

27.     HotChalk is a privately held, for-profit corporation. Its operations include a call center in Phoenix, Arizona, through which it aggressively solicits customers; i.e., students, on behalf of the Defendant Institutions from a "boiler room" sales-floor environment. HotChalk boasts that "Making the seven figure investment to grow your programs online is risky - we eliminate the risk. From marketing and recruitment to staffing the online Enrollment, Student Services and Adjunct Faculty departments, we deliver risk-free results." It further states that, "Our trained Enrollment Specialists will

faithfully represent your school and programs, identify potential students whose academic goals and career aspirations align with your offerings, and deliver fully documented applicants to you, per your specifications."

28.     HotChalk is not an educational institution but is a third-party servicer as defined by 34 C.F.R. § 668.2 and hence, its activities are subject to 34 C.F.R. § 668.25, which governs third party servicers. HotChalk also is not an accredited provider of academic degrees, courses or texts and is not accredited in any way in regard to any activities associated with a post-secondary educational institution except student recruitment. Despite the fact that it is not an education institution but is merely a third-party servicer, HotChalk openly touts that it provides a "unique, turnkey partnership opportunity which removes the barriers to growing your degree programs online." HotChalk indeed provides what it describes as "all Adjunct Faculty" who it claims "participate in weekly professional development calls and receive performance feedback from their students via individual course assessments." These "adjunct faculty" personnel are actually employees of HotChalk's Campbell, California office who operate without oversight from or meaningful accountability by the Defendant Institutions. In essence, when a student enrolls in a U. Mary or Concordia online curriculum, s/he does so unwittingly through HotChalk, and receives his or her "education" from HotChalk - not from U. Mary or Concordia. Defendant Institutions have simply allowed HotChalk to use their name, accreditation status and program participation.

29.     As of May 30, 2013, HotChalk had enrolled 2,405 students into the online M.Ed. it marketed and operated under the Concordia name as Concordia's "turnkey" servicer and its activities using the Concordia name are ongoing. As of April 17, 2013, HotChalk had enrolled several hundred students into the online masters degree in nursing it marketed and operated under the U. of Mary name as that school's "turnkey" servicer. The relationship between U. of Mary and HotChalk terminated on April 17, 2013. Each of the students enrolled by HotChalk in its online iterations of Concordia and U. Mary programs represents a separate violation of the FCA.

30.     Defendants HotChalk, Fields, Cheshire and Zinselmeier were well aware of the incentive compensation ban and spoke openly to HotChalk employees of implementing "ways around" the ban. HotChalk's Vice President of Enrollment, Thomas Corbett, who conducted the pre-employment interview of Calisesi for the position of enrollment specialist, was employed at University of Phoenix when that company was a defendant in a qui tam suit and paid approximately $75 million to settle allegations of its violations of the incentive compensation ban.

31.     Although both Defendant Institutions had existing online programs prior to contracting with HotChalk, each allowed HotChalk to create its own, separate online post-graduate degree programs together with the enrollment and financial aid operations necessary to provide students for those programs. Using its clients' names with the clients' knowledge and consent, HotChalk conducts the full array of operations or functions in regard to post-secondary educational student recruitment, enrollment, financial aid, admissions and/or other activities. HotChalk's enrollment specialists enroll students in HotChalk's online degree programs which HotChalk marketed as "Concordia University" or "University of Mary."

32.     Consistent with HotChalk's "turnkey partnership opportunity," each Defendant Institution allowed HotChalk to set up its own versions of their websites, albeit using different tuition rates in violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73. HotChalk also touts this as one of its "services:" "Our Engineering team will deliver seamless integration with your existing Learning Management System, or assist in the selection and deployment of an industry-standard LMS."

33.     In violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73, with respect to U. Mary, a student who enrolled directly with U. Mary in 2012 paid a fee of $450 per credit hour while a student enrolling in 2012 through http://online.umary.edu/admissions/tuition - the U. Mary website operated by HotChalk - paid $750 per credit hour. In either event, the money was paid to U. Mary which in turn paid a portion of it in the form of incentive compensation to HotChalk. U. Mary paid

1  HotChalk for each student enrolled by HotChalk - a direct violation of the incentive

2  compensation ban by U. Mary.

3      34.    In the case of Concordia, each student's tuition money was paid to

4  Concordia which in turn paid a portion of it in the form of incentive compensation to

5  HotChalk. Concordia paid HotChalk for each student enrolled by HotChalk - a direct

6  violation of the incentive compensation ban by Concordia.

7      35.    In violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73, the

8  Defendant Institutions allow HotChalk to operate from its Phoenix call center to use

9  deceptively named email addresses for HotChalk's enrollment specialists, including

10  Relators, with the domain names of "@education.cu-portland.edu" and

11  "@online.umary.edu." It also deceptively provides its customers (students) with Portland

12  and Bismarck area codes (where the Defendant Institutions are located) to reach the

13  HotChalk enrollment specialists. The enrollment specialists are instructed not to say they

14  are in Phoenix and to lie about their physical location if asked. The enrollment specialists

15  also are instructed never to say they are employed by HotChalk or even to identify

16  HotChalk in any way. Instead, the enrollment specialists are to say they are "with" U.

17  Mary or "with" Concordia. Each enrollment specialists is assigned to peddle degree

18  programs for only one of these two institutions, presumably to avoid any slip-ups.

19      36.    Relators Toi and Bolton were previously employed by Defendant HotChalk

20  as enrollment specialists. Toi was an Enrollment Specialist ("Specialist")for Defendant

21  Concordia, and Bolton was a Specialist for U. Mary. Toi's employment commenced on

22  December 15, 2011 and ended November 5, 2012. Bolton's employment commenced on

23  February 27, 2012 and ended February 4, 2013.  Relator Calisesi was employed by

24  Defendant HotChalk as a Specialist for the defendant institutions from October 25, 2010

25  through February, 2014.  All Relators worked at HotChalk's Phoenix, Arizona call center

26  located at 4129 East Van Buren, Suite 240, Phoenix, Arizona 85008.  As Specialists for

27  HotChalk, Relators witnessed HotChalk's violations firsthand.

28      37.    Specialists, such as Relators, are Defendant Institutions' "recruiters" and

are responsible for recruiting applicants for admission, including securing and managing new inquiries, achieving enrollment and start rate goals, participating in appropriate recruitment and enrollment activities. An enrollment specialist must stay in constant contact with potential students during the entire recruitment and enrollment process.

38. An enrollment specialists' salary increases, number of stock options, and award of other incentives are all based on HotChalk's relentless and exclusive focus on the number of new students an enrollment specialist is able to recruit, and thus, are in direct violation of the Title IV incentive compensation ban.

39. Specialists are instructed to create a false sense of urgency on the part of prospective students. For example, enrollment specialists are required to tell prospective students that if they "sign up" now for "this cohort" they will receive a free iPad and textbooks. The enrollment specialists were further instructed, in printed instructions, not to call the iPad and textbook give-away "free" but to say it is 'included" and not to refer to this as a "promotion" but as a "pilot program." This activity, and that more fully discussed below, directly violates 34 C.F.R. § 668.14(b)(22)(iii)(A) which defines an "incentive payment" as "a sum of money or something of value."

A. TOI AND CONCORDIA

40. When she interviewed at HotChalk, Toi had fifteen years of experience in college admissions, including, but not limited to, working for the University of Phoenix. When she applied for her position as a Specialist at Hotchalk, she interviewed for her job with Cheshire and Candice Childress (White). Cheshire told Toi that he had been an Enrollment Specialist and a manager at the University of Phoenix.

41. Toi requested a $50,000.00 yearly salary at HotChalk. HotChalk could not pay her the salary she requested, but Cheshire told her that, if she "performed at HotChalk as well as you performed for the University of Phoenix, HotChalk will give you a $5,000 salary increase in ninety days." It was HotChalk's standard procedure that Specialists were required to meet an enrollment quota. Throughout Toi's employment the Specialists were given tickets to football games, gift cards, lunches from various

1  local restaurants and other such incentives to meet and exceed their enrollment quota.

2  42.  Cheshire told Toi that compensation was much the same as University of

3  Phoenix, but "better" in that HotChalk had more frequent "reviews for increases" and

4  that the Specialists at Hotchalk were given stock options as well as other "really cool

5  incentives."  These incentives were reiterated when HotChalk called to make the

6  "official offer" of employment to Toi.  Toi accepted the employment offer and did

7  receive her first $5,000 salary increase after she had worked at HotChalk for over five

8  months.  She discovered that other employees had received the same compensation deal

9  she received.

10  1.  TRUE COMPENSATION SCHEME

11  43.  Toi did not receive a salary with reviews based upon her work habits,

12  attendance, etc.  Her salary depended upon the number of people she enrolled, not the

13  number of hours she worked helping people with their enrollment.  Cheshire and

14  Deloatche both explained the means by which compensation was paid to Specialists:

15  First and foremost, compensation depended upon the number of students the Specialist

16  enrolled.  The number of students a Specialist enrolled was not counted week to week.

17  Enrollment numbers were counted over time and making the required number of

18  enrollments entitled Specialists to make more money over time and allow them to keep

19  their jobs.  In fact, HotChalk's management made it clear to all Specialists that they were

20  salespeople who were expected to meet quotas and that each was subject to termination

21  if he/she did not meet the sales quotas.

22  44.  There were different incentives to make the quotas.  Until June, 2012, all

23  Specialists were paid an additional $100 for each student who graduated from the

24  Concordia program.  After that point, Zinselmeier stated that the $100 bonus per

25  graduate paid to Specialists was being discontinued.  Toi signed a document that

26  explained the discontinuation in generalities.  Though she was not given a copy, she was

27  told that the document went into her employee file.

28  45.  Around the same time, in June or July of 2012, HotChalk introduced the

new policy of pay being based upon "core values" or " core competencies." Zinselmeier, who was by then Vice President of Enrollment, told Specialists on the sales floor that, because of a lawsuit against the University of Phoenix, HotChalk could no longer compensate Specialists for enrollments. He said that HotChalk was therefore changing its review process and their reviews would be based purely upon "soft skills." He called these "soft skills" reviews "core competencies" or "core values" reviews. The "core competencies" were: (1) Adaptability/Flexibility; (2) Be Happy, No Drama; (3) Communication; (4) Results Focus and (5) Sense of Urgency.

46. During the new pay scheme roll out, Zinselmeier and other HotChalk management frankly told Specialists that HotChalk specifically formulated this "core competencies" review to "get around the incentive compensation ban." The pay scheme is specifically designed to appear to measure Enrollment Specialists' performance for meeting or exceeding "core competencies" with artificial performance ratings on "soft skills." The "soft skills" language in the new review forms allowed HotChalk, at least on paper, to stay away from reviewing Specialists based on enrollment numbers.

47. In the weeks that followed however, Specialists we were regularly reminded by ALL management, in both individual team huddle meetings and openly on the floor, "Your performance is being judged by numbers...don't lose sight of that reality." It was a constant verbal campaign to remind Employees of the truth that they could not put in writing. Hotchalk was very careful not to put anything in writing. However, Fields and management personnel made no secret of the fact that Specialists would receive good ratings on these "core values" so long as they were meeting their sales quotas. If they did not meet the sales quotas, they would not receive good ratings on "core values."

48. Hotchalk's management was very loose with language that clearly showed their effort to beat the incentive compensation ban laws. It was not unusual to hear them use the word "reward", or the phrase "get around." Zinselmeier or Fields, at all-hands meetings where they were rolling out new policies, would openly say "Our attorneys

have found a way..." To get around the incentive compensation ban. They never had any qualms about referring to the University of Phoenix or EDMC lawsuits directly when making their points. In May, 2012, Zinselmeier said that, when HotChalk rolled out the new review practices,

> "We are having to make some changes to our review process. I know many of you are overdue for your reviews but thanks to the lawsuit won against University of Phoenix our lawyers had to help us put together a new review process so that the language doesn't reflect that we are reviewing based on numbers. But make no mistake about it, this is a sales floor and you are sales people, and nothing about your job has changed. We have numbers to make and if you aren't making those numbers this isn't the place for you. What you are about to see is a change in 'language' but we all know what is really expected."

49.    He was referring to a PowerPoint presentation about to be presented by Dominick, a trainer whom they hired from the University of Phoenix.

50.    After the "soft skill" roll out, during a one on one meeting (when management would review Specialists' phone calls or go over their numbers individually) with Dearring, Toi had a frank conversation about the "smoke and mirrors" of the new review policy. Dearring admitted that the managers had been told "that they were to make sure their team was clear, despite the change in the review criteria made at the urging of their lawyers, that no one had better make the mistake of thinking their pay increase was tied to anything other than enrollment numbers."

51.    The Assistant Director of Admissions would go to each Enrollment Specialist's desk several times a week to go over his or her "pipeline," i.e., the leads on which he or she was working. Each Specialist was asked to give his/her anticipated "high" and "low" number of enrollments for that 5 week cycle. They were reminded in their weekly "team huddle" that they were in sales. They were taught to implemented sales strategies designed to get a prospect to remain on the phone with them, even when the prospect tells them they do not have time to talk. Specialists were expected to reach a certain number of hours of "talk time" and "dials" each day.

52.    If a Specialist did not meet the required enrollment goal, he/she was "put on plan," which meant probation. By being "put on plan," he/she was given the next

five-week cycle to meet the required quotas. If he/she did not meet the quotas, he/she could be terminated, forfeiting some or all of his/her stock option incentives. Being "put on plan" was a disciplinary tool that was implemented for failure to meet the required enrollment quota. If Specialists did achieve their quota, they were given an increase in their salary after their review and got to keep the stock options awarded by the company.

53.     At the close of every five week cycle, the enrollment and management staff held what was referred to as an "all hands meeting." Fields primarily conducted the first half of these meetings by way of video conference. He reviewed extensive numbers in regard to enrollments, profit margin and other goal oriented information. Zinselmeier conducted the second half of the meeting by acknowledging the Specialist with the highest number of enrollments. He would also reiterate the minimum number of enrollments needed from each Specialist in order to attain the projected profit reviewed by the CEO in the first half of the meeting.

54.     For every enrollment, a celebratory email was sent to the entire floor indicating the number enrollment it was for the cycle and the name of the Specialist to whom it belonged. That Specialist was celebrated on the floor by their clicking a mouse connected to a 50" inch television screen displaying the number enrollment and the sounds of ringing bells for all to hear and see. HotChalk managers would "hit the button" whenever a student enrolled. An email was sent to the entire team, including upper level managers, to announce that a student has enrolled, and the Specialist who enrolled the student went to the big screen television with a keyboard and "hits the button" to add to HotChalk's count of enrolled students for that cycle. When the button was pushed, everyone clapped, yelled, whistled, hooted, and hollered.

55.     Every Specialist received a salary, stock options for HotChalk stock and other incentives for meeting enrollment goals for each cohort (five week period). If a Specialist excelled at enrollments, he or she received more stock options, and the number of shares was tied directly to the number of students enrolled.

56.     HotChalk had competitions between teams for the highest number of

enrollments. The winning team received gift cards, an all expenses paid trip to Las Vegas and football tickets. HotChalk often had lunches brought in as well. Fields often sent emails to the Specialists encouraging them to "raise the bar" or "win" by enrolling more students.

57. On September 11, 2012, Fields sent an email to the Specialists in Phoenix rewarding them with Arizona Cardinals tickets for a "record setting Back To School season." On September 13, 2012, he sent an email offering an $80 gift card as an alternative to the Cardinals tickets.

58. All Specialist salary increases and other incentives were based solely upon the number of students he/she could enroll in a five week cycle. The minimum enrollment requirement for each Specialist was 3-5 enrollments per cycle. Although HotChalk was designed to appear to be an online education resource, it was actually a sales driven company where enrollment and profit were the primary goals.

59. Zinselmeier and Cheshire would openly state, "Make no mistake, we are in sales. This is a sales floor. This is what you have to get." They would further say, "Imagine how much money you will make and how 'wealthy' you will become from your HotChalk stock options."

60. On September 4, 2012, HotChalk informed the Enrollment Specialists that their compensation scheme would change yet again. This time, they were transformed into "hourly" wage employees so that they could have the opportunity to earn more money in the form or "overtime" if they met or exceeded their quotas of new enrollments. HotChalk had Specialists sign a document entitled "Pay Structure Change" outlining the new wage policy, which was signed by Wanda DeLoatche at HotChalk. Because of this, overtime became another incentive to encourage Specialists to sell the product. It wasn't real overtime as dictated by the Fair Labor Standards Act, but the right to work future overtime related to how many sales the specialist had in the preceding a five week period.

61. If a Specialist met his enrollment quota, he would be eligible to work up

to ten additional hours per week for the next cycle, for an additional 50 hours of hourly pay. If a Specialist worked overtime and met his quota during that cycle, he was authorized to work overtime the next cycle. That would continue until he did not make his quota. At that point, the right to work overtime was revoked until the Specialist increased his numbers to the minimum enrollment quota. Overtime was designed to reward Specialists who maintained a high number of enrollments by paying them more money.

62. HotChalk management knew that the overtime scheme was a violation of the incentive compensation ban because Cheshire and Zinselmeier, as well as Dearing and Ken Cook openly told Specialists that the overtime program was being implemented to "get around" the incentive compensation ban. Whether a Specialist was entitled to overtime pay was determined by HotChalk solely on the basis of whether the Specialist met or exceeded the enrollment quota. Further, "overtime pay" was not time and a half, as mandated by the Fair Labor Standards act. It was up to 10 additional hours of straight time.

63. Specialists were switched from salary to hourly so that HotChalk could more directly reward them for the number of enrollments by putting more money directly into their pockets. The overtime was limited to ten hours per week. HotChalk hired a new senior VP of finance, John Lambert, who wanted to control the money being spent on labor. Overtime was set up to kick in after forty hours.

64. Congress, the DOE and the Defendant Institutions' PPAs ban incentive payments except the "payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid."

65. Selectively granted overtime violates this ban in three ways: First, it is not a "fixed hourly wage" but is instead a variable hourly wage of one and a half times the "normal" hourly rate of the Specialist. Second, it was an adjustment that occurred "more

than twice during any twelve month period" because it was granted or denied at the end of each five week enrollment cycle based on the number of students enrolled that cycle. Third, whether a Specialist is allowed to work overtime at one and a half times his "normal" hourly rate is determined solely on the number of students enrolled by each particular Specialist, including the Relators, and on no other basis.

## 2. THE PRODUCT SOLD

66. HotChalk sold the M.Ed. Programs offered by Concordia University. At the 2012 Christmas party, Fields said that, "Other Universities are beating our doors down to do for them what we have done for Concordia University." He said that the upcoming year would be an exciting one of growth and that those Specialists "on the ground floor" would be the greatest beneficiaries of HotChalk's growth.

67. HotChalk would train a Specialist class of around seven people. Dr. Pearson would give a presentation and explained that she creates the curriculum for the M.Ed. Programs, and determines what programs are offered. So, HotChalk was not really selling Concordia University programs, but programs created by HotChalk and using Concordia's name. HotChalk was essentially functioning as a University, under the banner of a longstanding University's name. HotChalk's sales force operated almost completely free of any hands on involvement from Concordia University. Even so, there was still a connection between them because, now and again, HotChalk would receive a rare visit from a Concordia campus employee. Specialists were told in advance of the person's coming, and the Concordia representative's appearance on the sales floor was minimal.

68. Scott Besemen, from Concordia University's campus admissions department, would come in and Y-connect with a representative once in a while. Toi is specifically aware of one visit to HotChalk by Concordia's campus President, with some executive board members. It was in the earlier part of 2012, and Cheshire asked the Specialists to "dress-up for the dog and pony show." They were pulled off the phones, brought to an area of the call center floor and presented to a group of well suited men.

Fields conducted the introductions and opening welcomes to them. The Concordia representatives spoke about what a "fabulous job" HotChalk was doing for Concordia. There were some joking references to "the new football field or athletic building" Concordia had built as a result of the profits made from HotChalk. They also joked that the new facilities should be named after Edward Fields.

69.     The Concordia personnel spoke about the greatly increased student enrollment numbers and attributed that directly to doing business with HotChalk. One of them made a joking reference to the other Concordia Universities, and how jealous they were that Portland had seized this opportunity with HotChalk and now had a very successful and profitable online M.Ed. program. They eluded to other programs that HotChalk would be rolling out on Concordia's behalf and talked up the prosperous financial and record breaking future Concordia expected to have with HotChalk.

70.     They commended the Specialists for the fabulous job they were doing. Edward Fields then said, "This is what it's all about...give yourselves a hand because without your hard work in the trenches, none of this would be possible." There was no discussion about the quality of education being offered, or pride in any caliber of the programs. It was all about "numbers and the profits." After the presentation, the Concordia representatives took a quick walk through and were quickly whisked away. They asked no questions about enrollment strategies and criteria.

71.     HotChalk created an entire school under the name of Concordia, a real University. HotChalk created the curriculum and hired the teachers. The teachers were either HotChalk employees, or contractors, and were not associated with Concordia University. The teachers were not answerable to Concordia University. Further, HotChalk seemed to entirely control its own enrollment activities for Concordia and U. Mary.

72.     While HotChalk provided all aspects of the online programs under the name of Concordia University, Portland, Oregon, the programs offered were asynchronous and taught in a "cohort" model entirely online. The programs offered were

"accelerated" because the curriculum was designed to be completed in one year.  The classes themselves were taught one at a time, every six weeks.  In 2012, HotChalk, through Concordia University, began to offer Bachelor of Science online degree completion programs in Early Childhood Education and another in Career & Technical Education.  It was a fitful start to the offering of these two programs because they were 'degree completion' programs and a student had to have completed many prerequisite classes before they could be admitted.   Importantly, review of the prospective or enrolled student's transcripts for consideration of acceptance, was done completely by Hotchalk employees, and not at all by Concordia.

73.    There were enrollment standards, G.P.A.'s, etc. that  that students had to meet to qualify for the programs.  However, HotChalk quickly evolved into a different way of doing business. Prospective students who applied after speaking with an Enrollment Specialist were screened via a writing sample that HotChalk referred to as a "letter of intent." This letter was used as a writing sample which prospective students were supposed to use to express their passion for being a teacher, their desire for becoming more effective, their reasons for wishing to be selected by Concordia, as well as why they had chosen Concordia.  Throughout 2012, the enrollment criteria changed drastically.

74.    Although Concordia University and University of Mary published academic requirements for incoming students, through HotChalk, nearly every potential student who completed an application and submitted a "Letter of Intent" essay was admitted. HotChalk had a history of double talk when it came to the admissions processes and the criteria basis for which a student had actually been admitted.  No student was rejected unless they were in Financial Aid default or had reached their aggregate financial aid limit.

75.    Specialists were instructed to tell the students that Concordia "selected" its students, even turned away students, if their Letters of Intent were sub par or if the student didn't meet the minimum GPA of 2.75. This statement was false.  Prospective

students were told that they could petition to be considered for admission if they could explain in their Letter of Intent why they had a low GPA. The "explanation" for a low GPA could be as simple as a statement tagged at the end of the Letter of Intent that said something like, "I was young and partied a lot," "It was my first time away from home," or "I was working full time while getting my Bachelors." If the statement was enough to provide an explanation for the low GPA, it was never questioned beyond that point. It was a common standard sales floor joke that "If they are breathing and can get through financial aid okay, they are going to be admitted."

76. The Letter of Intent requirement was a joke. Even a single paragraph drafted with the writing skills of an eighth grader would suffice and hardly any students were denied enrollment based on their essay's content or quality or lack thereof. The letters of intent were sent to Michael Dearring first for approval. No matter how poorly written, Michael always said, "I have had worse than that, put it through." The students were never rejected.

77. Every once in a while, Specialists would get an email from Dr. Pearson, asking if the students were made aware that the Concordia program didn't lead to licensure or certification. That was a sticking point with Dr. Pearson and the only area about which anyone at HotChalk ever showed any concern. The lack of licensure was boldly included on the admissions application. Dr. Pearson also wanted recognition of the fact noted on the prospective student's Letter Of Intent, as well as whether the student was already a licensed or a certified teacher.

78. Specialists were required to tell prospective students in the Bachelor's and Master's programs that the graduation rate was approximately 90%. Specialists had no way of verifying this information, but were expected to use it in their "interviews" with prospective students because it led them to believe that Concordia was dedicated to the students' success and graduation from the program. With regard to the Bachelor's degree candidates, stating that Concordia had a 90% graduation rate was an outright lie because Concordia had not yet had a graduating class for the online Bachelor's program.

79.     At the same time, HotChalk took great pains to conceal from the students the fact that HotChalk existed.  Every aspect of a Specialist's presentation to prospective students was designed to lead them to believe that the HotChalk Specialists were Concordia University employees.  HotChalk wanted to ensure that prospective students had no knowledge of HotChalk's existence.  Specialists could not disclose that they were located in Phoenix, Arizona.  Specialists were expected to lead students and prospective students to believe that they were located at Concordia's Porland, Oregon Campus.

80.     HotChalk's Concordia phone number area code was a Portland, Oregon area code.  Specialists were strictly prohibited from even implying that they were not located in Portland or that they were employees of another company.  They were required to answer the phone, "Thank you for calling Concordia University."  The area code that appeared in the caller I.D. was Portland area code "503."  This was all to give the appearance that Specialists were calling from Portland, Oregon.  Specialists' email addresses were designed to appear to be Concordia email addresses.  Toi's email address was toi@education.cu-portland.edu.  By contrast, the HotChalk office manager's email address was deb.menke@hotchalk.com.  On occasion Specialists were instructed to actually tell prospective students that they were in Portland.  In fact, graduating students who planned to travel to Portland for commencement would asked Specialists whether they would be at the graduation ceremony.

81.     Cheshire and Fields stated that HotChalk's business model was to represent only non-profit, Christian schools. The general practices and approaches of traditional, non-profit, regionally accredited college admissions is quite different than that of a for profit education sales force. This why Fields and Zinselmeier specifically seek to do business only with these faith-based, non-profit institutions.

82.     In fact, a huge part of HotChalk's selling point was that Concordia University (HotChalk) was a "Christian, private, non-profit university."  Specialists were instructed to point this out in every presentation to a potential student. They were provided what was known as a 'rubric' that was a script guideline. Though the rubric was

changed frequently by the compliance director Susan, there were things specifically highlighted that Specialists were always required to say. Among those things was that Concordia was a faith-based or Christian, private, non-profit college. All the while, HotChalk management placed high emphasis on profits, going public one day and the HotChalk "family" retiring rich.

83. Michael Dearring, along with Cheshire, often reminded Specialists of their stock options and their need to generate the profit margins that Fields needed for the board and investors. Every six weeks HotChalk had an "all hands" meeting. Fields told them during the "all hands" meetings that he would only work with these Christian non-profit, regionally accredited colleges and that they were lined up for our services. HotChalk management instructed Specialists to tell prospective students, that "we" do not answer to stockholders. They were told that this was to give the impression that Concordia's first commitment is to the student, not to profits. However, according to Fields, Zinselmeier and other HotChalk managers, HotChalk had investors who invested capital with HotChalk. Specialists in the sales force were expected to meet minimum enrollment numbers to meet the expectations of these investors so that HotChalk could continue to receive capital from them. Specialists were also told that by meeting the enrollment quotas, their own stock would be worth more and HotChalk could go public.

3. BOILER ROOM

84. HotChalk is a hardcore sales, numbers driven environment that is clearly high-pressure and would no doubt be described as a boiler-room, pressure cooker and a sweatshop sales floor call center. Specialists are under continual pressure to make the numbers by any means necessary. A Specialist would be hyper scrutinized, right down to how many times he went to the restroom that day, or how long it took him to get coffee. Cheshire, who was promoted to the center's Director of Admissions, notoriously sweated Specialists who were not having good sales cycles to the point of exercising an abusive management style.

85. A mandatory criteria of Specialists' conversations with potential students

was to "create urgency" for the upcoming start date. Every day, five times a day Specialists received a "talk time" report that monitored how much time each Specialist was actively speaking to someone. The more talk time accrued, the more likely the Specialist would be permitted to work overtime. Every day, five times a day, HotChalk sent a report showing how many outgoing calls were placed by each Specialist. Daily, HotChalk issued a report on how many enrollments each Specialist had for the upcoming cycle.

86. HotChalk's aggressive sales tactics increased with the implementation of the automatic dialing system. With this automatic dialing system, management increased the number of times Specialists called prospective students in an attempt to reach them. The excessive number of attempts were excessive, harassing, and predatory. HotChalk's Specialists created such an unfavorable impression that interested candidates stated they were "turned off" by the excessive phone calls and did not or no longer wished to learn about the program or receive information. Although this feedback was shared with management, management refused to reduce the number of times prospective students were called. Specialists often received requests from prospects to have their number placed on the "Do Not Call" list or to have their phone number or email address removed from the database. This request was not always honored.

4. SCHOLARSHIPS

87. HotChalk had approximately ten "start dates" for each of the five-week "cycles" for courses that it offered throughout the year in which students could begin their degree under the Concordia University or University of Mary name. A cycle was called a cohort. Although HotChalk had the schedule for the entire year, Specialists were instructed to only mention the very next start date and if pressed, the start date after that. They were instructed that in no case were they to disclose more than the next two start dates. This policy was to create what HotChalk's sales managers repeatedly referred to a sense of "urgency" and to discourage prospects from putting off enrollment. If a Specialist was asked about the dates of the cohorts beyond that, he

would acknowledge that "there will indeed be other dates in which to enroll," but would indicate that he did not know the exact dates. The purpose of this was to get a prospective student to start right away so HotChalk could meet its sales goals.

88. When necessary to close a sale, Specialists were required to offer "scholarships" which were not scholarships but were actually discounts off of HotChalk's established "tuition" rates which Specialists were required to use when enrolling students in its online program. These prices misrepresented the tuition charges because Specialists were instructed by HotChalk management to tell some prospects "that our tuition is 'flexible' for certain prospective students" or Specialists were to specify a certain amount of a scholarship for others. These scholarships ranged in amounts from $500 to $4,000. Specialists were instructed to present these to prospective students to entice them to enroll in the current cycle without delay. HotChalk's stated tuition pricing was a misrepresentation of the actual cost that HotChalk would accept as payment for tuition. This is a misrepresentation concerning the nature of the Defendant Institution's financial charges in violation of 20 USC§ 1094(c)(3)(A) and 34 CFR § 668.73.

89. In early 2012, Cheshire announced, with tremendous enthusiasm, that "We would be continuing the practice of the offering of 'scholarships'." The "scholarships" were originally offered sporadically as a test for boosting enrollment and were terrific sales tools disguised as a tuition reduction. Specialists represented that the Assistant Director of Admissions had to approve the scholarship, which was sometimes upward of $4,000.00. This so called scholarship could go from $1000.00 to $4,000.00 within a matter of minutes if the student demonstrated any hesitancy to enroll. Basically, the $20,600.00 tuition could become $16,000.00 to secure the enrollment.

90. Specialists were trained to present this "scholarship opportunity" anytime a prospective student seemed reluctant to immediately enroll in the next starting cohort, or if they indicated interest in another school, or if they were stalling or delaying

getting all of the 'collateral' needed to complete the enrollment process. The scholarship was used as an incentive to create urgency. The Specialist would put the prospective student on the phone with the Asst. Director Of Admissions, who would ask them several questions (the answers to which were already known), and then say "if I can give you a scholarship, can you get everything we need in the next 48 hours?" It was not unusual for the manager to end the conversation by reminding the student that there was barely any scholarship money left and that if they didn't get everything in timely, the money would have to go to someone else. This practice was referred to at HotChalk as "second voice." They would tell the student that this was a part of Concordia's selection process and that they were available as a second point of contact for the prospective student. They also offered the fake scholarship at this time.

91.     Michael Dearring told the Specialists that the "scholarship" came out of Hotchalk's profits, not Concordia's tuition, and thus giving ultimately affected "our," his and the sales staffs', profit line in the bigger picture, which is why he started lower in the amount that he offered. Cheshire and Dearring were notorious for telling the prospective that if they didn't enroll immediately in the upcoming cohort, there were only a couple of seats left and they probably wouldn't get in. I have heard Dearring say, "The only reason this scholarship money is available to you is that we had a student not get accepted and so this money is now available, and that is why it is imperative to get your application, financial aid and collateral in ASAP." They would then turn the call back over to the Enrollment Specialist to close the deal.

92.     If a prospective student was willing to enroll and didn't balk in anyway, no scholarship money was offered to that individual. This was reserved for a prod to move a prospective student forward quicker. If a Specialist had a student that he felt really needed help, like a single struggling mother or someone like that, Cheshire and Dearring simply said, "That is not what scholarship money is for." This was a huge part of the Hotchalk sales culture.

93.     One specific instance of using a scholarship as leverage occurred in the

late spring, 2012. HotChalk was scheduling for the summer cohort and a prospective student stated that she had a schedule vacation pre-planned for two weeks with her family. She wanted to start in the cycle after because she knew she wouldn't be focused on school. The student already sent in her Letter of Intent and a couple of other required enrollment items, called collateral. She had also completed the FAFSA and input Concordia's school code. When Michael Dearring made his weekly rounds to sit with each person on his team to check on the status of the prospective students, Toi conveyed the prospect's issues. Dearring told Toi to tell the student that, if she didn't start the next cycle, she would not only lose the $2,500.00 scholarship he had offered her, but that it could affect her financial aid as well. He also said to tell her that, because Concordia's teachers liked to start in the summer, there may not be a cohort that she could start until after the fall. None of this was true. When Toi protested that it wasn't true, Dearring said "We can't afford to lose any of the people I have on the books, and she won't know better if you don't tell her."

94. Sometimes, other bogus strategies were implemented for the scholarship offering, like completing an essay to be written for a competition. The essay competition was pointless because it was not run as a valid essay competition. The deadline dates were never really the deadline dates and the how, when and by whom the essays would be reviewed were never clear. Specialists were allowed to continue to collect the essays when the winners had already been chosen. Sometimes the winners were selected and no one on the sales floor knew that this was the case and management simply allowed them to keep collecting essays.

95. Supervisors authorized Specialists to give scholarships when they were ending an enrollment cycle and were not tracking to hit their goal numbers. The scholarships were supposedly designed for specific teachers, such as teachers who work in a Title I school. However, HotChalk awarded the scholarships without verifying whether the students met any specified criteria. In reality, the scholarships were merely a discount off the tuition price that HotChalk set in the first place.

96.     HotChalk awards the "Study Buddy Scholarship" to a student when he refers someone who also enrolls and begins in the same cohort.  Each referring students was given a $2,000 "scholarship." Again, this was not a scholarship, but merely another gimmick to get students to refer prospects.

97.     The online M.Ed. Program did not lead to a student's licensure or certification and that information was not initially disclosed to the students.  HotChalk had issues with teachers being enrolled, believing that they were going to be licensed or certified after completion of Concordia's (HotChalk's) M.Ed. Programs when that simply was not the case. This wasn't a problem if a teacher worked for a private school, such as a private Catholic school, where licensure was not a requirement. Given the student's sizable investment in the M.Ed program in both cost and time, it should have been disclosed to them prior to enrolling because they could end up with an education that limited them solely to private schools for employment.

98.     Specialists were always happy to get private school educators because that particular issue would not come up or they could gloss over the fact that the degree did not lead to licensure.  On one occasion, Specialist Derrick Doss attempted on several calls, to finesse the fact that the program didn't lead to certification, implying to the prospective student that he could work on that aspect after finishing the program.

B.     BOLTON AND U. MARY

99.     Jeffri Bolton worked for The University of Phoenix as an Enrollment Specialist for its Healthcare Program.  HotChalk was negotiating a contract with the University of Mary, located in Bismarck, North Dakota, to operate an online healthcare degree program through that school.

100.     At the University of Phoenix, Jeffri Bolton was the number one recruiter, out of 250 recruiters, in converting prospective, inquiring students into enrolled students. She submitted her stats and resume to HotChalk and participated in an online interview via Skype with Zinselmeier.  Zinselmeier specifically questioned her about her stat report from the University of Phoenix, whether she felt like she would be able

to deliver the same enrollment results, her ability to meet HotChalk's enrollment expectations consistently and whether she could work in "high pressure sales environment." This was important to HotChalk because she would be their first, and for a time only, designated healthcare curriculum Specialist.

## 1. COMPENSATION

101. Zinselmeier explained to Jeffri Bolton that HotChalk's pay scheme for U.Mary was the same as that for Concordia: Each Specialist was expected to meet a minimum of 3-5 enrollments every 5 week cycle and would be tracked by his immediate supervisor. At the close of the first 6 months, the number of enrollments would be tallied and the Specialist's salary increase would be determined based on that number. The Specialist's review would be conducted by his immediate supervisor and the director of admissions. The maximum increase in salary was roughly $5000 per 6 months, assuming the Specialist consistently enrolled 3-5 students over that time span.

102. On two separate occasions, both Cheshire and Zinselmeier specified that any salary increase would be predicated upon Bolton's enrollment numbers each five week cycle. Zinselmeier said, "With this level of performance and enrollment activity, you will be well on your way to receiving the maximum increase on your six-month review." Bolton's experience in healthcare and nursing program recruitment at the University of Phoenix made her HotChalk's "designated hitter" for the startup of the University of Mary program. HotChalk literally had no one else who had healthcare or nursing degree experience.

103. HotChalk started Bolton out at a salary of $50,000.00 a year. After hiring Bolton, HotChalk developed a program, similar to its Concordia program, with University of Mary. The program, like the Conrdia Program, was designed to generate a profit for University of Mary, as well as for HotChalk. The same enrollment strategies were implemented with University of Mary that were implemented with Concordia University, so that Specialists received incentives in the form of bonuses, prizes, trips and other rewards, based on the number of students they enrolled.

104.    Bolton enroll nursing candidates for University of Mary's online bachelor and masters nursing programs.  For months, she was the only Specialist for the University of Mary.  Cheshire, told her that HotChalk was banking on my nursing admissions background and experience to get the ball rolling with the new program and to get students enrolled.  Bolton was included in all developmental meetings with management staff from both HotChalk and University of Mary. Present at the meetings were Bolton, Cheshire, Joanne Lassiter (HotChalk's U. Mary RN liaison) and Rachel (another HotChalk U. Mary liaison). Fields, included himself in these meeting on random occasions but he primarily visited the Phoenix office in person for meetings with Joanne Lassiter and Rachel.

## 2.    U. MARY - HOTCHALK UNIVERSITY

105.    From February, 2012 through April, 2012, Bolton was asked to, and did, develop the U. Mary administrative documents for potential students, including transcript request forms, online inquiry admission forms, internal student tracking software and other documents required to enroll students.  She assisted with reviewing ongoing developments such as the HotChalk online U. Mary website, U. Mary enrollment rubric, U. Mary funding guide, and U. Mary Specialist training materials. By April, while these things were in development, Hotchalk opted to have me initiate enrolling students without any of the aforementioned being actually completed.

106.    During the first month of enrolling for University of Mary, Bolton asked Cheshire if she would be compensated for her efforts in generating potential students, since HotChalk had not yet given her any nursing leads to contact for enrollment. Cheshire responded, "Rest assured, I'll have you on the phones in no time. If you show me you can hit the ground running and give me at least 30 students, I'll be sure to return the favor on your six month review."  By April, 2012, Bolton was on the phone speaking to MSN (Master of Science in Nursing) candidates, and BSN (Bachelor of Science in Nursing) candidates.

107.    However, at that time, HotChalk had no processes in place to evaluate

student transcripts and no waiver or permissible forms.  In fact, Bolton was enrolling candidates into a program that did not technically exist.  There was no established curriculum, no teachers, no other faculty nor were there other implementations for the program.  It was actually a full five months later before the program actually came into existence. When Bolton expressed concerns to Cheshire, he responded, "Just do your part and get the students in the door. We'll cross that bridge when we get to it. I'm banking on you for a big class start. You pull in the numbers and we'll do the rest. Don't worry, I'll be sure to treat you right when its review time. Just hold on to them as long as you can."

108.    HotChalk was operating as an online nursing school, with the consent of U. Mary, for the purpose of generating profit for both HotChalk and U. Mary. HotChalk was responsible for hiring the online nursing faculty, the online marketing, determining and implementing all "scholarship" programs, enrollment of students and hiring sales enrollment staff.   The course instructors were actually HotChalk employees, not U. Mary faculty.  Students who previously had contact with U. Mary directly, were transferred to HotChalk as it "took over" responsibility for U. Mary's online division.

### 3.    THE PRODUCT

109.    It was an absolute rule that students were not allowed to know that they were actually dealing with a company called HotChalk, not U. Mary.  Not only did they hide HotChalk's involvement, they actively lied about it when asked on the rare occasion that a student would see admissions documents that accidently listed HotChalk as their online school of attendance.  Not only was Bolton not allowed to tell students that they were enrolled in HotChalk classes instead of U. Mary classes, she was prohibited from telling students that she was anyone other than U. Mary representative.

110.    HotChalk went to extreme measures to prevent potential students from discovering the true identity of HotChalk.  Specialists were not allowed to disclose the

true location of HotChalk. Though HotChalk was physically located in Phoenix, Arizona, Specialists were given phone numbers with area codes local to the Bismarck, North Dakota, where the U. Mary campus was located, to give the impression that they were on the Bismarck campus. Specialists answered the phone identifying themselves as U. Mary representatives. If asked, Specialists were required to outright lie to the students and tell them that they were located in Bismark.

111. Hotchalk designed, built and operated the online U. Mary website. A significant number of leads with potential student inquiries were generated by the U. Mary website. As HotChalk technical specialist, Eric Chiat, explained to Bolton, when a potential student accessed HotChalk's online website, spyware installed by Hotchalk captured their information regardless of whether they had taken the initiative to fill out an inquiry form. This explained the countless times Bolton would speak with someone who was frustrated because they never requested her call or any information about the nursing program.

112. HotChalk offered four different masters nursing programs. The tuition for those programs ranged from $32,000.00 to $60,000.00 through program completion. This tuition was most often covered by student loans saddling the student with an enormous amount of debt. A student who enrolled directly with University of Mary online typically paid a fee of $450 per credit hour. A student who enrolled through HotChalk for the same University of Mary program paid $750 per credit hour. When Bolton asked James Cheshire about the difference in the cost per credit hour, he responded, "How do you think we're going to pay for your trip to Vegas?"

113. University of Mary had academic requirements for incoming students. Nevertheless, HotChalk accepted all potential students, even if they didn't meet the GPA requirements, so long as they completed an application and submitted an essay, just like the essay required for Concordia. It was extremely rare for any student to be denied enrollment based on the essay's content or lack of quality. HotChalk employees determine the sufficiency of the "letter of intent" with University of Mary.

114. Initially, Hotchalk did not accept all nursing students. However it did greatly change the minimum requirement for the program and planned to move in the direction of accepting all nursing candidates. The minimum GPA was changed from a 2.7 to 2.5. Initially all prerequisites were required upon entering the program, this changed to offering the prerequisite courses to be taken with the program. In August, 2012, Bolton discussed multiple times with fellow U.Mary Specialists Harlan Stone and Kit McGhee, the initial difficulty of finding students who had all prerequisites. James Cheshire chimed in on their conversation saying,

> "It started out this way with Concordia. Once University of Mary sees how much money we bring in for them, they'll make some major adjustments to their academic criteria just like Concordia did. We're going to send Julie [Smith] to the Bismark campus and get some of this straightened out. They won't be so hard headed for long".

115. After Julie Smith returned from her trip, there was no longer a need for the letter of intent with the admissions process, the GPA requirement for the program was lowered, missing prerequisites were going to be built into the students program, a resume from the candidate was no longer needed and HotChalk was allowed to enroll diploma nursing graduates rather than solely degree holding nurses. All of these changes were negotiated and approved by U.Mary.

116. As long as the student met the lowered GPA, none of the other miscellaneous documents mattered. Regardless of the sufficiency of reference letters, applications and other hoops candidates jumped through, they were admitted. Once admitted, the student would almost always obtain students loans to pay tuition, particularly for the graduate nursing program because there was a lot of loan money available to graduate students.

117. HotChalk supervisors Carl Blunt (manager of U.Mary as of October, 2012) and James Cheshire wanted it to appear that the applicant's low GPA was an issue for "special consideration." In fact, all they did was artificially slow that applicant's enrollment process to make it appear that they were making special efforts on behalf of the applicant. In the end, the applicant would always be admitted to

U.Mary despite being under-qualified because all admissions decisions were in fact made by HotChalk. Once admitted, the student would almost always obtain a student loan to pay the tuition.

118. After qualifying a potential student, Specialists would direct the student to the governmental FAFSA site to apply for financial aid. There was even a link to the FAFSA site that was included in the signature block of emails to the students, so that all they would have to do was click on the link and that would take them directly to the FAFSA site to complete the application. There was someone at the HotChalk financial aid department who interfaced with them if they needed help with their student loan and financing in general. The head of that department was Silvino Tibi.

119. Once a student's financial aid forms were complete, a financial aid officer calculated the student's financial aid plan based on a DOE formula and informed the student of the plan. The student could accept or reject the financial aid plan. If a student rejected a financial aid plan, often because the student did not qualify for enough financial aid to cover the entire amount of tuition, it was the Specialist's job to convince the student to accept the financial aid package and enroll by misleadingly offering "scholarships" to help them finance the classes. The "scholarships" were exactly like those described above for Concordia.

120. Like Concordia, urgency was a very big and ongoing theme when enrolling U.Mary students. Specialists were placed under constant pressure to enroll a student now as opposed to later, for the earliest upcoming course cycle. Specialists enrolling U.Mary students used exactly the same tactics to pressure prospective students as those explained above for Concordia. The scholarships were used to lure and "hold on" to prospective students. A part of that "holding on" process involved offering incentives for potential students ranging from iPads to books to the "scholarships."

121. A lot of Enrollment Specialists for U.Mary had absolutely no background in nursing. Yet they were still doing transcript evaluations for the students that had

credits they wanted to transfer in and they were coming back wrong. The students were paying for and scheduled to take classes that they had already taken through another university. No one from U.Mary was doing an official evaluation of the nursing transcript to evaluate credit transfers.

### 4. THE COMPENSATION

122. Specialists for U.Mary were specifically hired to enroll students in the online program and retain those students. Nothing related to the student's education beyond that was the Specialist's concern. A Specialist's salary increase was based on the number of enrollments they were able to obtain in a six month period. The minimum enrollment expectation for each Enrollment Specialist is 3-5 enrollments per cycle. Despite the sales-floor atmosphere, Specialist were required to explain to prospective students that theirs was a non-profit institution. All Specialists were provided with a "rubric", which was initially a script and later a guideline for conversations with potential students. The first mandatory criteria of conversations was to "create urgency" for the upcoming start date. Every day, five times a day, each Specialist received a "talk time" report that monitored how much time each enrollment rep was actively speaking to someone. The more talk time a Specialist accrued, the more likely he was to enroll a student. The more students he enrolled, the more likely he was to qualify for "overtime," which was one incentive HotChalk used to encourage sales.

123. HotChalk's standard procedure required Specialists to meet an enrollment quota. Specialists who met or exceeded their quota were given tickets to baseball games, gift cards, lunches from various local restaurants and other such incentives. Specialists even won an all-expense paid Las Vegas trip. CEO Edward Fields rewarded the qualifying Specialists with a trip to Las Vegas for a couple of days. The trip was reserved for those who had contributed to what was described as a "milestone profit" for the company.

124. In 2012, Zinselmeier explained that, "we have found a way to work

around the compensation ban" and instituted the "core values" review explained above. All U.Mary Specialists were all required sign an acknowledgment of this change in their valuations and were told that the document would go into their personnel files. Zinselmeier made it clear to the Specialists that this was just for what he called "CYA" purposes. Our managers openly stated so long as the minimum number of student enrollments is achieved, the "core values" do not matter and that they are nothing more than an effort to disguise the fact that performance and compensation are measured exclusively by reference to student enrollment. Thus, all Enrollment Specialist had to do to meet the minimum core competencies, and receive the minimum core values rating is simply meets their quota of new enrollments.

125.    When she received her first review, Bolton realized that the reviews were not meaningful.  If she met her sales quota, she would receive a good review on the "core competencies" and continue to receive salary increases and bonus incentives.  If she failed to achieve her quota of five new enrollments per month, she would receive a negative review on "core competencies."

126.    Once Specialists were switched from salary to hourly, overtime became another incentive to encourage them to sell the product.   The purpose of the overtime was purely to drive the numbers.  Sometime around August or September, 2012, James Cheshire told the U.Mary Specialists that unlike HotChalk's Concordia Specialists, who were limited to ten hours overtime based on their enrollment numbers, U.Mary Specialists would be allowed unlimited overtime because they so badly needed a big start and to enroll as many students as possible. U.Mary Specialists' ability to work overtime only lasted from August to November.  Overtime was discontinued in November because Hotchalk was unprepared for the overwhelming numner of students.  There were not enough teachers, there was scheduling confusion and in general a disorganized mess with which HotChalk had to deal.

        4.    "BE HAPPY, NO DRAMA"

127.    To Zinselmeier, "Be Happy, No Drama" means, no matter what

HotChalk instructs a Specialist to do, no matter how HotChalk treats the Specialist and no matter what unreasonable expectations HotChalk places on the specialist, the Specialist is to do nothing. Specialists can't ask questions, seek clarity and certainly never suggest that HotChalk crosses any lines or that HotChalk should do anything differently. HotChalk told its Specialists, "Be happy you have a job and be happy for the efforts to bend the rules for your benefit."

128. Bolton had many conversations with Dearring about the "No Drama, Be Happy" culture. He interpreted her questioning the HotChalk policies, procedures and what she considered to be the manipulation of prospective students, as a direct challenge to the HotChalk culture. He expressed that her ideas conflicted with HotChalk's way of doing things. Dearring and Cheshire told Bolton on several occasions that she wasn't being happy and that her questions, or her refusal to "support the culture" was "creating drama."

129. Ultimately, HotChalk terminated Bolton's employment for being "disruptive" in the work environment. She was "disruptive" because she asked questions in open meetings and team huddles, seeking clarification of instructions on policies and directions that seemed improper.

C. DAMAGE TO THE GOVERNMENT

130. HotChalk's boiler room culture and incentive compensation results in the admission of students to expensive programs when the student's ability to complete the program is dubious at best. Knowing this, HotChalk encourages and actively assists these students in obtaining student loans that are federally insured. A significant number of the students who enroll can't complete the course work and drop out. More still default on their student loans, requiring the federal government to pay the balance owed. This outcome is precisely one of the reasons why incentive based compensation for enrolling students is banned.

131. Title IV of the HEA requires that, to be eligible to participate in and receive payment from its loan and grant programs, educational institutions must agree

and promise not to provide any commission, bonus or other incentive payment to their student recruiters based directly or indirectly upon success in securing enrollments. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22). The Defendant Institutions entered into such agreements (Program Participation Agreement or "PPA") and made such promises, and submitted and caused to be submitted to the DOE thousands of loan and grant applications.

132. Regardless of a signed Program Participation Agreement, HotChalk and the Defendant Institutions are deemed to have agreed to comply with the incentive compensation ban. Defendant Institutions' agreements and promises, and each and every one of their applications, were and are false and fraudulent because, Defendants tied their enrollment specialists' compensation directly to the number of students they enrolled. Over a period of years, in reliance upon the Defendant Institutions' false and fraudulent agreements and promises, the DOE paid out millions of dollars in student grants, payments of loan interest, and repayment of defaulted guaranteed student loans, all used for tuition payments for the online programs of the Defendant Institutions. Each of these requests for payment of such funds constitutes an actionable false claim under the FCA. Each dollar paid or guaranteed to be paid by the DOE constitutes a loss to the government.

133. Pursuant to Title IV of the HEA of 1965, 20 U.S.C. §§ 1070 et seq., DOE provides financial assistance in the form of grants, loans, loan guarantees and interest subsidies to eligible students to help defray the costs of education, including, but not limited to, the Federal Perkins Loan Program, 20 U.S.C. § 1087aa et seq., 34 CFR § 674 and the Federal Direct Student Loan Program, 20 U.S.C. §§ 1087a et seq., 34 CFR § 685.

134. Each of the Title IV programs has specific requirements as a prerequisite to obtaining federal funds. One requirement is that in order to become eligible to receive Title IV funds under these programs, each institution must enter into a PPA with the DOE. 20 U.S.C. § 1094(a); 34 C.F.R. § 668. 14(a)(1). Regardless of the

existence of a PPA, however, HotChalk and the Defendant Institutions are deemed to have agreed to have entered into a PPA with the DOE. PPAs expressly "condition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

135.    The statute, regulation and PPA explicitly provide that an educational institution is prohibited from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance[.]" 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22). This is commonly referred to in the post-secondary education industry as "the incentive compensation ban." Compliance with this ban is an express condition to the initial and continuing eligibility of schools to obtain Title IV funding.

136.    In each PPA, an institution certifies, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." Each PPA then states, inter alia, "By entering into this Program Participation Agreement, the Institution agrees that ... (22) It will not provide, nor contract with any entity that provides, -any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance...."

137.    To maintain its eligibility to receive Title IV funds, each year the institution also must provide the DOE with an annual compliance audit and financial statements prepared by independent auditors. 20 U.S.C. § 1094(c); 34 C.F.R. §§668.23 and 668.25. The audit reports are used to determine whether schools are adhering to applicable requirements for funding, including the incentive compensation ban. As a required part of the audit, the Defendant Institutions certify compliance with the

requirements for eligibility to participate in Title IV programs, including the incentive compensation ban.

138. Congress enacted the prohibition against paying commissions, bonuses or other incentive payments based on success in recruiting students because it determined that such payments were associated with the enrollment of unqualified students to receive federal student-aid funds and high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor. When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, of which incentive compensation was a part. See S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

139. Congress has specifically prohibited educational institutions from using deceptive practices, including misrepresentations which concern the nature of a school's "financial charges." Among the specified prohibited conduct, an institution shall not engage in false, erroneous or misleading statements concerning offers of scholarships to pay all or part of a course charge. 20 U.S.C. § 1094(c)(3)(A); 34 C.F.R. § 668.73.

140. An educational institution is permitted to engage the services of a third-party servicer provided it complies with 20 U.S.C.A. § 1094(c) and 34 C.F.R. § 668.25. This statute and regulation requires that an educational institution require, in its contract with the servicer, compliance with all statutory provisions of or applicable to Title IV of the HEA, all regulatory provisions prescribed under that statutory authority, and all special arrangements, agreements, limitations, suspensions, and terminations entered into under the authority of statutes applicable to Title IV of the

HEA, including the requirement to use any funds that the servicer administers under any Title IV, HEA program and any interest or other earnings thereon solely for the purposes specified in and in accordance with that program. An institution also is required to include in its contract with the servicer, the servicer's agreement to report to the government violations of the law. Essentially, the government prohibits eligible educational institutions from contracting away to third parties the compliance obligations imposed on the institutions.

141. After a school becomes eligible to receive Title IV funds by entering into a PPA, claims for payment of those funds can be made in various ways. Under some programs, students submit requests for funding directly to the DOE, or to the DOE with the assistance of schools, while under other programs, students and schools jointly submit requests for loans to private lenders which are guaranteed by state guaranty agencies that are, in turn, insured by the DOE, which pays only in the event of a student default.

142. With respect to all Title IV programs, the disbursement of federal funds rests on required statements of eligibility made by schools that were necessary for requests for payment to be considered.

143. By signing their PPAs, the Defendant Institutions each acknowledged their responsibilities to act as fiduciaries, to comply with all Title IV program requirements and to account for the federal funds entrusted to them.

D. Defendants' Participation in HEA Title IV Programs

144. The Defendant Institutions sign and submit PPAs to the DOE, thereby certifying their compliance with the incentive compensation ban, their future compliance with all applicable statutory and regulatory provisions, and compliance with the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program. The Defendant Institutions additionally certify that with certain exceptions, they will not provide any commission,

bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds. Thus, the Defendant Institutions certify that they will not engage in the payment of incentive compensation based either on enrollments or financial aid.

145.    The Defendant Institutions are currently operating under approved PPAs and cannot, in fact, operate in the Title IV environment without a current PPA. As a matter of law, each Defendant Institution is deemed to be operating under a PPA. See 20 USC §1094 and 34 CFR § 668.14. Each submits a variety of claims to the government for Title IV funds that it knows to be false based upon its non-compliance with the incentive compensation ban. During each academic year starting July 2010 through March 2013, the Defendant Institutions secured enrollments in their online programs, and received Title IV funds for students enrolled in their online programs marketed by HotChalk. Additionally, during each academic year starting July 2010 through March 2013, students obtained loans guaranteed by the government, or in some cases, financial aid directly from the government.

## VI. Claims For Defendants' Statutory Violations

146.    Defendants are liable to the United States under the FCA because of their use of false statements to obtain HEA, Title IV loan funds. Specifically, in requesting and receiving millions of dollars annually, Defendant Institutions falsely represented that they were in compliance with the HEA's prohibitions against using incentive payments for enrollments, a key pre-condition to the receipt of any HEA Title IV funds.

147.    The Defendant Institutions falsely certified that they were in compliance with the ban on incentive compensation for enrollments and without such certifications of compliance, Defendant Institutions would not have been permitted to continue to participate in Title IV HEA activities nor to receive Title IV funds from the government. In submitting PPAs which falsely certified compliance, each Defendant

Institution knew the PPAs were false and acted knowingly or in reckless disregard of the truth or falsity of the information provided to the United States. The Defendant Institutions thereby fraudulently caused the United States to pay Title IV HEA funds to themselves by false and fraudulent PPAs, compliance audit and financial statement audit opinions. Defendant Institutions certified to the DOE their compliance with the ban on incentive compensation in order to collect federal funds for which they were ineligible, in violation of 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

148. HotChalk violated the law by knowingly receiving incentive compensation from the Defendant Institutions – both Concordia and U. Mary – for each student its enrollment specialists enrolled, and by knowingly paying incentive compensation to its enrollment specialists in the form of salary increases, "overtime" compensation, per-enrollment bonuses, prizes, gifts and other incentives.

149. U. Mary conspired with HotChalk to violate the incentive compensation ban. U. Mary did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online U. Mary program.

150. Concordia conspired with HotChalk to violate the incentive compensation ban. Concordia did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online Concordia programs.

151. Defendants' fraudulent conduct that violates the FCA in several ways. First, In order to be eligible to participate and to continue to participate in any Title IV programs, the Defendant Institutions entered into Program Participation Agreements ("PPAs") with the DOE in which they falsely stated that they were obeying and would obey Title IV's incentive compensation ban, when in fact they were not and are not in compliance with that ban, and they knew that their statements were false.

152. Every year, the Defendant Institutions knowingly falsely certify that they are complying with 20 U.S.C. § 1094(a)(20) by promising that they are not and that

they will not provide any commission, bonus, or other incentive payment based directly or indirectly on securing enrollments to any person engaged in student recruiting or admission activities, when in fact (a) Defendant Institutions routinely and knowingly compensates and awards HotChalk based on the numbers of students enrolled; and (b) Defendants HotChalk, Edward Fields, James Cheshire and Mark Zinselmeier routinely and knowingly compensates and awards its enrollment and admissions employees based on the numbers of students enrolled.

153. Third, numerous times every year, the Defendant Institutions submit and cause students to submit loan applications to the DOE that are false and fraudulent in at least three ways: (a) the Defendant Institutions knowingly use, and cause students to use, the false PPAs and annual certifications, which are necessary prerequisites to the Defendant Institutions' eligibility for Title IV funds; and (b) in each and every loan application, the Defendant Institutions falsely certify that they are in compliance with all statutory and regulatory requirements on which program eligibility and payment are conditioned, misrepresentations that the Defendant Institutions know to be untrue because of their ongoing knowing and intentional noncompliance with the incentive compensation ban. This noncompliance is carried out by Concordia and previously by U. Mary through and with the active participation and assistance of HotChalk and ( c) Defendants engage in substantial misrepresentations of the nature of their educational programs by deliberately concealing from students and prospective students the very existence of HotChalk, allowing HotChalk to provide a "turnkey partnership opportunity" - disguised as Concordia or U. Mary- consisting of recruitment, enrollment and admission, financial aid, curriculum and online course instructors. Defendants also engage in substantial misrepresentations concerning offers of scholarships to pay all or part of a course charge by falsely and deceptively offering non-existent "scholarships" or grants to make up for any shortfall between the course charge less available financial aid the student's ability to pay.

154. This is a claim for treble damages under the False Claims Act, 31 U.S.C.

§§ 3729, et seq. as amended.

155.    Through the acts described above, Defendants knowingly submitted or caused to be submitted to the United States government false or fraudulent claims for student financial aid. The United States, unaware of the falsity, paid the Defendants for claims that would otherwise not have been allowed.

156.    By reason of the Defendants' fraudulent acts, the United States government has been damaged and continues to be damaged in the amount of millions of dollars.

## VII. JURY DEMAND

157.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators hereby demand trial by jury.

## VIII. ATTORNEY FEES AND COSTS

158.    Pursuant to 31 U.S.C. §3729(a)(3) and 31 U.S.C. §3730, Plaintiffs/Relators seek all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorney fees and costs.

WHEREFORE, Plaintiffs/Relators Toi, and Jeffri Bolton seek judgment against Defendants HotChalk, Inc., Concordia University, University of Mary, Edward Fields, James Cheshire and Mark Zinselmeier and that this Court grant them all monetary and equitable relief available under each statute, including but not limited to actual damages, trebled damages, statutory penalties, prejudgment and post-judgment interest, expenses, attorneys' fees and costs. In addition, Plaintiffs/Relators request such other and further relief to which they are entitled.

____May 27, 2014____                      _____
Date                                      Dawn R. Meade, TBN 13879750, FAN 28099
                                          Executive Plaza West
                                          4635 Southwest Freeway, Suite 900
                                          Houston, Texas 77027
                                          Tel:    (713) 961-7770
                                          Fax:    (713) 961-5336
                                          Email:      dawnmeade@spencer-law.com

                                          Attorney-in-Charge

Bonnie E. Spencer, TBN 06366100, FAN 7343
Executive Plaza West
4635 S.W. Freeway, Suite 900
Houston, TX 77027
Tel:    713-961-7770
Fax:    713-961-5336
Email:        bonniespencer@spencer-law.com

OF COUNSEL:
SPENCER & ASSOCIATES, P.C.
Ashley M. Spencer, TBN 24079374; FAN 1348733
Email:        ashleyspencer@spencer-law.com

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document(s) was served upon all interested parties via the United States District Court's electronic transmission services and/or otherwise by First Class Mail on May 27, 2014.

Mark Brewer                                    *Via CM/ECF and First Class Mail*
Brewer & Pritchard, P.C.
3 Riverway, 18th Floor
Houston, Texas 77056

Troy B. Froderman                              *Via CM/ECF and First Class Mail*
Polsinelli, P.C.
One East Washington Street, Suite 1200
Phoenix, Arizona 85004

The Honorable Eric Holder                      *Via CM/ECF and First Class Mail*
Attorney General of the United States
Attn: Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

The Honorable John S. Lenardo                  *Via CM/ECF and First Class Mail*
United States Attorney, District of Arizona
Attn: Civil Division
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

Hotchalk, Inc.                                 ***Via Certified Mail, R.R.R.***
c/o The Company Corporation, Registered Agent
2711 Centerville Rd., Suite 400
Wilmington, Delaware 19808

Hotchalk, Inc.                                 ***Via Certified Mail, R.R.R.***
c/o ISL, Inc., Registered Agent
300 West Clarendon Ave., Suite 240
Phoenix, Arizona 85013

University of Mary                         ***Via Certified Mail, R.R.R.***
c/o Elizabeth Condic, Registered Agent
7500 University Dr.
Bismarck, North Dakota 58504

Concordia University                      ***Via Certified Mail, R.R.R.***
c/o Charles E. Schlimpert, Registered Agent
2811 NE Holman Street
Portland, Oregon 97211

Mark Zinselmeier                          ***Via Certified Mail, R.R.R.***
300 West Clarendon Ave., Suite 240
Phoenix, Arizona 85013

James Cheshire                            ***Via Certified Mail, R.R.R.***
300 West Clarendon Ave., Suite 240
Phoenix, Arizona 85013

Edward Fields                              ***Via Certified Mail, R.R.R.***
14810 Clara St.
Los Gatos, California 95032

_____

Dawn R. Meade