J. Mark Brewer (Admitted pro hac vice)
A. Blaire Hickman (Admitted pro hac vice)
**BREWER & PRITCHARD, P.C.**
Three Riverway, Suite 1800
Houston, TX 77056
Phone: (713) 209-2950
Brewer@bplaw.com
Hickman@bplaw.com

Troy B. Froderman (#012717)
Carlyle W. Hall, III (#026958)
**POLSINELLI PC**
CityScape
One East Washington St., Ste. 1200
Phoenix, AZ 85004
Phone: (602) 650-2000
Fax: (602) 264-7033
tfroderman@polsinelli.com
chall@polsinelli.com

Attorneys for Relator Regina Calisesi

Dawn R. Meade (Admitted pro hac vice)
Bonnie E. Spencer (Admitted pro hac vice)
Ashley Spencer (Admitted pro hac vice)
**THE SPENCER LAW FIRM**
4635 S.W. Freeway, Suite 900
Houston, TX  77027

Attorneys for Relators Toi and Jeffri Bolton

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Regina Calisesi, Toi, and Jeffri Bolton,
Ex Rel United States of America,

           Plaintiffs,

vs.

HotChalk, Inc.; Concordia University, (an Oregon not for profit); University of Mary; Centenary College; Concordia University, (a Nebraska not for profit); Concordia College – New York Foundation, Inc.; Edward Fields; James Cheshire; and Mark Zinselmeier

           Defendants.

CASE NO. 2:13-CV-01150-PHX-NVW

**QUI TAM** ~~SECOND~~ **FIRST AMENDED CONSOLIDATED COMPLAINT**

1

**EXHIBIT B**

## I.   INTRODUCTION

1.   This is the fFirst aAmended Consolidated cComplaint of Relators Regina Calisesi, Toi and Jeffri Bolton.   The purpose of this amendment is to -consolidate the separate amended complaints filed by the Relators.  add a count for retaliatory actions in violation of 31 U.S.C. §3730(h)(2) and to add as defendants the following additional parties:   Centenary College, Concordia University, (a Nebraska not for profit), and Concordia College – New York Foundation.

2.   This is an action to recover damages and civil penalties for false statements and claims made or caused to be made by Defendants HotChalk, Inc. ("HotChalk"), Concordia University (an Oregon not for profit) ("CUP"), University of Mary ("U. Mary"), Centenary College ("Centenary"), Concordia University (a Nebraska not for profit) ("CUNE"), Concordia College – New York Foundation ("CNY"),,[1] Edward Fields, James Cheshire and Mark Zinselmeier in violation of the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (the "FCA"). At issue are false claims and statements submitted by Defendant Institutions to the United States Department of Education ("DOE") in order to participate in federal programs for financial aid for students at Defendant Institutions' post-secondary internet-based degree programs.   The claims at issue with respect to HotChalk relate to its role as aider, abettor and conspirator with the Defendant Institutions.

2.   A.   THE FALSE CLAIMS ACT

3.   Originally enacted 150 years ago,[2] the False Claims Act ("FCA") (1986) is "the primary vehicle by the Government for recouping losses suffered through

---

[1]   Defendants CUP, U. Mary, Centenary, CUNE, and CNY are collectively referred to as Defendant Institutions.

[2]   The False Claims Act was enacted in 1863 (see Act of Mar. 2, 1863 (1863 Act), ch. 67, 12 Stat. 696).

2

fraud."[3]  The FCA prohibits any "person" from "knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. 3729(a)(1). The Act also prohibits a variety of related deceptive practices involving government funds and property. 31 U.S.C. 3729(a)(2)-(7). A "person" who violates the FCA "is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three times the amount of damages which the Government sustains." 31 U.S.C. 3729(a). The Act empowers Plaintiffs (also referred to as "Relators") to bring an action on behalf of the United States and to share in any recovery because they possess information regarding false or fraudulent claims made to the government.

3.    **B.    THE RELATORS' CLAIMS**

4.

a.    4.    Pursuant to the FCA, Plaintiffs Regina Calisesi ("Calisesi"), Toi ("Toi"), and Jeffri Bolton ("Bolton") seek to recover on behalf of the United States, damages and civil penalties arising from false and improper claims for payment that Defendants HotChalk, CUP, U. Mary, Edward Fields, James Cheshire and Mark Zinselmeier[4] submitted, or caused to be submitted in connection with student loan applications under Title IV of the Higher Education Act of 1965 ("HEA") from at least August 1, 2009, to the date of filing of this complaint.

b.    5.    Pursuant to the FCA, Calisesi seeks to recover on behalf of the United States, damages and civil penalties arising from false and improper claims for payment that Defendants HotChalk and Centenary submitted, or caused to be submitted in connection with HotChalk's and Centenary's student enrollment activities and student

---

[3] H.R. Rep. No. 660, 99th Cong., 2d Sess. 18 (1986).
[4] The defendants hereafter collectively referred to as "the Original Defendants" are HotChalk, CUP, U. Mary, Edward Fields, James Cheshire, and Mark Zinselmeier to make clear that Centenary, CUNE, and CNY are defendants added by this amended complaint.

3

loan applications under Title IV of the Higher Education Act of 1965 ("HEA") from approximately November 2013, to at least the date of filing of this complaint.

6.    Pursuant to the FCA, Calisesi seeks to recover on behalf of the United States, damages and civil penalties arising from false and improper claims for payment that Defendants HotChalk, CUNE and CNY submitted, or caused to be submitted in connection with HotChalk's CUNE's and CNY's student enrollment activities and student loan applications under Title IV of the Higher Education Act of 1965 ("HEA") from early 2014 to at least the date of filing of this complaint.

C.    C.    DEFENDANTS' CONDUCT

5.    7.    Defendants are engaged in fraudulent conduct that violates the FCA in several ways:

a.    In order to be eligible to participate and to continue to participate in any Title IV programs, the Defendant Institutions entered into Program Participation Agreements ("PPAs") with the DOE in which they falsely stated that they were obeying and would obey Title IV's incentive compensation ban, when in fact they were not and are not in compliance with that ban, and they knew that their statements were false;

b.    Every year, the Defendant Institutions knowingly falsely certify that they are complying with 20 U.S.C. § 1094(a)(20) by promising that they are not and that they will not provide any commission, bonus, or other incentive payment based directly or indirectly on securing enrollments to any person engaged in student recruiting or admission activities, when in fact

i.    Defendant Institutions routinely and knowingly compensate and award HotChalk based on the numbers of students enrolled; and

ii.    Defendants HotChalk, Edward Fields, James Cheshire and Mark Zinselmeier routinely and knowingly compensate and award its

4

enrollment and admissions employees based on the numbers of students enrolled;

c.    Numerous times every year, the Defendant Institutions submit and cause students to submit loan applications to the DOE that are false and fraudulent in at least three ways:

    i.    The Defendant Institutions knowingly use, and cause students to use, the false PPAs and annual certifications, which are necessary prerequisites to the Defendant Institutions' eligibility for Title IV funds; and

    ii.    In each and every loan application, the Defendant Institutions falsely certify that they are in compliance with all statutory and regulatory requirements on which program eligibility and payment are conditioned, misrepresentations that the Defendant Institutions know to be untrue because of their ongoing knowing and intentional noncompliance with the incentive compensation ban. This noncompliance is carried out by CUP, Centenary, CUNE, and CNY and previously by U. Mary through and with the active participation and assistance of HotChalk.

    iii.    Defendants engage in substantial misrepresentations of the nature of their educational programs by deliberately concealing from students and prospective students the very existence of HotChalk, allowing HotChalk to provide a "turnkey partnership opportunity" – disguised as CUP, Centenary, CUNE, CNY, or U. Mary– consisting of recruitment, enrollment and admission, financial aid, curriculum and hiring and reviewing online course instructors. Defendants also engage in substantial misrepresentations concerning offers of scholarships to pay all or part of a course charge by falsely and deceptively offering non-existent

5

"scholarships" or grants to make up for any shortfall between the course charge less available financial aid and the student's ability to pay.

## II.     PARTIES

8.     Relators Calisesi, Toi, and Bolton are residents of Arizona and are United States citizens. ~~Toi and Bolton~~They were previously employed by Defendant HotChalk as enrollment specialists ~~Toi, Bolton and Calisesi worked~~ at HotChalk's Phoenix call center located at 4129 East Van Buren, Suite 240, Phoenix, Arizona 85008. Toi was an enrollment specialist (referred to as either "enrollment specialist" or "ES") for Defendant CUP~~, , and~~ and her ~~Toi's~~ employment commenced on December 15, 2011 and ended November 5, 2012. Bolton was an ES for Defendant U. Mary. ~~Toi's employment commenced on December 15, 2011 and ended November 5, 2012.~~ Bolton's employment commenced on February 27, 2012 and ended February 4, 2013. Calisesi was continuously employed by Defendant HotChalk as an ES for Defendant Institutions from October 25, 2010 until February 28, 2014 when she was constructively discharged in retaliation for lawful acts done by her in furtherance of other efforts to stop one or more violations of the FCA. Calisesi was also discriminated against by HotChalk in the terms and conditions of her employment because of lawful acts done by her in furtherance of other efforts to stop one or more violations of the FCA.

~~6.~~   9.   Relators bring this action for violations of 31 U.S.C. §§ 3729 *et seq.,* on behalf of themselves and the United States.  All relators, through their work as enrollment specialists for HotChalk, have direct knowledge of the false records, statements and claims presented to the United States by HotChalk on behalf of the Original Defendants.  Additionally, relator Calisesi has direct knowledge of the false records, statements and claims presented to the United States by Centenary, CUNE, CNY, or on their behalf.

~~7.~~   10.   HotChalk is a Delaware corporation with its principal offices at 1999 S. Bascom Avenue, Suite 1020, Campbell, California 95008.   It is registered to do

6

business in Arizona and its registered agent is located at 300 W. Clarendon Avenue, Suite 240, Phoenix, Arizona 85013.  HotChalk is a for-profit operator of an online "university" and a call center through which it poses as the recruiting and admissions operation of its principals, CUP, U. Mary, Centenary, CUNE, and CNY.  Through its Phoenix call center, HotChalk has enrolled thousands of post-graduate students in its purported online courses.

8.   11.   CUP is a non-profit university with a location in Portland, Oregon.  It may be served with process by serving is Charles E. Schlimpert, 2811 NE Holman Street, Portland, Oregon 97211.

9.   12.   CUNE is a non-profit university with a location in Seward, Nebraska. It may be served with process by serving the Reverend Dr. Brian L. Friedrich, President, Weller Hall 104, 800 N. Columbia Ave., Seward, NE 68434.

10.   13.   CNY is a non-profit university with a location in Bronxville, New York. It may be served with process by serving Dr. Viji George, President, 171 White Plains Rd, Bronxville, NY 10708.

11.   14.   U. Mary is a non-profit university based in Bismarck, North Dakota.  It may be served with process by serving Brent Winiger, 7500 University Drive, Bismarck, North Dakota 58504.

12.   15.   Centenary is a non-profit university with its principal office located at 400 Jefferson Street, Hackettstown, NJ 07840.  Its registered agent is Barbara-Jayne Lewthwaite, who may be served at that address.

13.   16.   Defendant Edward Fields resides in California and may be served at 14810 Clara St., Los Gatos, CA 95032-1702. Defendants James Cheshire and Mark Zinselmeier reside in Arizona.  Each may be served at 300 W. Clarendon Avenue, Suite 240, Phoenix, Arizona 85013.  As employees of HotChalk, Edward Fields, James

Formatted:  No bullets or numbering, Tab stops: Not at  1.13"

Formatted:  No bullets or numbering

Formatted:  No bullets or numbering, Tab stops: Not at  1.13"

Formatted:  No bullets or numbering

7

Cheshire, and Mark Zinselmeier are principal actors in regard to the fraudulent conduct alleged herein.

### III.    JURISDICTION AND VENUE

~~14.~~    17.    This is an action brought pursuant to the FCA, 31 U.S.C. §§ 3279, et *seq*. Jurisdiction of this federal court is invoked pursuant to the Court's federal question jurisdiction, 28 U.S.C. § 1331 and subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers original jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

~~15.~~    18.    This Court has in personam jurisdiction over the Defendants under 31 U.S.C. § 3732(a), which authorizes nationwide service of process, and because the Defendants can be found in and transact the business that is the subject matter of this lawsuit in the District of Arizona.

~~16.~~    19.    Venue is proper in the United States District Court for the District of Arizona, pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C.§ 3732(a), because HotChalk is a corporation with its principal offices located in Phoenix, Arizona, and because HotChalk maintains and operates an online program within this District, and many of the acts that form the basis of this Complaint occurred in the District of Arizona.

20.    This case is not based on a public disclosure. Toi, Bolton and Calisesi are each an original source, and each of them have direct, personal knowledge of the matters alleged herein as to the Original Defendants.   Additionally, Calisesi is an original source and she has direct, personal knowledge of the matters alleged herein as to Centenary, CUNE, and CNY.

~~17.~~

### IV.    FACTUAL BACKGROUND

21.    Title IV of the HEA requires that to be eligible to participate in and receive payment from its loan and grant programs, educational institutions must agree and promise not to provide any commission, bonus or other incentive payment to their

student recruiters based directly or indirectly upon success in securing enrollments. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22).  The Defendant Institutions entered into such PPAs and made such promises, and submitted and caused to be submitted to the DOE thousands of loan and grant applications.__—Regardless of a signed PPA, HotChalk and the Defendant Institutions are deemed to have agreed to comply with the incentive compensation ban.

18.  22.  Defendant Institutions' agreements and promises, and each and every one of their applications, were and are false and fraudulent because, as this Complaint and Relators' first-hand experience, and Defendants' own documents show, Defendants tied their enrollment specialists' compensation directly to the number of students they enrolled. Over a period of years, in reliance on the Defendant Institutions' false and fraudulent agreements and promises, the DOE paid out millions of dollars in student grants, payments of loan interest, and repayment of defaulted guaranteed student loans, all used for tuition payments for the online programs of the Defendant Institutions. Each of these requests for payment of such funds constitutes an actionable false claim under the FCA.  Each dollar paid or guaranteed to be paid by the DOE constitutes a loss to the government.

A.  THE HIGHER EDUCATION ACT OF 1965

19.  23.  Pursuant to Title IV of the HEA of 1965, 20 U.S.C. §§ 1070 et seq., DOE provides financial assistance in the form of grants, loans, loan guarantees and interest subsidies to eligible students to help defray the costs of education, including, but not limited to, the Federal Perkins Loan Program, 20 U.S.C. § 1087aa *et seq.*, 34 CFR § 674 and the Federal Direct Student Loan Program, 20 U.S.C. §§ 1087a *et seq.*, 34 CFR § 685.__

B.  ELIGIBILITY FOR TITLE IV LOAN AND GRANT PROGRAMS

20.  24.  Each of the Title IV programs has specific requirements as a prerequisite to obtaining federal funds. One requirement is that in order to become eligible to receive Title IV funds under these programs, each institution must enter into a PPA with the

9

DOE. 20 U.S.C. § 1094(a); 34 C.F.R. § 668. 14(a)(1).  Regardless of the existence of a PPA, however, HotChalk and the Defendant Institutions are deemed to have agreed to have entered into a PPA with the DOE.  PPAs expressly "condition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

21. 25.   The statute, regulation and PPA explicitly provide that an educational institution is prohibited from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance[.]"  20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22).   This is commonly referred to in the post-secondary education industry as "the incentive payment ban."  Compliance with this ban is an express condition to the initial and continuing eligibility of schools to obtain Title IV funding.

22. 26.   In each PPA, an institution certifies, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program."  Each PPA then states, inter alia, "By entering into this Program Participation Agreement, the Institution agrees that ... (22) It will not provide, nor contract with any entity that provides, -any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance ...."

23. 27.   To maintain its eligibility to receive Title IV funds, each year the institution also must provide the DOE with annual compliance audit and financial statements prepared by independent auditors. 20 U.S.C. § 1094(c); 34 C.F.R. §§668.23 and 668.25.  The audit reports are used to determine whether schools are adhering to applicable requirements for funding, including the incentive compensation ban.  As a

10

1   required part of the audit, the Defendant Institutions certify compliance with the

2   requirements for eligibility to participate in Title IV programs, including the incentive

3   compensation ban.

4   ~~24.~~   28.   Congress enacted the prohibition against paying commissions, bonuses or

5   other incentive payments based on success in recruiting students because it determined

6   that such payments were associated with the enrollment of unqualified students to

7   receive federal student-aid funds and high loan default rates, which in turn resulted in a

8   significant drain on program funds where the government acts as a loan guarantor.

9   When Congress amended the HEA in 1992 to prohibit schools from paying these

10  incentives, it did so based on evidence of serious program abuses, of which incentive

11  payments were a part. *See* S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses

12  in Federal Student Aid Programs") (noting testimony "that contests were held whereby

13  sales representatives earned incentive awards for enrolling the highest number of

14  students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted

15  in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use

16  of commissioned sales persons and recruiters").

17  ~~25.~~   29.   Congress has specifically prohibited educational institutions from using

18  deceptive practices, including misrepresentations concerning the nature of a school's

19  "financial charges."   Among the specified prohibited conduct, an institution shall not

20  engage in false, erroneous or misleading statements concerning offers of scholarships to

21  pay all or part of a course charge.  20 U.S.C. § 1094(c)(3)(A); 34 C.F.R. § 668.73.

22      30.   An educational institution is permitted to engage the services of a third-

23  party servicer provided it complies with 20 U.S.C.A. § 1094(c) and 34 C.F.R. § 668.25.

24  This statute and regulation requires that an educational institution require, in its contract

25  with the servicer, compliance with all statutory provisions of or applicable to Title IV of

26  the HEA, all regulatory provisions prescribed under that statutory authority, and all

27  special arrangements, agreements, limitations, suspensions, and terminations entered

28  into under the authority of statutes applicable to Title IV of the HEA, including the

1   requirement to use any funds that the servicer administers under any Title IV, HEA
2   program and any interest or other earnings thereon solely for the purposes specified in
3   and in accordance with that program.  An institution also is required to include in its
4   contract with the servicer, the servicer's agreement to report to the government
5   violations of the law.

6   26.   31.   Essentially, the government prohibits eligible educational institutions
7   from contracting away to third parties the compliance obligations imposed on the
8   institutions.  An eligible education institution also is prohibited from contracting away
9   more than 50% of its education program to an ineligible institution; however, Centenary
10  contracted with HotChalk the recruitment, hiring, compensation, training and academic
11  review of all adjunct faculty for its online education programs.  On information and
12  belief, CUP, U. Mary, CUNE, and CNY similarly contracted away more than 50% of
13  their online education programs to HotChalk.

14  27.   32.   In addition to contracting to provide than 50% of Centenary's online
15  education program, HotChalk in practice assigned the same team of four enrollment
16  specialists to engage in the full array of enrollment activities on behalf of Centenary and
17  CUP on a simultaneous basis.  A HotChalk ES, Chelsea Christianson, who was assigned
18  to make calls for Centenary told Calisesi in February 2014 that CUP "found out" about
19  this and insisted that HotChalk segregate the sales people for CUP from any other
20  school.

21      C.    CLAIMS FOR PAYMENT UNDER TITLE IV PROGRAMS.

22  28.   33.   After a school becomes eligible to receive Title IV funds by entering into
23  a PPA, claims for payment of those funds can be made in various ways. Under some
24  programs, students submit requests for funding directly to the DOE, or to the DOE with
25  the assistance of schools, while under other programs, students and schools jointly
26  submit requests for loans to private lenders which are guaranteed by state guaranty
27  agencies that are, in turn, insured by the DOE, which pays only in the event of a student
28  default.

29. 34.    With respect to all Title IV programs, the disbursement of federal funds rests on required statements of eligibility made by schools that were necessary for requests for payment to be considered.

30. 35.    By signing their PPAs, the Defendant Institutions each acknowledged their responsibilities to act as fiduciaries, to comply with all Title IV program requirements and to account for the federal funds entrusted to them.

D.    DEFENDANTS' PARTICIPATION IN HEA TITLE IV PROGRAMS.

36.    The Defendant Institutions sign and submit PPAs to the DOE, thereby certifying their compliance with the incentive compensation ban, their future compliance with all applicable statutory and regulatory provisions, and compliance with the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program.

31. 37.    The Defendant Institutions additionally certify that with certain exceptions, they will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds.  Thus, the Defendant Institutions certify that they will not engage in incentive payments based either on enrollments or financial aid.

32. 38.    The Defendant Institutions are currently operating under approved PPAs and cannot, in fact, operate in the Title IV environment without a current PPA.  As a matter of law, each Defendant Institution is deemed to be operating under a PPA.  *See* 20 USC §1094 and 34 CFR § 668.14.  Each submits a variety of claims to the government for Title IV funds that it knows to be false based upon its non-compliance with the incentive payment ban. During each academic year starting July 2010 through March 2013, the Defendant Institutions secured enrollments in their online programs, and received Title IV funds for students enrolled in their online programs marketed by

13

HotChalk.  Additionally, during each academic year starting July 2010 through March 2013, students obtained loans guaranteed by the government, or in some cases, financial aid directly from the government.

     E.     THE ROLE OF HOTCHALK AND ITS ENROLLMENT SPECIALISTS

~~33.~~  39.  HotChalk is a privately held, for-profit corporation.  Its operations include a call center in Phoenix, Arizona, through which it aggressively solicits customers; *i.e.,* students, on behalf of the Defendant Institutions from a "boiler room" sales-floor environment.  HotChalk boasts that "Making the seven figure investment to grow your programs online is risky — we eliminate the risk. From marketing and recruitment to staffing the online Enrollment, Student Services and Adjunct Faculty departments, we deliver risk-free results."  It further states that, "Our trained Enrollment Specialists will faithfully represent your school and programs, identify potential students whose academic goals and career aspirations align with your offerings, and deliver fully documented applicants to you, per your specifications."[5]

40.  HotChalk is not an educational institution but is a third-party servicer as defined by 34 C.F.R. § 668.2 and hence, its activities are subject to 34 C.F.R. § 668.25, which governs third party servicers.  HotChalk also is not an accredited provider of academic degrees, courses or texts and is not accredited in any way in regard to any activities associated with a post-secondary educational institution except student recruitment.  Despite the fact that it is not an education institution but is merely a third-party servicer, HotChalk openly touts that it provides a "unique, turnkey partnership opportunity which removes the barriers to growing your degree programs online."[6]

~~34.~~  41.  HotChalk indeed provides what it describes as "all Adjunct Faculty" who it claims "participate in weekly professional development calls and receive performance feedback from their students via individual course assessments."[7]  These "adjunct

---

[5] http://www.hotchalk.com/higher-education/services/ [accessed May 22, 2013]
[6] *Id.*
[7] *Id.*

1    faculty" personnel are actually employees of HotChalk's Campbell, California office
2    who operate without oversight from or meaningful accountability by the Defendant
3    Institutions.  In essence, when a student enrolls in a U. Mary, Centenary, CUP, CUNE,
4    or CNY online curriculum, s/he does so unwittingly through HotChalk, and receives his
5    or her "education" from HotChalk – not from U. Mary, Centenary CUP, CUNE, or
6    CNY.   Defendant Institutions have simply allowed HotChalk to use their name,
7    accreditation status and program participation.

8    ~~35.~~   42.   Each of the students enrolled by HotChalk in its online iterations of CUP,
9    CUNE, CNY, U. Mary and Centenary programs represents a separate violation of the
10   FCA.

11           a.      As of May 30, 2013, HotChalk had enrolled 2,405 students into the online
12                   Masters of Education it marketed and operated under the CUP name as
13                   CUP's "turnkey" servicer and its activities using the CUP name are
14                   ongoing.   Calisesi was informed that in July 2013 alone, HotChalk
15                   enrolled 520 students into CUP cohorts. Specifically, Calisesi was
16                   informed by Edward Fields on July 23, 2013 that HotChalk had 520
17                   "bookings" (*i.e.,* enrollments) or $6.5 million in CUP enrollments just
18                   during July 2013 and that HotChalk's "revenue" on these enrollments was
19                   $3 million.   Calisesi believes that an additional approximately 3,500
20                   students were enrolled by HotChalk into CUP cohorts between August 1,
21                   2013 and February 28, 2014.

22           b.      As of April 17, 2013, HotChalk had enrolled several hundred students into
23                   the online master's degree in nursing it marketed and operated under the
24                   U. Mary name as that school's "turnkey" servicer. The relationship
25                   between U. Mary and HotChalk terminated on April 17, 2013.

26           c.      As of February 28, 2014, HotChalk had begun to enroll students into
27                   education programs marketed and operated under the Centenary name as
28                   that school's "turnkey" servicer.

15

Formatted:  No bullets or numbering

36.   43.   Defendants HotChalk, Fields, Cheshire and Zinselmeier were well aware of the incentive payment ban and spoke openly to HotChalk employees of implementing "ways around" the ban.  HotChalk's Vice President of Enrollment, Thomas Corbett, who conducted the pre-employment interview of Calisesi for the position of enrollment specialist, was employed at University of Phoenix when that company was a defendant in a qui tam suit and paid approximately $75 million to settle allegations of its violations of the incentive payment ban.

37.   44.   Although Defendant Institutions had existing online programs prior to contracting with HotChalk, each allowed HotChalk to create its own, separate online post-graduate degree programs together with the enrollment and financial aid operations necessary to provide students for those programs.  Using its clients' names with the clients' knowledge and consent, HotChalk conducts the full array of operations or functions in regard to post-secondary educational student recruitment, enrollment, financial aid, admissions and/or other activities.  HotChalk's enrollment specialists enroll students in HotChalk's online degree programs which HotChalk marketed as "Concordia University, Oregon," "University of Mary", "Centenary College", "Concordia University, Nebraska", or "Concordia College – New York"

38.   45.   Consistent with HotChalk's "turnkey partnership opportunity," each Defendant Institution allowed HotChalk to set up its own versions of their websites, albeit using different tuition rates in violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73.  HotChalk also touts this as one of its "services:"  "Our Engineering team will deliver seamless integration with your existing Learning Management System, or assist in the selection and deployment of an industry-standard LMS."[8]

39.   46.   In violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73, with respect to U. Mary, a student who enrolled directly with U. Mary in 2012 paid a fee of $450 per credit hour while a student enrolling in 2012 through

---

[8] *Id.*

http://online.umary.edu/admissions/tuition[9] – the U. Mary website operated by HotChalk – paid $750 per credit hour.  In either event, the money was paid to U. Mary which in turn paid a portion of it in the form of incentive compensation to HotChalk.  U. Mary paid HotChalk for each student enrolled by HotChalk – a direct violation of the incentive compensation ban by U. Mary.

40.   47.   In the case of CUP, CUNE, CNY and Centenary, each student's tuition money was paid to CUP, CUNE, CNY and Centenary which in turn paid a portion of it in the form of incentive payment to HotChalk.  CUP, CUNE, CNY and Centenary paid HotChalk for each student enrolled by HotChalk – a direct violation of the incentive compensation ban by CUP, CUNE, CNY and Centenary.

41.   48.   The stated consideration of the agreement between HotChalk and Centenary is for HotChalk to receive an incentive payment equal to 80% of the tuition paid by students enrolled by it: "2.  Consideration:  In compensation for the Bundled Services provided by HotChalk hereunder, Provider will pay service fees to HotChalk equal to 80% of Net Receipts ('Bundled Service Fee')."  (Exhibit A, page 23)  In addition, ninety percent of "all Net Receipts" are payable to HotChalk "on a cohort by cohort basis" with an adjustment to "the appropriate % of the final term."  (Exhibit A, page 23)  This provision is consistent with what Calisesi learned during her employment concerning the CUP, CUNE, CNY and U. Mary agreements.

42.   49.   In violation of 20 U.S.C. § 1094(c)(3)(A) and 34 C.F.R. § 668.73, the Defendant Institutions allow HotChalk to operate from its Phoenix call center to use deceptively named email addresses for HotChalk's enrollment specialists, including Relators, with the domain names of "@education.cu-portland.edu" and "@online.umary.edu."  It also deceptively provides its customers (students) with Portland, Bismarck, Hackettstown, Seward, and Bronxville area codes (where the Defendant Institutions are located) to reach the HotChalk enrollment specialists.  The

---

[9] accessed December 30, 2012.

17

enrollment specialists are instructed not to say they are in Phoenix and to lie about their physical location if asked. The enrollment specialists also are instructed never to say they are employed by HotChalk or even to identify HotChalk in any way. Instead, the enrollment specialists are to say they are "with" U. Mary, CUP, CUNE, CNY or Centenary. Each enrollment specialist is assigned to peddle degree programs for only one of these two institutions, presumably to avoid any slip-ups, except as alleged in paragraph 27 of this Amended Complaint.

43. 50. Enrollment specialists, such as Relators, are Defendant Institutions' "recruiters" and are responsible for recruiting applicants for admission, including securing and managing new inquiries, achieving enrollment and start rate goals, participating in appropriate recruitment and enrollment activities. An enrollment specialist must stay in constant contact with potential students during the entire recruitment and enrollment process.

44. 51. An enrollment specialists' salary increases, number of stock options, and award of other incentives are all based on HotChalk's relentless and exclusive focus on the number of new students an enrollment specialist is able to recruit, and thus, are in direct violation of the Title IV incentive compensation ban.

52. To boost its enrollment numbers, HotChalk urges each ES to enroll students before or without reviewing their transcripts to determine their academic qualifications for the online programs. Both Toi and Calisesi were told that they were to enroll students without having reviewed the prospective student's transcript. Although the Defendant Institutions publish academic requirements for incoming students, using HotChalk, each accepts all potential students who complete an application and submit an essay which HotChalk refers to as a "letter of intent." The essay requirement is a sham: even a single paragraph at an average eighth grader's ability level will suffice and it is extremely rare for any student to be denied enrollment based on the essay's content or quality or lack thereof of.

18

45. 53.   In any event, HotChalk employees determine the sufficiency of the "letter of intent" with the client Defendant Institution occasionally intervening where the deficiency is particularly egregious.  Although 4 CFR 668.2 prohibits HotChalk from "determining student eligibility and related activities," paragraph 4.4 of the agreement between HotChalk and Centenary calls for HotChalk to do exactly that; "Provider agrees that HotChalk shall screen all prospective students prior to referral to Provider to ensure that such students meet the qualifications for enrollment and admissions establish by Provider." (Exhibit A, Paragraph 4.4, page 6).

46. 54.   On behalf of the Defendant Institutions, HotChalk enrollment specialists approve all student applications regardless of the applicant's college GPA.  In one instance, Toi enrolled a student whose initials are AHG because HotChalk supervisor, Michael Dearing, literally got in Toi's face and told her substantially the following words: You don't have any right to tell him he can't get in – despite the fact that AHG was not qualified or capable of performing in the Concordia program.  AHG later emailed another HotChalk ES that he did not feel capable to participate in the program. Centenary's contract gives HotChalk express authority to enroll students. (Exhibit A, paragraph 4.4, page 6 and paragraph 3, page 18).

47. 55.   One tactic HotChalk supervisors use to make it appear that a low GPA is an issue is to artificially slow down the enrollment process.  Even obviously deficient students who submit woefully inadequate essays and credentials are admitted "by" the Defendant Institutions because all "admissions" decisions are in fact made by HotChalk.

48. 56.   In the case of enrollment specialists for the U. Mary online program, the stated minimum GPA was 2.75 on a 4.0 scale. However, if a prospect had a GPA below 2.75, they were simply asked to write a short statement explaining why their GPA was below 2.75. In virtually no case where the student submitted the short explanation was the minimum GPA requirement adhered to; i.e., students whose GPAs were below 2.75 were routinely enrolled. Additionally, if a student was sufficiently far enough along in the enrollment process to enroll for the soonest available cohort, their enrollment was

1  pushed through for that cohort.  In the case of Centenary, similar criteria are

2  contractually provided for in the HotChalk contract.  (Exhibit A, page 26).

3  ~~49.~~   57.   During their recruitment pitch, the enrollment specialists are instructed to

4  fraudulently misinform potential students that they are "at" or "with" U. Mary, CUP,

5  CUNE, CNY, or Centenary (depending on which school the enrollment specialist has

6  been assigned to pitch for).  At the end of April or early May 2011, Toi was told by her

7  then Director of Admissions, James Cheshire, to tell a prospective student that she was

8  in Portland, Oregon.

9  ~~50.~~   58.   Enrollment specialists are instructed to create a false sense of urgency on

10  the part of prospective students.  For example, enrollment specialists are required to tell

11  prospective students that if they "sign up" now for "this cohort" they will receive a free

12  iPad and textbooks.  The enrollment specialists were further instructed, in printed

13  instructions, not to call the iPad and textbook give-away "free" but to say it is

14  'included' and not to refer to this as a "promotion" but as a "pilot program."   This

15  activity directly violates 34 C.F.R. § 668.14(b)(22)(iii)(A) which defines an "incentive

16  payment" as "a sum of money or something of value."

17  ~~51.~~   59.   When a student agrees to enroll, a Las Vegas style announcement is

18  flashed on video monitors on the sales floor that comprises HotChalk's Phoenix

19  premises.  One image that is flashed on the video screens whenever there is a new

20  enrollment is that of a one hundred dollar bill with colorful animations.

21  ~~52.~~   60.   Provided that each ES meets his or her sales goal, s/he is retained and

22  given increased pay.  When a prospective student tells the ES that s/he wants to delay

23  her/his start date, the ES is required to pressure the prospect to start classes even if there

24  is no "course" and no instructor.  As stated previously, the instructors are actually

25  HotChalk employees – not faculty of the client Defendant Institutions.  For example, if

26  a student has enrolled and HotChalk has no course ready, the ES is required to falsely

27  tell the students that the course start date is being "moved back."

28

20

53.   61.   During the week before a cohort, called a new start period or "cycle," enrollment specialists will receive approximately five confirmation reports per day updating them as to whether their students have confirmed enrollment. If an ES' student has not confirmed enrollment, the ES is required to remain in contact with the student via telephone calls and e-mails urging the student to confirm enrollment, even if a student expresses doubts about doing so.   After a student is confirmed as a "start", HotChalk is compensated by the Defendant Institutions and the ES earns credit for the enrollment for purposes of salary increase.   Pursuant to the contract between HotChalk and Centenary, Centenary compensates HotChalk "within 2 weeks of class starting." (Exhibit A, page 24).

54.   62.   Enrollment specialists are required to make sure the students complete all of their loan applications and submit them to the school and the federal government.   To do this, enrollment specialists follow a phone script provided by HotChalk (referred to at HotChalk as "the rubric"). Using the rubric, each ES is required to use high pressure sales tactics to "qualify" the student for financial aid by asking canned questions. Enrollment specialists are required to direct students to the federal financial aid website (FAFSA) and instruct them to fill it out and enter CUP's, CUNE's, CNY's, U. Mary's or Centenary's school code.

55.   63.   Once a student's financial aid forms are complete, a financial aid officer calculates the student's financial aid plan based on a DOE formula and informs the student. The student can accept or reject the financial aid plan. If a student rejects a financial aid plan, often because the student does not qualify for enough financial aid to cover the entire amount of tuition, it is the ES' job to convince the student to accept the financial aid package and enroll by misleadingly offering "scholarships" that in reality are nothing more than a HotChalk "discount" of the tuition prices set by HotChalk in the first place.   The Centenary-HotChalk contract expressly provides for these "scholarships." (Exhibit A, page 24).   This is a misrepresentation concerning the nature

21

of the Defendant Institutions' financial charges in violation of 20 USC§ 1094(c)(3)(A) and 34 CFR § 668.73.

~~56.~~ 64.    Enrollment specialists are instructed to offer "scholarships" for several reasons: (1) if the student is considering applying at another institution; (2) if the student complains that the tuition is too high; (3) if the student wants to wait for another cohort because of personal reasons; or (4) if the student has a shortfall of financial aid coverage. Enrollment specialists are instructed to mislead students by telling them that the "scholarships" are only available if the student signs up now for the next cohort. However, in reality, "scholarships" are offered at any time.

~~57.~~ 65.    Students are not allowed to go part-time. Students are told that they must adhere to the one class every five weeks schedule and cannot for any reason detour from that set schedule because to do so will affect their financial aid period. If a student has plans, such as surgery or having a baby, enrollment specialists are instructed to tell the student that he or she will not be able to pay for school because he or she is disrupting his or her financial aid year. Although, in reality, a student would be allowed to return to school, enrollment specialists are instructed to advise students that it would not be likely.

~~58.~~ 66.    The "Study Buddy Scholarship" is awarded when a student refers someone who also enrolls and begins in the same cohort.  Each of the students is given a $2,000 "scholarship". In reality, this is not a scholarship, but merely another gimmick to get students to refer prospects.   These tactics of falsely and deceptively offering "scholarships" or grants to make up for any shortfall between the course charge and available financial aid is a substantial misrepresentation concerning offers of scholarships to pay all or part of a course charge in violation of 20 U.S.C. 1094(c)(3)(A) and 34 C.F.R. § 668.73.

~~F.~~    F.    DEFENDANTS' FALSE CLAIMS, FRAUDULENT CONDUCT AND VIOLATIONS OF THE INCENTIVE PAYMENT BAN

Formatted: Font: Not Bold, Not Italic

Formatted: Indent: Left:  0.5", Hanging:  0.5", No bullets or numbering

Formatted: Font: Not Bold, Not Italic

Formatted: Font: Not Bold, Not Italic

67.   Since approximately July 2010 and continuing through April 17, 2013 in the case of U. of Mary and at least February 28, 2014 in the case of CUP, CUNE, CNY and Centenary, HotChalk, acting on behalf of the Defendant Institutions, compensated enrollment specialists, including Relators, and their call-center supervisors based upon the number of new students enrolled. In direct violation of the ban on incentive payments, Defendants have a "boiler room"-style sales culture, in which they not only make incentive payments, but they make the recruitment of students to their schools the sole focus of their compensation regime.

59. 68. -Failure to enroll sufficient numbers of students results in termination. HotChalk fosters an environment of fear of losing one's job, tension and pressure to meet unreasonable sales goals of new student enrollments (these sales goals are referred to as the ES' "ramp rate")  HotChalk knowingly violates HEA, Title IV regulations. In so doing, HotChalk breaks the promises and the representations made by its principals – Centenary, U. Mary CUP, CUNE, and CNY – in the PPAs and in connection with the annual compliance audits.

60. 69.   The sales-culture of HotChalk's operation is typified by management's repeated emphasis that the salary of each ES is tied to the number of students s/he enrolls.   The Vice President of Operations, Mark Zinselmeier, and Director of Enrollment, James Cheshire, have stated openly substantially the following words: "Make no mistake, we are in sales.  This is a sales floor.  This is what you have to get." HotChalk supervisor, Michael Dearing, told Toi that she needed to stop acting like a "social worker."   HotChalk managers have said to the enrollment specialists substantially the following words:  "Imagine how much money you will make and how "wealthy" you will become from your HotChalk stock options." This statement is not true. In direct contradiction, enrollment specialists are instructed to explain to prospective students that they are "with" a non-profit institution; thus, they do not answer to stockholders.

      *1.*   *"Overtime"*

23

Formatted:  No bullets or numbering

61. 70.   As a matter of corporate practice, enrollment specialists have been required to meet an enrollment quota, depending on how long they have been employed at HotChalk.   Those enrollment specialists, including each of the Relators, who met their quotas received an initial raise of 10% of their starting base salary.   Then, in approximately the fall of 2012, each ES, was informed by HotChalk managers that they had been transformed into "hourly" wage employees so that they could have the opportunity to earn more money if they met or exceeded their quotas of new enrollments.

62. 71.   There was so much buzz among the management staff the day of the "overtime" announcement. Toi recalls Zinselmeier stating substantially the following words: "Edward Fields wanted a way for us to be able to put more money directly in enrollment specialists' pockets for getting more enrollments and we have found it."

63. 72.   Those enrollment specialists, including each of the Relators, who met their quotas and without regard to any other factors, were in fact granted "incentive" compensation in the form of "overtime hours" for the next five week cycle during which they would receive one and a half times their presumed hourly rate of pay.   Thus, "overtime" compensation was doled out solely on the basis of the number of new students which each ES, including the Relators, enrolled to incentivize the enrollment specialists, including the Relators, to enroll more students.

64. 73.   Those employees who failed to meet their quotas for any five week cycle were told they were not eligible for "overtime."   Similarly, those employees who met their quota for a given five week cycle, but fell below the quota's minimum because too many students failed to stay in the program for more than eight days, were told they were not eligible for "overtime."

65. 74.   On one occasion, Toi's manager, Michael Dearing, stated to Toi substantially the following words: "Can you believe the nerve of that [expletive] to ask me for overtime after four of her [eight] new enrollments dropped out?  No one is taking that kind of money from me and getting away from it."   On another occasion, Dearing

24

1   told Toi that she was not eligible for overtime because she had not met her quota of new
2   enrollments for the five week cycle.

3   66.   75.   HotChalk managers knew that the overtime scheme was an impermissible
4   violation of the incentive payment ban:  Cheshire and Zinselmeier, as well as Dearing
5   and Ken Cook excitedly told the enrollment specialists, including the Relators, that the
6   overtime program was being implemented to compensate new student enrollments.
7   Zinselmeier went so far as to say that it was to "get around" the incentive compensation
8   ban.  In practice and as implemented, "overtime" pay is determined by HotChalk solely
9   on the basis of whether the number of students each ES enrolls meets or exceeds his or
10  her quota.

11  67.   76.   Congress, the DOE and the Defendant Institutions' PPAs ban incentive
12  payments except the "payment of fixed compensation, such as a fixed annual salary or a
13  **fixed hourly wage**, as long as that compensation is not adjusted up or down more than
14  twice during any twelve month period, and any adjustment is not based solely on the
15  number of students recruited, admitted, enrolled, or awarded financial aid."

16  68.   77.   Selectively granted overtime violates this ban in three ways:  First, it is
17  not a "fixed hourly wage" but is instead a variable hourly wage of one and a half times
18  the "normal" hourly rate of the ES.  Second, it was an adjustment that occurred "more
19  than twice during any twelve month period" because it was granted or denied at the end
20  of each five week enrollment cycle based on the number of students enrolled that cycle.
21  Third, whether an ES is allowed to work overtime at one and a half times his or her
22  "normal" hourly rate is determined solely on the number of students enrolled by each
23  particular ES, including the Relators, and on no other basis.

24          *2.*     *"Core Values"*

25  69.   78.   "Core values" (sometimes referred to by HotChalk's managers as "core
26  competencies") is merely a sham performance rating system. In spring or summer of
27  2012, Zinselmeier addressed the ES team. Toi, Bolton and Calisesi attended.
28  Zinselmeier stated that that because of what he referred to as the qui tam lawsuit against

25

Formatted:  No bullets or numbering

the University of Phoenix, HotChalk could no longer openly compensate enrollment specialists for enrollments, and HotChalk would be changing its review process.  He further stated that reviews would be based purely on "soft skills."  This is the "core values" reviews. Zinselmeier said substantially the following words: "I know there are some people here who were going to get graduate bonuses and we can't do that anymore. Since we cannot give bonuses, the core values are a way to reward you for your hard work." Each ES, including Relators, was required sign an acknowledgment to this effect and the team was told that the document would go into the personnel file. Zinselmeier made clear to the enrollment specialists that this was just for what he called "CYA" purposes.

79.   Subsequently, HotChalk implemented a list of "core values" – supposed quality factors – for use in evaluating the performance of each ES. The "core competencies" are:  "Adaptability/Flexibility",  "Be Happy, No Drama", "Communication", "Results Focus" and "Sense of Urgency". From the time of the implementation of these "core values" and continuously thereafter, HotChalk management personnel has openly stated to each Relator and every other ES that so long as the minimum number of student enrollments is achieved, the "core values" do not matter and that they are nothing more than an effort to disguise the fact that performance and compensation are measured exclusively by reference to student enrollment.

70.   80.   For example, to achieve the minimum core competencies, the enrollment specialists do not even have to meet basic job requirements such as being at work on time.  Instead and as openly stated by management, whether each ES, including the Relators, receives the minimum core values rating is based solely on whether the ES meets his or her quota of new enrollments.  HotChalk management makes it clear to the enrollment specialists that it is impossible to achieve successful ratings on the "core values" without meeting the ES' ramp rate.  Thus, in practice and as implemented, the

"core values" of each ES are determined by HotChalk solely on the basis of the number of students each enrollment specialist enrolls.

### 3. *"Ramp Rate"*

~~71.~~  81.  On or about January 7, 2011, the enrollment specialists received a document titled "Ramp Rate Policy."  The document explains HotChalk's definition of ramp rate, the number of students each ES is expected to enroll, the penalties for missing a goal, and the incentive for meeting a goal. The incentive explained in the January 7, 2011 "Ramp Rate Policy" was that enrollment specialists would receive $100 for every student that graduated who they enrolled.   Enrollment specialists were required to follow up with students to make sure they stay in the program into which they enroll.   This "policy" as implemented is an intentional violation of the incentive compensation ban.

~~72.~~  82.  HotChalk's emphasis of, and reliance on, new student enrollment as the exclusive basis upon which it determines an ES' compensation is demonstrated by the extreme emphasis it places on training its enrollment specialists to "sell" enrollments. HotChalk meticulously tracks each ES' recruitment activities on a daily, weekly, monthly, quarterly and annual basis. Each ES' enrollment activity is then included in reports which are disseminated throughout HotChalk at the indicated intervals.  These reports contain only quantitative information, and focus exclusively on the applications and enrollments achieved. None of these reports, which HotChalk uses to manage, evaluate, and compensate its enrollment specialists, contains any information regarding any "core competencies."  The "core competencies" performance metric is nothing but a sham which HotChalk intentionally set up and uses to disguise its incentive compensation scheme.

### 4. *Initial Interviews by HotChalk*

83.  As explained by HotChalk to each Relator during the interview and hiring process, each ES' compensation is based on, and only on, the number of new students recruited.  During Toi's initial interview for her ES position with HotChalk, she asked

Formatted: No bullets or numbering

Formatted: No bullets or numbering

what she had to do to earn a higher salary than what HotChalk was initially offering. She also asked what the criteria was for her future compensation and when she would be given her first review.  This occurred at an in-person interview with HotChalk's then Director of Admissions, Cheshire and HotChalk's Manager of Human Resources and Recruiting, Wanda DeLoatche, in the last week of November 2011 and was followed by a telephone offer from DeLoatche of $50,000.

84.    At the interview, Toi presented Cheshire with an email she had from her prior employment at University of Phoenix.  The email showed that she had a relatively good "lead conversion" rate.  Based on the email, Toi said she wanted $55,000. Cheshire said that if she performed at HotChalk as well as she performed for University of Phoenix, HotChalk would give her a $5,000 increase in ninety days and at least a $5,000 increase every year thereafter.  Cheshire told Toi not to share that ninety day review information with her training class peers because HotChalk does not normally give salary increases at ninety days.

73. 85.   Toi responded that she did not know what she would have to work with at HotChalk and asked whether she would be provided with "the tools" she would need to hit five enrollments per cycle.  Cheshire said that there are people on the sales floor that are doing that well and they are well compensated.   Toi met her sales quota and was given the $5,000 increase in June 2012 – five months after her employment began. When combined with subsequent overtime pay, this violates the incentive compensation ban's prohibition on more than two salary increases within a year.[10]

74. 86.   Relator Bolton had similar conversations with her interviewers.  After she was hired and received her first review, she realized that the reviews were not meaningful and that if she failed to achieve her quota of five new enrollments per month, she would receive "reprimands" followed by termination.  If she met her sales

---

[10] 34 C.F.R. § 668.14(b)(22)(ii)(A)(2010).

28

quota, she would receive a good review on the "core competencies". If she did not meet her quota, she would be given a reprimand and receive a negative review on "core competencies". The "core competencies" reviews are merely a smokescreen to disguise that fact that HotChalk engages in incentive compensation.

75. 87.    HotChalk offered Relator Calisesi a starting salary of $42,000 plus stock options.  Using an employment recruiter, John Murphy, HotChalk informed Calisesi of her salary and stock options.  Murphy set up an in-person interview with HotChalk's director of enrollment, Tom Corbett.  During the interview, Corbett reiterated the salary and benefits as explained by Murphy.  Following this, Calisesi was interviewed over the phone by HotChalk's Vice President of Operations, Mark Zinselmeier.  Neither Murphy, Corbett nor Zinselmeier asked any questions or made the slightest comment about Calisesi's qualifications to work in post-graduate recruiting and enrollment. Instead, their sole focus was on HotChalk's sales culture.  Zinselmeier, for example, said he only wanted to make sure Calisesi would fit into HotChalk's "culture" by asking her what kind of culture she would like to work in.  Calisesi responded that she liked an environment of integrity where she could be part of a cohesive team without being micromanaged.

76. 88.    As soon as she started work at HotChalk, it was made clear to Calisesi that her compensation was purely a function of her sales performance.  She was told, for instance, that if she failed to meet her quota of new enrollees, she would be terminated. She was given two weeks of training before going onto the sales floor.  She began on November 25, 2010, and was told that her "ramp rate" was to get one enrollment in her first two weeks after training.  When she failed to get one enrollment within her first two weeks, Corbett turned on her and became hostile.  Calisesi's Assistant Director of Admissions at that time, James Cheshire, told her that she was ahead of the "curve" in training but now she had fallen below the "curve".

77. 89.    Corbett,  a former University of Phoenix employee, told Calisesi that after six months, she would have a salary increase eligibility review.  At the end of her first

six months, Zinselmeier called Calisesi into his office and informed her that her salary was being raised to $50,000 per year. She was then told it would go to $60,000 per annum if she continued to meet her "ramp rate." This is an intentional and direct violation of the prohibition on more than two salary increases within a year. Alternatively, when combined with HotChalk's overtime pay policy, it violates the prohibition on more than two salary increases within a year.[11]

78. 90.   Each Relator was told at the commencement of her employment at HotChalk that she would receive additional stock in the company if she excelled at enrollments. Calisesi did receive additional stock on July 26, 2012 from Zinselmeier in the presence of DeLoatche. This is an intentional and direct violation of the prohibition on more than two salary increases within a year.

79. 91.   On one occasion, Calisesi was present for a sales meeting with Zinselmeier and DeLoatche in which they told the enrollment specialists that they would be allowed to get up to a twelve percent increase if they got a five rating on the "core values." Zinselmeier and DeLoatche told the enrollment specialists that this was a "CYA" tactic to disguise the fact that this was a way for paying enrollment specialists based on the number of students enrolled.

### 5.   Incentives

80. 92.   In addition to salary, HotChalk recognizes *every* enrollment specialist in the form of all-expenses paid trips to Las Vegas, Nevada, paid lavish dinners at expensive restaurants with Defendant Fields, HotChalk's CEO, free tickets to MLB games and the like.

81. 93.   During the year, HotChalk managers send mass e-mails to the enrollment specialists on a weekly basis detailing the top performers for the previous week. The results and the rankings consist only of the number of appointments, interviews, and enrollments each ES secured.

[Formatted: No bullets or numbering]

---

[11] *Id.*

30

1  82.  94.   On one occasion, the ES sales team received free MLB tickets for the

2  team obtaining 200 enrollments.

3  83.  95.   On another occasion at the 2011 Christmas Party, HotChalk CEO,

4  Defendant Fields, announced that the HotChalk board was really pleased with the sales

5  numbers being delivered by the enrollment specialists. He further stated that these types

6  of numbers would enable HotChalk to "go public". He exhorted the employees to keep

7  up the good work.  He then stated that because the sales team had met its quota, he

8  wanted to reward them for their successes of new enrollments with a trip to Las Vegas.

9  The trip to Las Vegas was for the ES and his or her spouse, and every ES and his or her

10  spouse was given a fifty dollar gift card or cash to gamble while on the trip.

11  84.  96.   In early 2012, in follow-up to Fields' comment about taking the

12  enrollment specialists to Las Vegas, HotChalk management said that new hires would

13  not be allowed to go to the Las Vegas trip. Toi expressed her disappointment in this

14  regard to Cheshire because she was excited that Bolton would also be going on the trip.

15  Cheshire responded to Toi that new enrollment specialists were not invited because they

16  have not enrolled any students.

17  85.  97.   On another occasion, because the sales team met its overall quota,

18  HotChalk had Hummer limousines pick up all the enrollment specialists and other

19  HotChalk employees.  The limousines took the entire team to lunch and presented all

20  with a "gift bag."   On another occasion, Starbucks cards were passed out during phone

21  "blitzes" by HotChalk supervisors to enrollment specialists who had the "most dials"

22  and "most talk time." Additionally, enrollment specialists are routinely given free movie

23  tickets, chair massages and lunches all based on their performance of signing up new

24  student enrollments.  Each of these gifts and other incentives violates the incentive

25  compensation ban.

26  86.  98.   The top-recruiting ES for certain time periods or in particular offices wins

27  bonuses, including but not limited to, Godiva Chocolate gift baskets, movie tickets,

28  MLB baseball tickets, amusement park tickets, various restaurant gift cards, and free

31

lunches and dinners. At other times, enrollment specialists with a large number of new students will be given permission to leave work early yet still be paid for an entire work day.  Each of these gifts and other incentives violates the incentive compensation ban because the enrollment specialists are rewarded by HotChalk directly and indirectly on the number of students they enroll.

87. 99.   By regularly and repeatedly promoting the outings, dinners and trips, each ES is incentivized based on the number of students they enroll.  The trips are not designed to educate or improve the skills of the enrollment specialists, at least not in any way that complies with the incentive compensation ban.  Instead, these are simply incentive prizes used to spur enrollment specialists to compete against one another to achieve the most enrollments in the high pressure sales environment of HotChalk.

88. 100.   In connection with paying incentives based directly or indirectly on the number of students enrolled, HotChalk acted in concert with Defendant Institutions. Defendant Institutions were aware of HotChalk's policy and practice of incentive compensation tied directly or indirectly to the number of students enrolled. Additionally, Defendant Institutions' compensation to HotChalk was based directly or indirectly on the number of students enrolled by HotChalk enrollment specialists.

89. 101.   U. Mary conspired with HotChalk to violate the incentive compensation ban. U. Mary did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online U. Mary program.

90. 102.   CUP conspired with HotChalk to violate the incentive compensation ban. CUP did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online CUP programs.

91. 103.   CUNE conspired with HotChalk to violate the incentive compensation ban. CUNE did this by agreeing, expressly or impliedly, with HotChalk for HotChalk

enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online CUNE programs.

~~92.~~   104.   CNY conspired with HotChalk to violate the incentive compensation ban. CNY did this by agreeing, expressly or impliedly, with HotChalk for HotChalk enrollment specialists' compensation to be tied directly or indirectly to the number of students enrolled in the online CNY programs.

~~93.~~   105.   Centenary violated and conspired with HotChalk to violate the incentive payment ban by expressly agreeing to pay and by actually paying HotChalk 80% of all tuition payments received from or on behalf of students enrolled in the online Centenary programs.  (Exhibit A, page 23).  On information and belief, CUP, CUNE, CNY and U. Mary likewise violated and conspired with HotChalk to violate the incentive payment ban by expressly agreeing to pay and by actually paying HotChalk 80% of all tuition payments enrolled by HotChalk in the online programs of CUP, CUNE, CNY and U. Mary.

### 6.     Reprimands, or being Put on "Plan"

~~94.~~   106.   In addition to rewarding enrollment specialists who meet their sales goal ("ramp rate"), HotChalk closely monitors each ES for failure to meet his or her sales goal.  Enrollment specialists are terminated for failing to achieve an acceptable number of new enrollments, without regard to the so-called "core values."  Also, as alleged above, HotChalk makes it clear to the enrollment specialists that it is impossible to achieve successful ratings on the "core values" without meeting the enrollment specialists' ramp rate.

~~95.~~   107.   If an ES fails to meet his or her individual enrollment goal, HotChalk issues a written warning of disciplinary action.  This is known as being put on "plan." The ES is given a specific period of time within which to achieve his or her "ramp rate" before being subject to further "disciplinary action."  If the ramp rate is met, the ES will not be terminated or given further "disciplinary action."

33

Formatted:  No bullets or numbering

96. 108.   Defendants are liable to the United States under the FCA because of their use of false statements to obtain HEA, Title IV loan funds. Specifically, in requesting and receiving millions of dollars annually, Defendant Institutions falsely represented that they were in compliance with the HEA's prohibitions against using incentive payments for enrollments, a key pre-condition to the receipt of any HEA Title IV funds.

109.   The Defendant Institutions falsely certified that they were in compliance with the ban on incentive compensation for enrollments and without such certifications of compliance, Defendant Institutions would not have been permitted to continue to participate in Title IV HEA activities nor to receive Title IV funds from the government.  In submitting PPAs which falsely certified compliance, each Defendant Institution knew the PPAs were false and acted knowingly or in reckless disregard of the truth or falsity of the information provided to the United States.

97. 110.   The Defendant Institutions thereby fraudulently caused the United States to pay Title IV HEA funds to themselves by false and fraudulent PPAs, compliance audit and financial statement audit opinions.  Defendant Institutions certified to the DOE their compliance with the ban on incentive payments in order to collect federal funds for which they were ineligible, in violation of 31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

111.   HotChalk violated the law by knowingly receiving incentive payments from the Defendant Institutions for each student its enrollment specialists enrolled, and by knowingly making incentive payments to its enrollment specialists in the form of salary increases, "overtime" compensation, per-enrollment bonuses, prizes, gifts and other incentives.

98.

**V.    ADDITIONAL SEPARATE ALLEGATIONS OF TOI AND JEFFRI BOLTON**

34

99. **112.**   According to Toi, Cheshire told Toi that compensation was much the same as University of Phoenix, but "better" in that HotChalk had more frequent "reviews for increases" and that the Specialists at Hotchalk were given stock options as well as other "really cool incentives."  These incentives were reiterated when HotChalk called to make the "official offer" of employment to Toi.  Toi accepted the employment offer and did receive her first $5,000 salary increase after she had worked at HotChalk for over five months.   She discovered that other employees had received the same compensation deal she received.

100. **113.**   According to Toi and Jeffri, Toi did not receive a salary with reviews based upon her work habits, attendance, etc.  Her salary depended upon the number of people she enrolled, not the number of hours she worked helping people with their enrollment.  Cheshire and Deloatche both explained the means by which compensation was paid to Specialists:  First and foremost, compensation depended upon the number of students the Specialist enrolled.  The number of students a Specialist enrolled was not counted week to week.  Enrollment numbers were counted over time and making the required number of enrollments entitled Specialists to make more money over time and allow them to keep their jobs.  In fact, HotChalk's management made it clear to all Specialists that they were salespeople who were expected to meet quotas and that each was subject to termination if he/she did not meet the sales quotas.

101. **114.**   According to Toi and Jeffri, in the weeks that followed however, Specialists we were regularly reminded by ALL management, in both individual team huddle meetings and openly on the floor, "Your performance is being judged by numbers...don't  lose sight of that reality."  It was a constant verbal campaign to remind Employees of the truth that they could not put in writing.   HotCehalk was very careful not to put anything in writing.  However, Fields and management personnel made no secret of the fact that Specialists would receive good ratings on these "core values" so long as they were meeting their sales quotas.  If they did not meet the sales quotas, they would not receive good ratings on "core values."

35

Formatted:  No bullets or numbering

115.   According to Toi and Jeffri, HotCehalk's management was very loose with language that clearly showed their effort to beat the incentive compensation ban laws. It was not unusual to hear them use the word "reward", or the phrase "get around." Zinselmeier or Fields, at all-hands meetings where they were rolling out new policies, would openly say "Our attorneys have found a way..."   To get around the incentive compensation ban.   They never had any qualms about referring to the University of Phoenix or EDMC lawsuits directly when making their points.   In May, 2012, Zinselmeier said that, when HotChalk rolled out the new review practices,

> "We are having to make some changes to our review process. I know many of you are overdue for your reviews but thanks to the lawsuit won against University of Phoenix our lawyers had to help us put together a new review process so that the language doesn't reflect that we are reviewing based on numbers. But make no mistake about it, this is a sales floor and you are sales people, and nothing about your job has changed. We have numbers to make and if you aren't making those numbers this isn't the place for you. What you are about to see is a change in 'language' but we all know what is really expected."

~~102.~~  116.   He was referring to a PowerPoint presentation about to be presented by Dominick, a trainer whom they hired from the University of Phoenix.

~~103.~~  117.   After the "soft skill" roll out, during a one on one meeting (when management would review Specialists' phone calls or go over their numbers individually) with Dearring, Toi had a frank conversation about the "smoke and mirrors" of the new review policy.   Dearring admitted that the managers had been told "that they were to make sure their team was clear, despite the change in the review criteria made at the urging of their lawyers, that no one had better make the mistake of thinking their pay  increase was tied to anything other than enrollment numbers."

~~104.~~  118.   The Assistant Director of Admissions would go to each Enrollment Specialist's desk several times a week to go over his or her "pipeline," i.e., the leads on which he or she was working.   Each Specialist was asked to give his/her anticipated

36

"high" and "low" number of enrollments for that 5 week cycle. They were reminded in their weekly "team huddle" that they were in sales. They were taught to implemented sales strategies designed to get a prospect to remain on the phone with them, even when the prospect tells them they do not have time to talk. Specialists were expected to reach a certain number of hours of "talk time" and "dials" each day.

~~105.~~ 119.  For every enrollment, a celebratory email was sent to the entire floor indicating the number enrollment it was for the cycle and the name of the Specialist to whom it belonged.  That Specialist was celebrated on the floor by their clicking a mouse connected to a 50" inch television screen displaying the number enrollment and the sounds of ringing bells for all to hear and see.  HotChalk managers would "hit the button" whenever a student enrolled. An email was sent to the entire team, including upper level managers, to announce that a student has enrolled, and the Specialist who enrolled the student went to the big screen television with a keyboard and "hits the button" to add to HotChalk's count of enrolled students for that cycle. When the button was pushed, everyone clapped, yelled, whistled, hooted, and hollered.

~~106.~~ 120.  According to Toi and Jeffri, every Specialist received a salary, stock options for HotChalk stock and other incentives for meeting enrollment goals for each cohort (five week period).  If a Specialist excelled at enrollments, he or she received more stock options, and the number of shares was tied directly to the number of students enrolled.

~~107.~~ 121.  HotChalk had competitions between teams for the highest number of enrollments. The winning team received gift cards, an ~~all expenses~~all-expenses paid trip to Las Vegas and football tickets.  HotChalk often had lunches brought in as well. Fields often sent emails to the Specialists encouraging them to "raise the bar" or "win" by enrolling more students.

~~108.~~ 122.  HotChalk had competitions between teams for the highest number of enrollments. The winning team received gift cards, an ~~all expenses~~all-expenses paid trip to Las Vegas and football tickets.  HotChalk often had lunches brought in as well.

Fields often sent emails to the Specialists encouraging them to "raise the bar" or "win" by enrolling more students.

~~109.~~ 123.   On September 11, 2012, Fields sent an email to the Specialists in Phoenix rewarding them with Arizona Cardinals tickets for a "record setting Back To School season."   On September 13, 2012, he sent an email offering an $80 gift card as an alternative to the Cardinals tickets.

~~110.~~ 124.   All Specialist salary increases and other incentives were based solely upon the number of students he/she could enroll in a five week cycle.   The minimum enrollment requirement for each Specialist was 3-5 enrollments per cycle.   Although HotChalk was designed to appear to be an online education resource, it was actually a sales driven company where enrollment and profit were the primary goals.

~~111.~~ 125.   Zinselmeier and Cheshire would openly state, "Make no mistake, we are in sales.  This is a sales floor.  This is what you have to get."  They would further say, "Imagine how much money you will make and how 'wealthy' you will become from your HotChalk stock options."

~~112.~~ 126.   HotChalk sold the M.Ed. Programs offered by Concordia University.   At the 2012 Christmas party, Fields said that, "Other Universities are beating our doors down to do for them what we have done for Concordia University." He said that the upcoming year would be an exciting one of growth and that those Specialists "on the ground floor" would be the greatest beneficiaries of HotChalk's growth.

~~113.~~ 127.   HotChalk would train a Specialist class of around seven people.   Dr. Pearson would give a presentation and explained that she creates the curriculum for the M.Ed. Programs, and determines what programs are offered.   So, HotChalk was not really selling Concordia University programs, but programs created by HotChalk and using Concordia's name.   HotChalk was essentially functioning as a University, under the banner of a longstanding University's name.   HotChalk's sales force operated almost completely free of any hands on involvement from Concordia University.   Even so, there was still a connection between them because, now and again, HotChalk would

38

receive a rare visit from a Concordia campus employee. Specialists were told in advance of the person's coming, and the Concordia representative's appearance on the sales floor was minimal.

114. 128. Scott Besemen, from Concordia University's campus admissions department, would come in and Y-connect with a representative once in a while. Toi is specifically aware of one visit to HotChalk by Concordia's campus President, with some executive board members. It was in the earlier part of 2012, and Cheshire asked the Specialists to "dress-up for the dog and pony show."  They were pulled off the phones, brought to an area of the call center floor and presented to a group of well suited men. Fields conducted the introductions and opening welcomes to them. The Concordia representatives spoke about what a "fabulous job" HotChalk was doing for Concordia.  There were some joking references to "the new football field or athletic building" Concordia had built as a result of the profits made from HotChalk.  They also joked that the new facilities should be named after Edward Fields.

115. 129. In 2012, Concordia University, through HotChalk, began to offer Bachelor of Science online degree completion programs in Early Childhood Education and another in Career & Technical Education.  It was a fitful start to the offering of these two programs because they were 'degree completion' programs and a student had to have completed many prerequisite classes before they could be admitted. Importantly, review of the prospective or enrolled student's transcripts for consideration of acceptance, was done completely by HotCtchalk employees, and not at all by Concordia.

116. 130. Specialists were instructed to tell the students that Concordia "selected" its students, even turned away students, if their Letters of Intent were sub par subpar or if the student didn't meet the minimum GPA of 2.75. This statement was false. Prospective students were told that they could petition to be considered for admission if they could explain in their Letter of Intent why they had a low GPA. The "explanation" for a low GPA could be as simple as a statement tagged at the end of the Letter of Intent

39

that said something like, "I was young and partied a lot," "It was my first time away from home," or "I was working full time while getting my Bachelors." If the statement was enough to provide an explanation for the low GPA, it was never questioned beyond that point.   It was a common standard sales floor joke that "If they are breathing and can get through financial aid okay, they are going to be admitted."

117.   131.   The Letter of Intent requirement was a joke. Even a single paragraph drafted with the writing skills of an eighth grader would suffice and hardly any students were denied enrollment based on their essay's content or quality or lack thereof.  The letters of intent were sent to Michael Dearring first for approval. No matter how poorly written, Michael always said, "I have had worse than that, put it through."   The students were never rejected.

118.   132.   Cheshire and Fields stated that HotChalk's business model was to represent only non-profit, Christian schools. The general practices and approaches of traditional, non-profit, regionally accredited college admissions is quite different than that of a for profit education sales force. This why Fields and Zinselmeier specifically seek to do business only with these faith-based, non-profit institutions.

119.   133.   In fact, a huge part of HotChalk's selling point was that Concordia University (HotChalk) was a "Christian, private, non-profit university."   Specialists were instructed to point this out in every presentation to a potential student. They were provided what was known as a 'rubric' that was a script guideline. Though the rubric was changed frequently by the compliance director Susan, there were things specifically highlighted that Specialists were always required to say. Among those things was that Concordia was a faith-based or Christian, private, non-profit college. All the while, HotChalk management placed high emphasis on profits, going public one day and the HotChalk "family" retiring rich.

120.   134.   Michael Dearring, along with Cheshire, often reminded Specialists of their stock options and their need to generate the profit margins that Fields needed for the board and investors. Every six weeks HotChalk had an "all hands" meeting.  Fields

40

told them during the "all hands" meetings that he would only work with these Christian non-profit, regionally accredited colleges and that they were lined up for our services. HotChalk management instructed Specialists to tell prospective students, that "we" do not answer to stockholders.  They were told that this was to give the impression that Concordia's first commitment is to the student, not to profits.  However, according to Fields, Zinselmeier and other HotChalk managers, HotChalk had investors who invested capital with HotChalk.  Specialists in the sales force were expected to meet minimum enrollment numbers to meet the expectations of these investors so that HotChalk could continue to receive capital from them. Specialists were also told that by meeting the enrollment quotas, their own stock would be worth more and HotChalk could go public.

121.  135.  HotChalk is a hardcore sales, numbers driven environment that is clearly high-pressure and would no doubt be described as a boiler-room, pressure cooker and a sweatshop sales floor call center.  Specialists are under continual pressure to make the numbers by any means necessary. A Specialist would be hyper scrutinized, right down to how many times he went to the restroom that day, or how long it took him to get coffee.  Cheshire, who was promoted to the center's Director of Admissions, notoriously sweated Specialists who were not having good sales cycles to the point of exercising an abusive management style.

122.  136.  A mandatory criteria of Specialists' conversations with potential students was  to "create urgency" for the upcoming start date. Every day, five times a day Specialists received a "talk time" report that monitored how much time each Specialist was actively speaking to someone. The more talk time accrued, the more likely the Specialist would be permitted to work overtime.  Every day, five times a day, HotChalk sent a report showing how many outgoing calls were placed by each Specialist. Daily, HotChalk issued a report on how many enrollments each Specialist had for the upcoming cycle.

123.  137.  HotChalk's aggressive sales tactics increased with the implementation of the automatic dialing system.   With this automatic dialing system, management

41

increased the number of times Specialists called prospective students in an attempt to reach them. The excessive number of attempts were excessive, harassing, and predatory. HotChalk's Specialists   created such an unfavorable impression that interested candidates stated they were "turned off" by the excessive phone calls and did not or no longer wished to learn about the program or receive information.   Although this feedback was shared with management, management refused to reduce the number of times prospective students were called. Specialists often received requests from prospects to have their number placed on the "Do Not Call" list or to have their phone number or email address removed from the database. This request was not always honored.

~~124.~~  138.   These scholarships ranged in amounts from $500 to $4,000.  Specialists were instructed to present these to prospective students to entice them to enroll in the current cycle without delay. HotChalk's stated tuition pricing was a misrepresentation of the actual cost that HotChalk would accept as payment for tuition.   This is a misrepresentation concerning the nature of the Defendant Institution's financial charges in violation of 20 USC§ 1094(c)(3)(A) and 34 CFR § 668.73.

~~125.~~  139.   In early 2012, Cheshire announced, with tremendous enthusiasm, that "We would be continuing the practice of the offering of 'scholarships'."   The "scholarships" were originally offered sporadically as a test for boosting enrollment and were terrific sales tools disguised as a tuition reduction.  Specialists represented that  the Assistant Director of Admissions had to approve the scholarship, which was sometimes upward of $4,000.00. This so called scholarship could go from $1000.00 to $4,000.00 within a matter of minutes if the student demonstrated any hesitancy to enroll. Basically, the $20,600.00 tuition could become $16,000.00 to secure the enrollment.

140.   Specialists were trained to present this "scholarship opportunity" anytime a prospective student seemed reluctant to immediately enroll in the next starting cohort, or if they indicated interest in another school, or if they were stalling or delaying getting all of the 'collateral' needed to complete the enrollment process.  The scholarship was

42

used as an incentive to create urgency.  The Specialist would put the prospective student on the phone with the Asst. Director Of Admissions, who would ask them several questions (the answers to which were already known), and then say "if I can give you a scholarship, can you get everything we need in the next 48 hours?"

126. 141.   It was not unusual for the manager to end the conversation by reminding the student that there was barely any scholarship money left and that if they didn't get everything in timely, the money would have to go to someone else.  This practice was referred to at HotChalk as "second voice." They would tell the student that this was a part of Concordia's selection process and that they were available as a second point of contact for the prospective student.  They also offered the fake scholarship at this time.

127. 142.   Michael Dearring told the Specialists that the "scholarship" came out of HotCehalk's profits, not Concordia's tuition, and thus giving ultimately affected "our," his and the sales staffs', profit line in the bigger picture, which is why he started lower in the amount that he offered.  Cheshire and Dearring were notorious for telling the prospective that if they didn't enroll immediately in the upcoming cohort, there were only a couple of seats left and they probably wouldn't get in. I have heard Dearring say, "The only reason this scholarship money is available to you is that we had a student not get accepted and so this money is now available, and that is why it is imperative to get your application, financial aid and collateral in ASAP."   They would then turn the call back over to the Enrollment Specialist to close the deal.

128. 143.   If a prospective student was willing to enroll and didn't balk in anyway, no scholarship money was offered to that individual. This was reserved for a prod to move a prospective student forward quicker.  If a Specialist had a student that he felt really needed help, like a single struggling mother or someone like that, Cheshire and Dearring simply said, "That is not what scholarship money is for."   This was a huge part of the HotCehalk sales culture.

144.   One specific instance of using a scholarship as leverage occurred in the late spring, 2012.  HotChalk was scheduling for the summer cohort and a prospective

student stated that she had a schedule vacation pre-planned for two weeks with her family.  She wanted to start in the cycle after because she knew she wouldn't be focused on school.   The student already sent in her Letter of Intent and a couple of other required enrollment items, called collateral.  She had also completed the FAFSA and input Concordia's school code. When Michael Dearring made his weekly rounds to sit with each person on his team to check on the status of the prospective students, Toi conveyed the prospect's issues.

129.   145.   Dearring told Toi to tell the student that, if she didn't start the next cycle, she would not only lose the $2,500.00 scholarship he had offered her, but that it could affect her financial aid as well.  He also said to tell her that, because Concordia's teachers liked to start in the summer, there may not be a cohort that she could start until after the fall.  None of this was true.  When Toi protested that it wasn't true, Dearring said "We can't afford to lose any of the people I have on the books, and she won't know better if you don't tell her."

130.   146.   Sometimes, other bogus strategies were implemented for the scholarship offering, like completing an essay to be written for a competition.   The essay competition was pointless because it was not run as a valid essay competition. The deadline dates were never really the deadline dates and the how, when and by whom the essays would be reviewed were never clear. Specialists were allowed to continue to collect the essays when the winners had already been chosen. Sometimes the winners were selected and no one on the sales floor knew that this was the case and management simply allowed them to keep collecting essays.

131.   147.   Supervisors authorized Specialists to give scholarships when they were ending an enrollment cycle and were not tracking to hit their goal numbers. The scholarships were supposedly designed for specific teachers, such as teachers who work in a Title I school.  However, HotChalk awarded the scholarships without verifying whether the students met any specified criteria. In reality, the scholarships were merely a discount off the tuition price that HotChalk set in the first place.

132. 148.   The online M.Ed. Program did not lead to a student's licensure or certification and that information was not initially disclosed to the students.  HotChalk had issues with teachers being enrolled, believing that they were going to be licensed or certified after completion of Concordia's (HotChalk's) M.Ed. Programs when that simply was not the case. This wasn't a problem if a teacher worked for a private school, such as a private Catholic school, where licensure was not a requirement.  Given the student's sizable investment in the M.Ed program in both cost and time, it should have been disclosed to them prior to enrolling because they could end up with an education that limited them solely to private schools for employment.

133. 149.   Specialists were always happy to get private school educators because that particular issue would not come up or they could gloss over the fact that the degree did not lead to licensure.  On one occasion, Specialist Derrick Doss attempted on several calls, to finesse the fact that the program didn't lead to certification, implying to the prospective student that he could work on that aspect after finishing the program.

134. 150.   Jeffri Bolton worked for The University of Phoenix as an Enrollment Specialist for its Healthcare Program.  HotChalk was negotiating a contract with the University of Mary, located in Bismarck, North Dakota, to operate an online healthcare degree program through that school.

135. 151.   At the University of Phoenix, Jeffri Bolton was the number one recruiter, out of 250 recruiters, in converting prospective, inquiring students into enrolled students.  She submitted her stats and resume to HotChalk and participated in an online interview via Skype with Zinselmeier.  Zinselmeier specifically questioned her about her stat report from the University of Phoenix, whether she felt like she would be able to deliver the same enrollment results, her ability to meet HotChalk's enrollment expectations consistently and whether she  could work in "high pressure sales environment."  This was important to HotChalk because she would be their first, and for a time only, designated healthcare curriculum Specialist.

136.  152.   Zinselmeier explained to Jeffri Bolton that HotChalk's pay scheme for U.Mary was the same as that for Concordia:  Each Specialist was expected to meet a minimum of 3-5 enrollments every 5 week cycle and would be tracked by his immediate supervisor.  At the close of the first 6 months, the number of enrollments would be tallied and the Specialist's salary increase would be determined based on that number. The Specialist's review would be conducted by his immediate supervisor and the director of admissions.  The maximum increase in salary was roughly $5000 per 6 months, assuming the Specialist consistently enrolled 3-5 students over that time span.

137.  153.   On two separate occasions, both Cheshire and Zinselmeier specified that any salary increase would be predicated upon Bolton's enrollment numbers each five week cycle.  Zinselmeier said, "With this level of performance and enrollment activity, you will be well on your way to receiving the maximum increase on your six-month review."   Bolton's experience in healthcare and nursing program recruitment at the University of Phoenix made her HotChalk's "designated hitter" for the startup of the University of Mary program.  HotChalk literally had no one else who had healthcare or nursing degree experience.

138.  154.   HotChalk started Bolton out at a salary of $50,000.00 a year.  After hiring Bolton, HotChalk developed a program, similar to its Concordia program, with University of Mary.  The program, like the Conrdia Program, was designed to generate a profit for University of Mary, as well as for HotChalk.   The same enrollment strategies were implemented with University of Mary that were implemented with Concordia University, so that Specialists received incentives in the form of bonuses, prizes, trips and other rewards, based on the number of students they enrolled.

139.  155.   Bolton enroll nursing candidates for University of Mary's online bachelor and masters nursing programs.   For months, she was the only Specialist for the University of Mary.  —Cheshire, told her that HotChalk was banking on my nursing admissions background and experience to get the ball rolling with the new program and to get students enrolled.  Bolton was included in all developmental meetings with

46

management staff from both HotChalk and University of Mary. Present at the meetings were Bolton, Cheshire, Joanne Lassiter (HotChalk's U. Mary RN liaison) and Rachel (another HotChalk U. Mary liaison). Fields, included himself in these meeting on random occasions but he primarily visited the Phoenix office in person for meetings with Joanne Lassiter and Rachel.

140. 156.  From February, 2012 through April, 2012, Bolton was asked to, and did, develop the U. Mary administrative documents for potential students, including transcript request forms, online inquiry admission forms, internal student tracking software and other documents required to enroll students.  She assisted with reviewing ongoing developments such as the HotChalk online U. Mary website, U. Mary enrollment rubric, U. Mary funding guide, and U. Mary Specialist training materials. By April, while these things were in development, HotCehalk opted to have me initiate enrolling students without any of the aforementioned being actually completed.

141. 157.  During the first month of enrolling for University of Mary, Bolton asked Cheshire if she would be compensated for her efforts in generating potential students, since HotChalk had not yet given her any nursing leads to contact for enrollment. Cheshire responded, "Rest assured, I'll have you on the phones in no time. If you show me you can hit the ground running and give me at least 30 students, I'll be sure to return the favor on your six month review."  By April, 2012, Bolton was on the phone speaking to MSN (Master of Science in Nursing) candidates, and BSN (Bachelor of Science in Nursing) candidates.

142. 158.  However, at that time, HotChalk had no processes in place to evaluate student transcripts and no waiver or permissible forms.  In fact, Bolton was enrolling candidates into a program that did not technically exist.  There was no established curriculum, no teachers, no other faculty nor were there other implementations for the program.  It was actually a full five months later before the program actually came into existence. When Bolton expressed concerns to Cheshire, he responded, "Just do your part and get the students in the door. We'll cross that bridge when we get to it. I'm

47

banking on you for a big class start. You pull in the numbers and we'll do the rest. Don't worry, I'll be sure to treat you right when its review time. Just hold on to them as long as you can."

143.  159.  HotChalk was operating as an online nursing school, with the consent of U. Mary, for the purpose of generating profit for both HotChalk and U. Mary. HotChalk was responsible for hiring the online nursing faculty, the online marketing, determining and implementing all "scholarship" programs, enrollment of students and hiring sales enrollment staff.  The course instructors were actually HotChalk employees, not U. Mary faculty.  Students who previously had contact with U. Mary directly, were transferred to HotChalk as it "took over" responsibility for U. Mary's online division.

144.  160.  It was an absolute rule that students were not allowed to know that they were actually dealing with a company called HotChalk, not U. Mary.  Not only did they hide HotChalk's involvement, they actively lied about it when asked on the rare occasion that a student would see admissions documents that accidently listed HotChalk as their online school of attendance.  Not only was Bolton not allowed to tell students that they were enrolled in HotChalk classes instead of U. Mary classes, she was prohibited from telling students that she was anyone other than U. Mary representative.

145.  161.  HotCehalk designed, built and operated the online U. Mary website. A significant number of leads with potential student inquiries were generated by the U. Mary website.  As HotChalk technical specialist, Eric Chiat, explained to Bolton, when a potential student accessed HotChalk's online website, spyware installed by HoteChalk captured their information regardless of whether they had taken the initiative to fill out an inquiry form. This explained the countless times Bolton would speak with someone who was frustrated because they never requested her call or any information about the nursing program.

146.  162.  HotChalk offered four different masters nursing programs.  The tuition for those programs ranged from $32,000.00 to $60,000.00 through program completion. This tuition was most often covered by student loans saddling the student with an

48

enormous amount of debt.  A student who enrolled directly with University of Mary online typically paid a fee of $450 per credit hour. A student who enrolled through HotChalk for the same University of Mary program paid $750 per credit hour.  When Bolton asked James Cheshire about the difference in the cost per credit hour, he responded, "How do you think we're going to pay for your trip to Vegas?"

147.  163.   University of Mary had academic requirements for incoming students. Nevertheless, HotChalk accepted all potential students, even if they didn't meet the GPA requirements, so long as they completed an application and submitted an essay, just like the essay required for Concordia.  It was extremely rare for any student to be denied enrollment based on the essay's content or lack of quality.  HotChalk employees determine the sufficiency of the "letter of intent" with University of Mary.

164.   Initially, HotCehalk did not accept all nursing students. However it did greatly change the minimum requirement for the program and planned to move in the direction of accepting all nursing candidates. The minimum GPA was changed from a 2.7 to 2.5. Initially all prerequisites were required upon entering the program, this changed to offering the prerequisite courses to be taken with the program. In August, 2012, Bolton discussed multiple times with fellow U.Mary Specialists Harlan Stone and Kit McGhee, the initial difficulty of finding students who had all prerequisites. James Cheshire chimed in on their conversation saying,

148.

"It started out this way with Concordia. Once University of Mary sees how much money we bring in for them, they'll make some major adjustments to their academic criteria just like Concordia did. We're going to send Julie [Smith] to the Bismark campus and get some of this straightened out. They won't be so hard headed for long".

149.  165.   After Julie Smith returned from her trip, there was no longer a need for the letter of intent with the admissions process, the GPA requirement for the program was

49

lowered, missing prerequisites were going to be built into the students program, a resume from the candidate was no longer needed and HotChalk was allowed to enroll diploma nursing graduates rather than solely degree holding nurses.  All of these changes were negotiated and approved by U.Mary.

150. 166.   As long as the student met the lowered GPA, none of the other miscellaneous documents mattered.  Regardless of the sufficiency of reference letters, applications and other hoops candidates jumped through, they were admitted. Once admitted, the student would almost always obtain students loans to pay tuition, particularly for the graduate nursing program because there was a lot of loan money available to graduate students.

151. 167.   HotChalk supervisors Carl Blunt (manager of U.Mary as of October, 2012) and James Cheshire wanted it to appear that the applicant's low GPA was an issue for "special consideration."  In fact, all they did was artificially slow that applicant's enrollment process to make it appear that they were making special efforts on behalf of the applicant.  In the end, the applicant would always be admitted to U.Mary despite being under-qualified because all admissions decisions were in fact made by HotChalk. Once admitted, the student would almost always obtain a student loan to pay the tuition.

152. 168.   After qualifying a potential student, Specialists would direct the student to the governmental FAFSA site to apply for financial aid.  There was even a link to the FAFSA site that was included in the signature block of emails to the students, so that all they would have to do was click on the link and that would take them directly to the FAFSA site to complete the application.  There was someone at the HotChalk financial aid department who interfaced with them if they needed help with their student loan and financing in general.  The head of that department was Silvino Tibi.

153. 169.   Once a student's financial aid forms were complete, a financial aid officer calculated the student's financial aid plan based on a DOE formula and informed the student of the plan. The student could accept or reject the financial aid plan. If a student rejected a financial aid plan, often because the student did not qualify for enough

financial aid to cover the entire amount of tuition, it was the Specialist's job to convince the student to accept the financial aid package and enroll by misleadingly offering "scholarships" to help them finance the classes.  The "scholarships" were exactly like those described above for Concordia.

154. 170.  Like Concordia, urgency was a very big and ongoing theme when enrolling U.Mary students.  Specialists were placed under constant pressure to enroll a student now as opposed to later, for the earliest upcoming course cycle.  Specialists enrolling U.Mary students used exactly the same tactics to pressure prospective students as those explained above for Concordia.  The scholarships were used to lure and "hold on" to prospective students.   A part of that "holding on" process involved offering incentives for potential students ranging from iPads to books to the "scholarships."

155. 171.   A lot of Enrollment Specialists for U.Mary had absolutely no background in nursing. Yet they were still doing transcript evaluations for the students that had credits they wanted to transfer in and they were coming back wrong. The students were paying for and scheduled to take classes that they had already taken through another university.   No one from U.Mary was doing an official evaluation of the nursing transcript to evaluate credit transfers.

156. 172.   Specialists for U.Mary were specifically hired to enroll students in the online program and retain those students.  Nothing related to the student's education beyond that was the Specialist's concern.  A Specialist's salary increase was based on the number of enrollments they were able to obtain in a six month period.   The minimum enrollment expectation for each Enrollment Specialist is 3-5 enrollments per cycle.   Despite the sales-floor atmosphere, Specialist were required to explain to prospective students that theirs was a non-profit institution.   All Specialists were provided with a "rubric", which was initially a script and later a guideline for conversations with potential students. The first mandatory criteria of conversations was to "create urgency" for the upcoming start date. Every day, five times a day, each Specialist received a "talk time" report that monitored how much time each enrollment

1   rep was actively speaking to someone. The more talk time a Specialist accrued, the
2   more likely he was to enroll a student.  The more students he enrolled, the more likely
3   he was  to qualify for "overtime," which was one incentive HotChalk used to encourage
4   sales.

5   157.  173.  HotChalk's standard procedure required Specialists to meet an enrollment
6   quota.  Specialists who met or exceeded their quota were given tickets to baseball
7   games, gift cards, lunches from various local restaurants and other such incentives.
8   Specialists even won an all-expense paid Las Vegas trip. CEO Edward Fields rewarded
9   the qualifying Specialists with a trip to Las Vegas for a couple of days.  The trip was
10  reserved for those who had contributed to what was described as a "milestone profit" for
11  the company.

12  158.  174.  In 2012, Zinselmeier explained that, "we have found a way to work
13  around the compensation ban" and instituted the "core values" review explained above.
14  All U.Mary Specialists were all required sign an acknowledgment of this change in their
15  valuations and were told that the document would go into their personnel files.
16  Zinselmeier made it clear to the Specialists that this was just for what he called "CYA"
17  purposes. Our managers openly stated so long as the minimum number of student
18  enrollments is achieved, the "core values" do not matter and that they are nothing more
19  than an effort to disguise the fact that performance and compensation are measured
20  exclusively by reference to student enrollment. Thus, all Enrollment Specialist had to do
21  to meet the minimum core competencies, and receive the minimum core values rating is
22  simply meets their quota of new enrollments.

23  159.  175.  When she received her first review, Bolton realized that the reviews were
24  not meaningful.  If she met her sales quota, she would receive a good review on the
25  "core competencies" and continue to receive salary increases and bonus incentives.  If
26  she failed to achieve her quota of five new enrollments per month, she would receive a
27  negative review on "core competencies."

28

52

160.  176.   Once Specialists were switched from salary to hourly, overtime became another incentive to encourage them to sell the product.   The purpose of the overtime was purely to drive the numbers.  Sometime around August or September, 2012, James Cheshire told the U.Mary Specialists that unlike HotChalk's Concordia Specialists, who were limited to ten hours overtime based on their enrollment numbers, U.Mary Specialists would be allowed unlimited overtime because they so badly needed a big start and to enroll as many students as possible. U.Mary Specialists' ability to work overtime only lasted from August to November.   Overtime was discontinued in November because HotCehalk was unprepared for the overwhelming numbeer of students.   There were not enough teachers, there was scheduling confusion and in general a disorganized mess with which HotChalk had to deal.

161.  177.   To Zinselmeier, "Be Happy, No Drama" means, no matter what HotChalk instructs a Specialist to do, no matter how HotChalk treats the Specialist and no matter what unreasonable expectations HotChalk places on the specialist, the Specialist is to do nothing.   Specialists can't ask questions, seek clarity and certainly never suggest that HotChalk crosses any lines or that HotChalk should do anything differently.   HotChalk told its Specialists, "Be happy you have a job and be happy for the efforts to bend the rules for your benefit."

162.  178.   Bolton had many conversations with Dearring about the "No Drama, Be Happy" culture.   He interpreted her questioning the HotChalk policies, procedures and what she considered to be the manipulation of prospective students, as a direct challenge to the HotChalk culture.   He expressed that her ideas conflicted with HotChalk's way of doing things.   Dearring and Cheshire told Bolton on several occasions that she wasn't being happy and that her questions, or her refusal to "support the culture" was "creating drama."

163.  179.   Ultimately, HotChalk terminated Bolton's employment for being "disruptive" in the work environment.   She was "disruptive" because she asked

53

questions in open meetings and team huddles, seeking clarification of instructions on policies and directions that seemed improper.

180.   HotChalk's boiler room culture and incentive compensation results in the admission of students to expensive programs when the student's ability to complete the program is dubious at best.   Knowing this, HotChalk encourages and actively assists these students in obtaining student loans that are federally insured.   A significant number of the students who enroll can't complete the course work and drop out.  More still default on their student loans, requiring the federal government to pay the balance owed.  This outcome is precisely one of the reasons why incentive based compensation for enrolling students is banned.

164.

165.   Title IV of the HEA requires that, to be eligible to participate in and receive payment from its loan and grant programs, educational institutions must agree and promise not to provide any commission, bonus or other incentive payment to their student recruiters based directly or indirectly upon success in securing enrollments. 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22). The Defendant Institutions entered into such agreements (Program Participation Agreement or "PPA") and made such promises, and submitted and caused to be submitted to the DOE thousands of loan and grant applications.

166.   Regardless of a signed Program Participation Agreement, HotChalk and the Defendant Institutions are deemed to have agreed to comply with the incentive compensation ban. Defendant Institutions' agreements and promises, and each and every one of their applications, were and are false and fraudulent because, Defendants tied their enrollment specialists' compensation directly to the number of students they enrolled. Over a period of years, in reliance upon the Defendant Institutions' false and fraudulent agreements and promises, the DOE paid out millions of dollars in student grants, payments of loan interest, and repayment of defaulted guaranteed student loans, all used for tuition payments for the online programs of the Defendant Institutions. Each of these requests for payment of such funds constitutes an actionable false claim under the FCA. Each dollar paid or guaranteed to be paid by the DOE constitutes a loss to the government.

167.   Pursuant to Title IV of the HEA of 1965, 20 U.S.C. §§ 1070 et seq., DOE provides financial assistance in the form of grants, loans, loan guarantees and interest subsidies to eligible students to help defray the costs of education, including, but not limited to, the Federal Perkins Loan Program, 20 U.S.C. § 1087aa et seq., 34 CFR § 674

and the Federal Direct Student Loan Program, 20 U.S.C. §§ 1087a et seq., 34 CFR § 685.

168.   Each of the Title IV programs has specific requirements as a prerequisite to obtaining federal funds. One requirement is that in order to become eligible to receive Title IV funds under these programs, each institution must enter into a PPA with the DOE. 20 U.S.C. § 1094(a); 34 C.F.R. § 668. 14(a)(1). Regardless of the existence of a PPA, however, HotChalk and the Defendant Institutions are deemed to have agreed to have entered into a PPA with the DOE. PPAs expressly "condition the initial and continuing eligibility of the school to participate in a program upon compliance with" the requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668.14.

169.   The statute, regulation and PPA explicitly provide that an educational institution is prohibited from providing any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance[.]" 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668. 14(b)(22). This is commonly referred to in the post-secondary education industry as "the incentive compensation ban." Compliance with this ban is an express condition to the initial and continuing eligibility of schools to obtain Title IV funding.

170.   In each PPA, an institution certifies, "The execution of this Agreement by the Institution and the Secretary is a prerequisite to the Institution's initial or continued participation in any Title IV, HEA Program." Each PPA then states, inter alia, "By entering into this Program Participation Agreement, the Institution agrees that ... (22) It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance...."

171.   To maintain its eligibility to receive Title IV funds, each year the institution also must provide the DOE with an annual compliance audit and financial statements prepared by independent auditors. 20 U.S.C. § 1094(c); 34 C.F.R. §§668.23 and 668.25. The audit reports are used to determine whether schools are adhering to applicable requirements for funding, including the incentive compensation ban. As a required part of the audit, the Defendant Institutions certify compliance with the requirements for eligibility to participate in Title IV programs, including the incentive compensation ban.

172.   Congress enacted the prohibition against paying commissions, bonuses or other incentive payments based on success in recruiting students because it determined that such payments were associated with the enrollment of unqualified students to receive federal student aid funds and high loan default rates, which in turn resulted in a significant drain on program funds where the government acts as a loan guarantor. When Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, of which incentive compensation was a part. See S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number

55

of students for a given period"); H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, reprinted in 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

173.   Congress has specifically prohibited educational institutions from using deceptive practices, including misrepresentations which concern the nature of a school's "financial charges." Among the specified prohibited conduct, an institution shall not engage in false, erroneous or misleading statements concerning offers of scholarships to pay all or part of a course charge. 20 U.S.C. § 1094(c)(3)(A); 34 C.F.R. § 668.73.

174.   An educational institution is permitted to engage the services of a third party servicer provided it complies with 20 U.S.C.A. § 1094(c) and 34 C.F.R. § 668.25. This statute and regulation requires that an educational institution require, in its contract with the servicer, compliance with all statutory provisions of or applicable to Title IV of the HEA, all regulatory provisions prescribed under that statutory authority, and all special arrangements, agreements, limitations, suspensions, and terminations entered into under the authority of statutes applicable to Title IV of the HEA, including the requirement to use any funds that the servicer administers under any Title IV, HEA program and any interest or other earnings thereon solely for the purposes specified in and in accordance with that program. An institution also is required to include in its contract with the servicer, the servicer's agreement to report to the government violations of the law. Essentially, the government prohibits eligible educational institutions from contracting away to third parties the compliance obligations imposed on the institutions.

175.   After a school becomes eligible to receive Title IV funds by entering into a PPA, claims for payment of those funds can be made in various ways. Under some programs, students submit requests for funding directly to the DOE, or to the DOE with the assistance of schools, while under other programs, students and schools jointly submit requests for loans to private lenders which are guaranteed by state guaranty agencies that are, in turn, insured by the DOE, which pays only in the event of a student default.

176.   With respect to all Title IV programs, the disbursement of federal funds rests on required statements of eligibility made by schools that were necessary for requests for payment to be considered.

177.   By signing their PPAs, the Defendant Institutions each acknowledged their responsibilities to act as fiduciaries, to comply with all Title IV program requirements and to account for the federal funds entrusted to them.

178.   The Defendant Institutions sign and submit PPAs to the DOE, thereby certifying their compliance with the incentive compensation ban, their future compliance with all applicable statutory and regulatory provisions, and compliance with the requirement that the institution will use funds it receives under any Title IV, HEA program and any interest or other earnings thereon, solely for the purposes specified in and in accordance with that program. The Defendant Institutions additionally certify that with certain exceptions, they will not provide any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities or in making decisions regarding the awarding of title IV, HEA program funds. Thus, the Defendant Institutions certify that they will not engage in the payment of incentive compensation based either on enrollments or financial aid.

56

~~179.    The Defendant Institutions are currently operating under approved PPAs and cannot, in fact, operate in the Title IV environment without a current PPA. As a matter of law, each Defendant Institution is deemed to be operating under a PPA. See 20 USC §1094 and 34 CFR § 668.14. Each submits a variety of claims to the government for Title IV funds that it knows to be false based upon its non-compliance with the incentive compensation ban. During each academic year starting July 2010 through March 2013, the Defendant Institutions secured enrollments in their online programs, and received Title IV funds for students enrolled in their online programs marketed by HotChalk. Additionally, during each academic year starting July 2010 through March 2013, students obtained loans guaranteed by the government, or in some cases, financial aid directly from the government.~~

**VI.    COUNT I – <u>ALL RELATORS -</u> THE FALSE CLAIMS ACT, 31 U.S.C. §§3729(a)(I),(a)(2) and 3732 (b)**

~~180.~~  <u>181.</u>  Plaintiffs/Relators re-allege and incorporate by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

~~181.~~  <u>182.</u>   This is a claim for treble damages under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

~~182.~~  <u>183.</u>   Through the acts described above, Defendants knowingly submitted or caused to be submitted to the United States government false or fraudulent claims for student financial aid. The United States, unaware of the falsity, paid the Defendants for claims that would otherwise not have been allowed.

<u>184.</u>   By reason of the Defendants' fraudulent acts, the United States government has been damaged and continues to be damaged in the amount of millions of dollars.

~~183.~~

**WHEREFORE,** Plaintiffs/Relators Regina Calisesi, Toi, and Jeffri Bolton pray for judgment against Defendants HotChalk, CUP, U. Mary, Centenary, CUNE, CNY, Fields, Cheshire and Zinselmeier and that this Court grant them all monetary and equitable relief available under each statute, including but not limited to actual damages, trebled damages, statutory penalties, prejudgment and ~~postjudgment~~<u>post judgment</u>

interest and attorneys' fees and costs. In addition, Plaintiffs/Relators request such other and further relief to which they are entitled.

**VII.   COUNT II – RELATOR CALISESI ONLY - THE FALSE CLAIMS ACT, 31 U.S.C. §3730(h)**

18599.   Plaintiff/Relator Calisesi re-alleges and incorporates by reference the allegations made in the preceding paragraphs of this Complaint as though fully set forth herein.

100186.   Calisesi was constructively discharged, threatened, harassed and discriminated against in the terms and conditions of her employment at HotChalk because of lawful acts done by her in furtherance of other efforts to stop one or more violations of the FCA.  As a result, Calisesi is entitled to the relief provided for by 31 U.S.C. §3730(h)(2).

**WHEREFORE,** Plaintiff/Relator Regina Calisesi prays for judgment against Defendants HotChalk, CUP, U. Mary, Centenary, CUNE, CNY, Fields, Cheshire and Zinselmeier and that this Court grant her reinstatement with the same seniority status that she would have had but for the discrimination, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained by her as a result of the discrimination, including litigation costs and reasonable attorneys' fees. In addition, Plaintiff/Relator Calisesi requests such other and further relief to which she is entitled.

### Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs/Relators hereby demand trial by jury.

58

1    Dated this 107th day of April July, 2014.

2

3                        Respectfully Submitted,

4              **POLSINELLI PC**

5              **/s/ Carlyle W. Hall, III**
6              Troy B. Froderman
               Carlyle W. Hall, III
7              One East Washington Street, Suite 1200
               Phoenix, Arizona 85004
8              (602) 650-2343
               tfroderman@polsinelli.com
9              chall@polsinelli.com

10

11             **BREWER & PRITCHARD, P.C.**

12             **/s/ J. Mark Brewer**
               J. Mark Brewer (Admitted pro hac vice)
13             A. Blaire Hickman  (Admitted pro hac vice)
               Three Riverway, Suite 1800
14             Houston, Texas 77056
               (713) 209-2950
15             brewer@bplaw.com
               hickman@bplaw.com
16

17             *Attorneys for Plaintiff/Relator Regina Calisesi*

18

19             **THE SPENCER LAW FIRM**

20

21             /s/ Dawn R. Meade
22             Dawn R. Meade (Admitted Pro Hac vice)
               Bonnie E. spencer (Admitted Pro Hac vice)
23             Ashley M. Spencer (Admitted pro hac vice)
               4635 S.W. Freeway, Suite 900
24             Houston, TX  77027
               (713) 961-7770
25             dawnmeade@spencer-law.com
26             bonniespencer@spencer-law.com
               ashleyspencer@spencer-law.com
27
28             *Attorneys for Plaintiffs/Relators  Toi and Jeffri Bolton*

                                59

Formatted: Superscript

Formatted: Not Small caps

Formatted: Not Small caps
Formatted: Not Small caps
Formatted: Not Small caps
Formatted: Not Small caps
Formatted: Not Small caps
Formatted: Not Small caps

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE

I hereby certified that on July 7, 2014, I served the foregoing document on all counsel of record via electronic service through the Court's CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Howard Cabot
Jacob Roberston
Perkins Coie, L.L.P.
PO Box 400
Phoenix, Arizona, 85001
*Attorneys for Concordia University*

Reilley Keeting
Jeremy Sacks
Stoel Rives, L.L.P.
900 S.W. 5th Ave., Suite 2600
Portland, Oregon 97204
*Attorneys for Concordia University*

Paul Gerding, Jr.
Echo Orcutt
Kutak Rock, L.L.P.
8601 N. Scottsdale Rd., Suite 300
Scottsdale, Arizona, 85253
*Attorneys for University of Mary*

Mark Nadeau
Ronald Roach
DLA Piper, L.L.P.
2525 E. Camelback Rd., Suite 1000
Phoenix, Arizona 850016
Attorneys for HotChalk, Inc., Edward Fields,
*James Cheshire and Mark Zinselmeier*

I hereby certify that on July 7, 2014, I served the foregoing document on the following via first class mail:

The Honorable Eric Holder
Attorney General of the United States
Attn: Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

61

The Honorable John S. Lenardo
United States Attorney, District of Arizona
Attn: Civil Division
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004

_____/s/ Dawn R. Meade

Formatted: Font: Not Bold, Not Small caps

Formatted: Not Small caps

62