# EXHIBIT A

## ONLINE DEGREE GRANTING PROGRAM
## ADMINISTRATIVE SERVICES AGREEMENT

This Online Degree Granting Program Administrative Services Agreement ("**Agreement**") is entered into as of July 29, 2013 ("**Effective Date**"), by and between Centenary College, a New Jersey nonprofit corporation ("**Provider**"), with its principal office located at 400 Jefferson Street, Hackettstown, NJ 07840, and HotChalk, Inc., a Delaware corporation ("**HotChalk**") with its principal office located at 1999 S. Bascom Ave., Suite 1020, Campbell, CA 95008.

WHEREAS, Provider is a higher education institution accredited by the Middle States Commission on Higher Education, offering degree based academic programs;

WHEREAS, Provider is the creator and owner of certain online courses, curricula, and programs listed in Exhibit A Section 1A.1 attached hereto;

WHEREAS, HotChalk has the specialized capacity to effectively market and distribute such online courses, curricula and programs;

WHEREAS, HotChalk has the specialized capacity to assist Provider in administering certain services as described in Exhibit A Section 1A attached hereto; and

WHEREAS, pursuant to this Agreement, Provider desires to obtain the above services from HotChalk, and HotChalk desires to provide these services subject to and in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, the parties, subject to approval of this Agreement by the higher education institution noted above, hereto agree as follows:

1.     DEFINITIONS

1.1     "**HotChalk Marks**" means the trade names, trademarks and service marks of HotChalk.

1.2     "**HotChalk Bundled Services**" means the services to be provided by HotChalk as set forth in Exhibit A Section 1A.

1.3     "**HotChalk Website(s)**" means the website accessible at the URL www.hotchalk.com, other HotChalk-controlled websites, or other websites specified in writing by HotChalk.

1.4     "**Intellectual Property Rights**" means all patents, patent applications, business processes, data rights, trademarks, service marks, trade names, know-how and copyrights; rights relating to the protection of trade secrets and confidential information; and other proprietary rights including, without limitation, license rights relating to intangible property; and divisions, continuations, renewals, reissues and extensions of the foregoing now existing, or hereafter filed, issued or acquired, arising or enforceable under United States law or the law of any other jurisdiction or international treaty regime.

1.5 **"Net Receipts"** means the payments received by Provider for students enrolled in Online Curriculum adjusted for any deductions detailed in Section 5.3.

1.6 **"Online Curriculum"** means Provider's courses, curriculum, certificate, and degree granting programs offered online and identified on Exhibit A Section 1A1.

1.7 **"Online Curricular Environment"** means the Provider-controlled learning management system made available by Provider.

1.8 **"Student Relationship Management Software"** or **"Accordion"** means the software owned and used by HotChalk for the purposes of enrollment and student services.

1.9 **"Provider Marks"** means the trade names, trademarks and service marks of Provider.

1.10 **"Source Code"** means any human readable computer program code.

2. PROPERTY.

2.1 Title and Copyright Owned by Provider. HotChalk acknowledges that Provider owns and maintains all right, title and interest (including all Intellectual Property Rights) in and to the Online Curriculum and no such rights shall pass to HotChalk, except to the extent to which such rights are expressly granted under this Agreement. HotChalk shall take such steps as are reasonable under the circumstances to ensure the protection of Provider's ownership in and to the Online Curriculum.

2.2 Title and Copyright Owned by HotChalk. Provider acknowledges that HotChalk owns and maintains all right, title and interest (including all Intellectual Property Rights) in and to Accordion and no such rights shall pass to Provider, except to the extent to which such rights are expressly granted under this Agreement.

2.3 Student Information and Data. Provider acknowledges that information and data related to potential students generated or procured by HotChalk under the terms of this Agreement are owned by HotChalk. HotChalk acknowledges that information and data related to students that are enrolled by Provider shall not be utilized for purposes other than in the performance of, or as contemplated by, this Agreement.

2.4 Product Branding and Modification. Subject to the Reservation of Academic Rights set forth at Section 4.5, below, HotChalk retains sole control and authority on the "look and feel" of Accordion.

3. LICENSE AND RIGHTS

3.1 Provider License. Subject to the Reservation of Academic Rights set forth at Section 4.5, below, and otherwise subject to the terms and conditions of this Agreement, Provider hereby grants to HotChalk the exclusive right and limited, non-transferrable license during the term of this Agreement to advertise, market, publish, use, reproduce, distribute, test, and demonstrate the Online Curriculum solely for purposes of offering and providing the HotChalk Bundled Services to students and potential students of Provider including the right to publish, use, reproduce and distribute all documentation associated therewith, solely for the

purpose of performing the HotChalk Bundled Services, including, without limitation, for (a) marketing directly to students, (b) marketing through partners, dealers, distributors, representatives and value-added resellers, provided HotChalk complies with the terms and conditions of this Agreement.

3.2    Notwithstanding the foregoing, Provider shall have the right, through the use of its own employees, trustees, students and alumni, to promote the Online Curriculum. Provider may not, however, utilize the services of any third party in promoting the Online Curriculum.

4.    PROVIDER OBLIGATIONS, ONLINE CURRICULUM, AND DOCUMENTATION

4.1    Courses and Curriculum. Immediately after execution of this Agreement or as specified in Exhibit A, Provider shall provide HotChalk with access to and copies of the content for the Online Curriculum detailed in Exhibit A Section 1A, including electronic files and other materials as specified in Exhibit D. Provider also commits to the additional Online Curriculum as detailed in Exhibit D.

4.2    Course Delivery. The Online Curriculum shall be delivered by faculty appointed by and under the academic control of Provider, with such assistance by HotChalk as described in Exhibit A Section 1A. HotChalk recognizes that Provider requires the approval of its faculty and the Middle States Commission on Higher Education prior to the beginning of any classes. Provider agrees to seek such approvals on expedited bases.

4.3    Marketing. HotChalk will operate as the sole entity executing marketing activities aimed at generating qualified leads for the Online Curriculum. These lead generation marketing activities include, but are not limited to, managing campaigns with aggregator and directory sites; managing media buys, including display and text ads; using email, direct mail, telephone, conference exposure, speaking events, and any other direct means to target and reach prospective students (See Exhibit B). Provider shall furnish HotChalk with the list of deliverables (See Exhibit D).

4.3.1 Search Engine Marketing: HotChalk utilizes search engine marketing to deliver enrollments. HotChalk's holistic approach to search engine marketing requires Provider to agree to the following:

4.3.1.a  HotChalk will be the only agency running paid search engine marketing for Online Curriculum.

4.3.1.b HotChalk will be the only agency used by Provider to run search engine campaigns that include bidding on provider trademark terms or brand names for Online Curriculum.

4.3.1.c HotChalk will bear all search engine marketing costs related to the Online Curriculum. Provider shall have the right to run search engine marketing campaigns for programs that are not Online Curriculum with any individuals or entities it chooses and does not have to use HotChalk exclusively for such campaigns. If HotChalk deems, at its sole discretion, that Provider's use of other individuals or entities to run search engine marketing campaigns for programs that are not Online Curriculum in anyway

diminishes the effectiveness of HotChalk's search engine marketing work, then Provider will immediately cease its campaigns.

4.3.2 Web pages: HotChalk may direct prospective student web site traffic at its discretion to Provider's .edu URL, or to other landing pages outside Provider's .edu domain. Provider agrees to the following:

4.3.2.a Provider will grant HotChalk access to all of its web pages in order to conduct audits aimed at identifying opportunities for improving site yield, which is defined as converting site visitors to leads and eventually to enrolled students. If changes are compliant with applicable laws and regulations and are otherwise appropriate as determined by Provider, Provider will implement all recommended changes in order to improve site yield, including but not limited to color changes; layout changes; placement of inquiry forms on certain pages; and highlighting of certain programs on certain pages.

4.3.2.b Provider will work collaboratively with HotChalk to allow HotChalk to make changes to web page source code aimed at enabling marketing activities, including but not limited to the addition of links to external sites, placement of meta tags, streamlining structure and elimination of code redundancies, and placement of code aimed at analytics and retargeting.

4.3.2.c At HotChalk's request, Provider will create and assign to HotChalk's use certain subdomains, subdirectories, and pages within its .edu site. HotChalk's use of these subdomains, subdirectories and pages shall not interfere with Provider's use of its .edu site.

4.3.3 Social media: HotChalk will engage in social media to promote the Online Curriculum.

4.3.3.a HotChalk will develop and manage social media properties used to promote the Online Curriculum. In order to maximize advantages of cross-fertilization, Provider and HotChalk will cooperate to maintain continuity in all social media outlets.

4.3.4 Safeguarding Provider's reputation and maintaining marketing material integrity: HotChalk recognizes the significance and importance of safeguarding Provider's reputation, accreditation, state approval, Title IV eligibility, and academic integrity, including but not limited to adherence with the U.S. Department of Education's misrepresentation regulations provided at 34 C.F.R. Part 668 Subpart F. Marketing material developed by HotChalk shall be subject to Provider approval as follows:

4.3.4.a All text copy content will be submitted by Hotchalk for a review and approval by Provider of accuracy, brand consistency, brand integrity, fact-checking or accreditation/regulatory risk. This includes but is not limited to the following:

4.3.4.a.1    Email, banner, search ad text, web page content and deliverables to be used by HotChalk personnel when interacting with students.

4.3.4.a.2    Social media – Facebook, Twitter, and the like – are not subject to review in real time.

4.3.4.a.3    Photos or images.

4.3.4.b    Provider may veto any content that is factually incorrect or that is deemed as carrying accreditation or regulatory risk, or that is not in alignment with brand consistency or brand integrity. HotChalk will submit text content in Microsoft Word format to a designated contact person. Provider will respond with either approval or rejection of submitted content within two (2) business days of receipt. Failure to respond within two (2) business days of receipt will result in HotChalk raising the delinquent response to the Provider's Operational Liaison for prompt approval or rejection.

4.3.4.c    Provider and HotChalk shall institute a collaborative review process aimed at identifying and correcting radical departures from approved messaging. The following items will be considered outside the scope of the review process described in 4.3.4.b:

4.3.4.c.1    Style, direct response language (e.g. starting a sentence with the word "And" may be called for, and cannot be vetoed).

4.3.4.c.2    Font and Color – HotChalk will use tasteful and appropriate font and color palate as in the official style guide or as close to it as possible. However, certain marketing vehicles and media may require use of fonts and colors that are not in the style guide; regardless, HotChalk will strive to remain faithful to or within approved style guide.

4.3.4.c.3    Graphic component size, placement, color, shape, and label – for example, a button may be placed anywhere on a web page, carry whichever action label ("Next", "Go", "Continue", etc.).

4.3.4.c.4    Inquiry form mechanics and labeling of form components (e.g. order of questions, number of steps).

4.3.4.c.5    Combination of any approved text and any approved photos or images.

4.3.4.d    HotChalk will engage in testing to identify which appropriate visual elements should be used in marketing material.

4.3.5 Agency of Record: Provider will also sign an Agency of Record Letter ("AOR Letter", see Exhibit G) authorizing HotChalk and its agents and affiliates to act as an Agency of Record for Provider.

4.4    Online Degree Management.  Provider shall admit students who Provider determines to be qualified degree candidates, which determination shall be in Provider's sole discretion, to the Online Curriculum.  Provider agrees that HotChalk shall screen all prospective students prior to referral to Provider to ensure that such students meet the qualifications for enrollment and admissions established by Provider in Exhibit C.

4.5    Reservation of Academic Rights.  Notwithstanding any other provision of this Agreement to the contrary, it is expressly agreed by the Parties that Provider has and will continue to have exclusive control over its academic programs.  By entering into this Agreement, Provider is not delegating, and will not delegate, any of its academic rights or obligations, including but not limited to all academic judgments and decisions consistent with its published policies and procedures.  Non-delegated duties include, without limitation: admission of students, course content and the delivery of the instructional program; approval of employment of faculty; registration, and retention of students; acceptance of transfer credit; evaluation of student progress; and the awarding and recording of credits and degrees, credentials and/or certificates.  The Parties agree that operational policies relating to institutional accreditation will, to the extent applicable to the performance of this Agreement, guide the conduct of the Parties.  Nothing herein shall in any way limit Provider's rights to offer any courses, curriculum, certificate, and degree granting programs in a manner not provided for under this Agreement.

Consistent with this section 4.5, and meeting Provider's existing, established operational criteria and procedures; both parties agree to operate in a manner that maximizes these existing criteria and processes for successful, scalable growth of Online Curriculum.

4.6    Financial Aid.  Provider agrees to carry out the processing and awarding of all aspects of the financial aid process in compliance with Federal regulations.  Provider agrees to perform a proactive, consultative approach in reaching out to all prospective students.  Provider will perform these actions with expediency and with a high quality customer service approach.  Provider will:

- Establish student awards within 72 hours of receiving the student's valid ISIR; and
- fully monitor and manage all aspects of student's award acceptance, and loan entrance counseling and master promissory note signing in an expedient manner following the student's acceptance of awards.

Provider agrees to staff one fulltime Financial Aid employee in Campbell, CA for at least every 400 students enrolled, beginning when 50 students have been enrolled as a result of HotChalk services.  The fulltime Financial Aid employee shall be under the sole control, supervision, and authority of the Provider.

4.7    Tuition.  Tuition and fees to be charged for each course of study or credit in the Online Curriculum shall be determined by Provider in its sole discretion.  Provider shall have the right to change the charge for tuition and/or fees, or to add additional fees, during the term

of this Agreement as determined by Provider in its sole discretion with 180 days notice to HotChalk.

## 5.    BUNDLED SERVICE FEES

5.1    Bundled Service Fees. Fees payable to HotChalk for HotChalk Bundled Services. Provider shall pay to HotChalk the Bundled Service Fees set forth in Exhibit A, Section 2.

5.2    Contingencies. Payment of Bundled Service Fees arising from the enrollment in the Online Curriculum of any particular student recruited by HotChalk is contingent upon Provider receiving payment from such particular student, provided that Provider uses its commercially reasonable efforts to enforce payment, including without limitation deciding in its good faith discretion not to expend funds pursuing payment.

5.3    Deductions. In the event Provider pays any Bundled Service Fees to HotChalk and Provider (i) does not receive the corresponding payment from the student; or (ii) makes a valid refund of the corresponding payment to the student, in either case, Provider may at its option (a) make the corresponding deduction to the Bundled Service Fees payable to HotChalk in respect of subsequent students; or (b) render an invoice to HotChalk for a refund of the applicable overpayment and HotChalk agrees to pay such invoice within thirty (30) days of receipt if Provider has an obligation to make such refund before receiving additional tuition fees from students.

## 6.    TERMS AND CONDITIONS OF PAYMENT, RECORDS AND AUDIT RIGHTS

6.1    Bundled Service Fees. Net Revenues shall be calculated, and the Bundled Service Fees calculated and paid to HotChalk, weekly upon receipt. Payments shall be accompanied by a reasonably detailed report including the number of individual enrollments of students recruited by HotChalk, price, discounts, and deductions showing the calculation of the Service Fees relative to tuition received.

6.2    Records. Each Party will maintain complete and accurate books and records with respect to its duties and services under this Agreement, including, without limitation, records, as applicable, reflecting billing, payments, students, and payroll. All such records shall be maintained for at least six (6) years after the expiration or termination of this Agreement. If Provider provides written notice to HotChalk that Provider is subject to an audit or other review by a regulatory agency, or to any claim or litigation, in relation to Provider's compliance with the statutory and regulatory provisions referenced in Section 12.1 below, then HotChalk will continue to maintain and retain complete records relating to this Agreement and the compensation of its employees or other persons who perform any student recruitment or admission activities for Provider under this Agreement until Provider provides written notice to HotChalk that such audit, review, claim or litigation has been concluded.

6.3    Audit. Each Party as the non-paying Party ("Auditing Party") may request an audit of the Net Receipts received by the paying Party ("Audited Party") to be performed by an independent certified public accountant, approved by the Audited Party. Any such audit shall be at the expense of the Auditing Party. The Auditing Party may not request such an audit more than one (1) time within any twelve (12) month period and in a given time period

may only be audited one time. If such an audit shows an underpayment of ten percent (10%) or more by the Audited Party of service fee amounts payable to the Auditing Party, the Audited Party shall promptly pay to the Auditing Party the amount of any such underpayment plus interest at one half percent (0.5%) per month from the date of the underpayment plus the reasonable and documented cost of the audit.

7. SECURITY AND CONTENT ASSOCIATION.

7.1 Security. During the term of this Agreement, HotChalk will use reasonable efforts to assist Provider in the protection of the Online Curriculum from unauthorized access through the Online Curricular Environment.

7.2 Compliance with Family Educational Rights and Privacy Act ("FERPA").

7.2.1 Educational Records shall be the property of and maintained by Provider. Provider acknowledges that, in order to carry out the purposes of this Agreement, HotChalk will have access to Educational Records in accordance with 34 C.F.R. 99.31(a)(1)(B).

7.2.2 During the term of this Agreement, HotChalk agrees to use reasonable efforts to maintain the security of Education Records and Personally Identifiable Information, as such terms are defined at 34 CFR § 99.3 in accordance with the FERPA requirements as generally set forth at 34 CFR Part 99 and to otherwise ensure its compliance with FERPA and applicable regulations. HotChalk undertakes that it will promptly notify Provider in the event any such Education Record or Personally Identifiable Information is accidentally made public, and will promptly do such things as Provider may reasonably require in such event.

8. TRADEMARK LICENSES.

8.1 Provider Marks. Subject to the terms and conditions of this Agreement, Provider hereby grants HotChalk an exclusive, non-transferable and limited license during the Term to use the Provider Marks solely for the purpose of promoting the Online Curriculum. All materials displaying the Provider Marks shall be subject to the prior approval of Provider in Provider's sole discretion. Notwithstanding the foregoing, promotional materials provided to HotChalk by Provider may be used by HotChalk without the need for separate approval. If, at any time, Provider notifies HotChalk of its objection to the use of any materials displaying the Provider Marks, regardless of whether such materials were previously approved or supplied by Provider, HotChalk will discontinue any and all uses of such materials within five (5) business days from receipt of written notice from Provider. Any use that is deemed to violate state or federal law or accrediting agency standards will be corrected immediately upon notice to HotChalk.

8.1.1 Notwithstanding the foregoing, the exclusive license to use Provider marks shall not impair the ability of Provider's employees to utilize the Provider Marks in promoting the Online Curriculum.

8.2 HotChalk Marks. Subject to the terms and conditions of this Agreement, HotChalk hereby grants Provider a non-exclusive, non-transferable license during the term to

use the HotChalk Marks. All materials utilizing the HotChalk Marks shall be subject to the prior approval of HotChalk, which will not be unreasonably withheld or delayed. Notwithstanding the foregoing, promotional materials provided by HotChalk and uses of the HotChalk Marks for informational purposes in routine promotional material shall be deemed approved if such use is consistent with Provider's prior uses and any HotChalk usage guidelines, unless HotChalk notifies Provider in writing to the contrary. Any uses that are not consistent with Provider's prior uses and any HotChalk usage guidelines will be corrected by Provider within five (5) business days from receipt of written notice from HotChalk.

9. TERM AND TERMINATION

9.1 Term. This Agreement shall commence on the Effective Date and shall continue for a period of ten (10) years thereafter, with an automatic renewal of five (5) years after the end of such ten (10) year term based on HotChalk achieving 75% of the average of mutually agreed Annual Enrollment Goals over such ten (10) year term as detailed in Exhibit H. In the event additional Online Curriculum are added to this Agreement pursuant to Exhibit D, the parties shall revise the Annual Enrollment Goals on Exhibit H. In the event the parties cannot mutually agree on the revised Annual Enrollment Goals, Provider shall have no obligation to deliver the additional Online Curriculum. Such term may be further extended by the parties' mutual written agreement or terminated earlier by either party in the event the other party:

9.1.1 Files a petition in bankruptcy, is adjudicated bankrupt, makes a general assignment for the benefit of creditors, becomes insolvent, or has involuntary bankruptcy proceedings commenced against it which are not vacated within sixty (60) days of service of commencement of such proceedings;

9.1.2 Commits a material breach of any of the terms of the Agreement and fails to cure such breach within thirty (30) days after receipt, from the non-breaching party, of written notice specifying in reasonable detail the material breach; provided, however, that if a cure cannot be effected within such period and the breaching party promptly commences a cure within such period and diligently pursues the cure until fully effected, the thirty (30) day period shall be extended to include such reasonable period of time that is necessary in order to complete the cure, but no more than thirty (30) additional days from the end of the first thirty (30) day period.

9.2 Termination. Notwithstanding the terms as set out in Section 9.1:

9.2.1 Either party may terminate this Agreement at any time after the ten year anniversary of this Agreement during any renewal term in force by giving forty-five (45) days' prior notice to the other party. Any outstanding Bundled Service Fees due to HotChalk shall be paid in accordance with this Agreement to the date of termination.

9.2.2 If, for three consecutive years, HotChalk does not achieve 50% of the Annual Enrollment Goal identified in Exhibit H, Provider will have the right to terminate the Agreement after a further two (2) year period during which HotChalk shall provide Bundled Services under the terms of this Agreement.

9.2.3 HotChalk acknowledges that Provider is accredited by the Middle States Commission on Higher Education and is subject to state and federal requirements in connection with the offering and delivery of the Online Curriculum. In the event any

regulatory authority shall issue a notice to Provider or if any law, regulation or rule shall indicate any aspect of this Agreement is unacceptable as a means of conveying the Online Curriculum to any students of Provider or in any way jeopardizes the status of Provider as an accredited, non-profit, tax exempt educational organization operated in compliance with the Higher Education Act and similar laws, Provider shall have the right to immediately terminate this Agreement upon written notice to HotChalk, *provided, however* if a) termination is through no fault of HotChalk then HotChalk will be reimbursed in full for all costs it has incurred during this Agreement; or b). if Provider's accreditation or business is put at risk due to actions of HotChalk then HotChalk will be given 90 days to remedy such actions and if so remedied be allowed to continue this Agreement, and if after 90 days HotChalk is unable to remedy such actions then HotChalk will be allowed to teach out the current students. Any outstanding Bundled Service Fees due to HotChalk shall be paid in accordance with this Agreement to the date of termination.

      9.3    <u>Effect of Termination</u>. Expiration or termination of this Agreement shall not affect any students that were enrolled in an Online Curriculum prior to such expiration or termination date and such students may continue to use the Online Curriculum and Online Curricular Environment for the remainder of the term during which such students continue to be enrolled at Provider, and Licenses and Rights granted to HotChalk under Section 4.1 of this Agreement will continue to enable HotChalk to support the continued provision of the Bundled Services to such students to allow them to complete their enrolled Online Curriculum (the "Teach Out Period"). In the event of expiration or termination of this Agreement, HotChalk shall continue the provision of the Bundled Services, solely with respect to enrolled students for the remainder of the term of their enrolled Online Curriculum under the terms and conditions herein, including payment of Bundled Service Fees with respect to such students. For purposes of this Section 9, "term" shall mean the academic period over which the students' degree program is or are taught.

      9.4    Upon completion of the Teach Out Period, each Party shall immediately cease all use of the other Party's Confidential Information and return or destroy all copies of such Confidential Information, within twenty (20) days of such termination or expiration, and so certify in writing to the other Party.

      9.5    <u>Survival of Terms</u>. Sections 1, 6.2, 8.2, 9.3, 9.4, 9.5, 10, 11, 12, 13, 14, 15 and 16 of this Agreement, as well as any other provisions reasonably required by the parties to exercise their post termination rights hereunder, shall survive any termination of this Agreement.

## 10.   <u>REPRESENTATIONS AND WARRANTIES</u>

      10.1    Provider hereby represents and warrants to HotChalk that:

          (a)    Provider has all right, title and interest in and to the Online Curriculum and the Provider Marks and has the sole and exclusive right to grant the rights and licenses with respect to the Online Curriculum and Provider Marks provided for in this Agreement;

(b)     To Provider's knowledge, the Online Curriculum and the Provider Marks do not infringe any copyright, patent, trademark, trade secret or other proprietary and intellectual property rights of any other person or entity; and

(c)     Provider has the requisite authority to enter into this Agreement and the granting of the licenses and other rights under this Agreement will not result in the violation of: (i) the organizational documents or Bylaws of Provider, (ii) any agreement, contract, lease, license, document or other commitment, written or oral, with respect to the Online Curriculum or Provider Marks to which Provider is a party or may become bound, or (iii) any applicable law, rule, license or regulation.

10.2     HotChalk hereby represents and warrants to Provider that:

(a)     HotChalk has all right, title and interest in and to Accordion and HotChalk Marks (collectively "HotChalk Intellectual Property") and has the sole and exclusive right to grant the rights and licenses with respect to the HotChalk Intellectual Property provided for in this Agreement;

(b)     No portion of the HotChalk Intellectual Property Rights infringes or violates any copyright, patent, trademark, trade secret or other proprietary and intellectual property rights of any other person or entity;

(c)     HotChalk has the requisite authority to enter into this Agreement and the performance of the HotChalk Bundled Services under this Agreement will not result in the violation of: (i) the organizational documents or Bylaws of HotChalk, (ii) any agreement, contract, lease, license, document or other commitment, written or oral, to which HotChalk is a party and may become bound, or (iii) any applicable law, rule, license, or regulation;

(d)     HotChalk and the HotChalk Bundled Services will comply with all applicable federal, state and local laws, including without limitation, all privacy, data protection, advertising and marketing laws, and contracts;

(e)     HotChalk possesses all necessary skill, knowledge and authority to enter into this Agreement and will fully perform its obligations hereunder in accordance with applicable industry standards using sound, professional practices and in a competent and professional manner by knowledgeable, trained and qualified personnel;

(f)     The HotChalk Bundled Services will be performed in strict conformance with the specifications of this Agreement and will fulfill the particular purposes intended;

(g)     The HotChalk Bundled Services shall be free of viruses, worms, time bombs, logic bombs, trap doors, Trojan horses, or similar malicious instructions, techniques, or devices capable of disrupting, erasing, disabling, damaging, or shutting down a computer system or software or hardware component thereof;

(h)     The HotChalk Bundled Services do not and will not contain any computer code that would automatically disable the Online Curriculum, the Online Curriculum Environment, the HotChalk Bundled Services or any hardware, software or systems, or impair, or enable HotChalk to impair, in any way, the operation thereof based on the elapsing of a period

of time, exceeding an authorized number of copies or users, advancements to a particular date or other numeral, or other similar self-destruct mechanisms (sometimes referred to as "time bombs", "time locks", "locking devices" or "drop dead devices") or that would permit HotChalk to access the Provider's systems to cause such disablement or impairment (sometimes referred to as a "trap door" or "back door" device);

        (i)    HotChalk is not affiliated (within the meaning of U.S. Department of Education rules and guidance) with any institution that provides educational services; and

        (j)    Neither HotChalk nor any principal or affiliate of HotChalk has been debarred or suspended, or engaged in any activity that is cause for debarment or suspension, pursuant to the U.S. Department of Education regulations at 34 C.F.R. Part 85.

10.3    The warranties set forth in this paragraph shall continue until 1 (one) year after termination or expiration of this Agreement or until any existing HotChalk obligations to students expire, whichever is longer.

10.4 Except for the express warranties stated in this Agreement, NEITHER PARTY MAKES ANY OTHER WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED OR STATUTORY, AND BOTH PARTIES DISCLAIM ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS AND FITNESS FOR A PARTICULAR PURPOSE.

11.    COMPLIANCE WITH LAWS

    11.1    HotChalk agrees it will render all services and obligations under this Agreement in compliance with local, state and federal laws, regulations and rules and specifically acknowledges and agrees that in rendering services hereunder it must comply with local, state and federal laws, rules and regulations as well as those of the Middle States Commission of Higher Education as they relate to the offering and delivery of the Online Curriculum by Provider.

    11.2    Without in anyway limiting the generality of Section 11.1, HotChalk hereby represents and warrants that the compensation of its employees or other persons who perform any student recruitment or admission activities for Provider under this Agreement is and will continue to be in compliance with Section 487(a)(20) of the HEA (20 U.S.C. § 1094(a)(20)), or any successor provision, and the regulations promulgated thereunder by the U.S. Department of Education (currently located at 34 C.F.R. § 668.14(b)(22)).

    11.3    It is the intention of the parties that this Agreement fall under Example 2-B, page 12 of the letter titled "Implementation of Program Integrity Regulations" from the U.S. Department of Education issued on March 17, 2011.  See Exhibits E & F.

12.    INDEMNITY

    12.1    By Provider.  Provider shall indemnify and hold HotChalk, its officers, directors, employees, agents and representatives, harmless for, from and against all demands, losses, liabilities, judgments, awards and costs (including legal fees and expenses) which may arise or result from the Online Curriculum, or any part thereof, infringing the copyright,

patent, trademark, trade secret or other proprietary or intellectual property rights of any other person or entity, Provider's breach of any representation or warranty herein.

12.2    By HotChalk. HotChalk shall indemnify and hold Provider, its officers, trustees, employees, agents and representatives, harmless for, from and against all demands, losses, liabilities, judgments, awards and costs (including legal fees and expenses) which may arise or result from the HotChalk Intellectual Property, or any part thereof, infringing the copyright, patent, trademark, trade secret, or other proprietary or intellectual property rights of any other person or entity, HotChalk's breach of any representation or warranty herein; any negligent act or omission of HotChalk or breach of any terms and conditions of this Agreement provided, however, that HotChalk has no obligation to indemnify or hold Provider, its officers, trustees, employees, agents and representatives, harmless for losses, liabilities, judgments, awards and costs (including legal fees and expenses) which arise from marketing materials that Provider approved, which approval had not been revoked and which marketing materials HotChalk did not know to be outdated.

12.3    Litigation. With respect to any claims falling within the scope of the foregoing indemnifications:

(a)    The indemnified party agrees to notify the indemnifying party promptly of any claims arising under the indemnification, and to provide reasonable assistance to the indemnifying party, at the indemnifying party's expense, in the defense of any such claims;

(b)    The indemnified party shall have the right, but not the obligation, to control, at its expense, the defense of a claim or suit filed against it; and

(c)    The indemnifying party shall not settle any such claims without the prior written consent of the indemnified party.

13.    CONFIDENTIALITY. The terms of this Agreement are confidential and shall not be disclosed to any other party without the written consent of both parties or as provided herein. Each party shall (and will take such reasonable actions to ensure that its employees, agents and representatives) preserve in strict confidence any information obtained by the other party or its employees, agents and representatives, concerning its business or any of its affiliates including, without limitation, trade secrets, proprietary information, computer programs, Source Code, algorithms, know-how, formulas, processes, ideas, inventions (whether patentable or not), schematics concepts, pricing information, business methods, business and financial and technical plans, research and test results, including the results of any performance or benchmark tests or evaluation of any Online Curriculum and other customer and product development plans, forecasts, strategies and information ("Confidential Information"), and agrees, except as expressly permitted herein, to refrain (and shall take such reasonable action to assure that its employees, agents and representatives refrain) from disclosing or using (other than as authorized in this Agreement), during the term of this Agreement or at any time thereafter, any such Confidential Information to any person or persons, or business organizations. Each party agrees that such party will disclose the terms of this Agreement and/or the Confidential Information of the other party only to those of such party's employees, trustees and/or independent contractors (i) with a need to know and (ii) who, as a condition to employment or receipt of the Confidential Information have agreed in writing to obligations of confidentiality substantially similar to those contained herein, or (iii) as required by law. Each party further agrees to promptly notify the other in writing of any misuse or misappropriation of the other party's Confidential Information

that may come to its attention or of any court order or governmental decree requiring the disclosure of Confidential Information (such disclosure to be expressly permitted by either party) and to cooperate, at the disclosing party's expense, with the disclosing party's attempts to obtain a protective order.

Information shall not be considered Confidential Information if it is (a) available to the public other than by breach of this Agreement by the receiving party; (b) rightfully received by the receiving party from a third party without confidentiality limitations; (c) independently developed by the receiving party without any use of or reference to the disclosing party's Confidential Information; or (d) known to the receiving party prior to first receipt of same from the disclosing party.

14.     NOTICES. Notices permitted or required under this Agreement shall be sent to the addresses set forth below the signature lines and shall be deemed to have been given: (i) on the date actually received when personally delivered; (ii) when sent by facsimile or email, with electronic verification of receipt, followed with written confirmation sent by mail; or (iii) three (3) days after mailing if sent registered or certified mail, return receipt requested.

15.     DISPUTE RESOLUTION

15.1     Arbitration. Any dispute, controversy or claim arising out of or in connection with this Agreement shall be determined and settled by arbitration in Santa Clara County, CA pursuant to the Commercial Arbitration Rules then in effect of the American Arbitration Association ("AAA"), and the parties hereby consent to the jurisdiction as set forth herein. The parties agree to mutually select a single arbitrator engaged in the practice of law within thirty (30) days of receipt of a notice of intent to arbitrate. Such arbitrator will be knowledgeable about the regulation and approval of postsecondary education institutions, the online content industry, and online content law. Any decision and award rendered shall be final and conclusive upon the parties and a judgment thereon may be entered in any court having competent jurisdiction. The arbitrator hearing such dispute shall follow substantive rules of the law; require the testimony to be transcribed; and require the award to be accompanied by findings of fact and a statement of reasons for the decision. All costs and expenses, including attorney's fees, of all parties incurred in any dispute which is determined and/or settled by arbitration shall be borne by the party determined to be liable in respect of such dispute; provided, however, that if complete liability is not assessed against any one party, the parties shall share the total costs in proportion to their respective amounts of liability or fault so determined by the arbitrator.

15.2     Injunctive Relief. Notwithstanding Section 15.1 (Arbitration), the parties hereto further agree that any breach of this Agreement related to misrepresentation, as defined at 34 C.F.R. Part 668 Subpart F, or infringement or misappropriation of intellectual property rights, or a breach by either party of its obligations with regard to the other party's Confidential Information, may result in irreparable injury to the other and each party agrees that the non-breaching party shall be entitled, if it so elects, to seek specific performance of this Agreement by such party, or seek to enjoin such party from activities in violation of this Agreement, without the posting of a bond.

16.     LIMITATION OF LIABILITY

16.1     EXCEPT WITH RESPECT TO HOTCHALK'S LIABILITY UNDER SECTION 11 (COMPLIANCE WITH LAWS) AND EACH PARTY'S LIABILITY UNDER SECTION 12 (INDEMNITY) OR A BREACH BY EITHER PARTY OF ITS CONFIDENTIALITY OBLIGATIONS AS SET FORTH IN SECTION 13 (CONFIDENTIALITY), NEITHER PARTY SHALL HAVE ANY LIABILITY TO THE OTHER PARTY FOR LOST PROFITS OR BUSINESS OPPORTUNITIES, OR ANY OTHER INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR RELIANCE DAMAGES, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (EXCEPT INTENTIONAL BUT INCLUDING NEGLIGENCE), PRODUCT LIABILITY OR OTHERWISE. THESE LIMITATIONS SHALL APPLY REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

16.2     EXCEPT WITH RESPECT TO HOTCHALK'S LIABILITY UNDER SECTION 11 (COMPLIANCE WITH LAWS) AND EACH PARTY'S LIABILITY UNDER SECTION 12 (INDEMNITY), OR A BREACH BY EITHER PARTY OF ITS CONFIDENTIALITY OBLIGATIONS AS SET FORTH IN SECTION 13 (CONFIDENTIALITY), IN NO EVENT SHALL ONE PARTY'S LIABILITY TO THE OTHER PARTY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER BASED ON AN ACTION OR CLAIM IN CONTRACT OR TORT, INCLUDING NEGLIGENCE, STRICT LIABILITY OR WARRANTY, EXCEPT LIABILITY FOR BODILY INJURY,  BE AS FOLLOWS: a). HOTCHALK'S LIABILITY TO PROVIDER WILL NOT EXCEED THE AMOUNT OF BUNDLED SERVICE FEES PAID OR OWING HEREUNDER; AND b). PROVIDER'S LIABILITY TO HOTCHALK WILL NOT EXCEED THE AMOUNT OF MARKETING AND LEAD GENERATION INVESTMENT MADE BY HOTCHALK, BOTH FOR THE THREE (3) YEAR PERIOD IMMEDIATELY PRECEDING THE CLAIM FROM WHICH THE DAMAGES AROSE.

17.     MISCELLANEOUS

17.1     Entire Agreement.  This Agreement, together with all of the Exhibits attached hereto and incorporated herein by reference, contains the entire understanding of the parties hereto relating to the subject matter hereof, supersedes any prior written or oral agreement, proposals, or understandings between the parties with respect to the subject matter hereof (including, without limitation, the Prior Agreement), and cannot be changed or terminated orally. This Agreement may not be modified, altered or amended, except in writing signed by the parties hereto.

17.2     Enforceability.  The invalidity or unenforceability of any provision of this Agreement will not affect the validity or enforceability of any other provision of this Agreement. If any provision of this Agreement is invalid under any applicable statute or rule of law, it is to that extent to be deemed omitted. The remainder of this Agreement shall be valid and enforceable to the maximum extent possible consistent with the original intent of the parties.  Upon a determination that any term or other provision is invalid, illegal or incapable of being enforced during a current term of the Agreement, the parties hereto shall negotiate in good faith to modify this Agreement so as to affect the original intent of the parties as closely as possible in an acceptable manner.

17.3    No Waiver. The waiver or failure of either party to exercise in any respect any right provided for in this Agreement shall not be deemed a waiver of any further right under this Agreement.

17.4    Assignment. Neither this Agreement nor any rights, licenses or obligations hereunder, may be assigned by either party without the prior written approval of the other, which shall not be unreasonably withheld. Notwithstanding the foregoing, either party may assign this Agreement to any acquirer of all or of substantially all of its equity securities, assets or business relating to the subject matter of this Agreement without prior written approval of the other. In addition, either party may assign this Agreement to any division or other subsidiary business component of either party through a corporate reorganization. Any attempted assignment in violation of this Section will be void and without effect. Subject to the foregoing, all rights and obligations arising out of this Agreement shall inure to the benefit, and be binding on and enforceable by the parties' permitted successors and assigns. If a third party acquires HotChalk and Provider can substantiate at that time, or within 18 months after such acquisition, that the acquisition will create a diminution in value of the brand of Provider then Provider can terminate this Agreement by giving forty-five (45) days prior notice to HotChalk.

17.4.1  HotChalk has the right to assign this Agreement to a special purpose entity created for the purpose of supporting the growth of the relationship between the parties, where HotChalk is the sponsor and service provider to the special purpose entity.

17.5    Independent Contractors. Provider and HotChalk shall perform their duties pursuant to this Agreement as independent contractors. Nothing in this Agreement shall be construed to create a joint venture, partnership or other joint relationship between Provider and HotChalk. Neither party shall have the ability to incur any obligation on behalf of the other party, except as set forth in Section 4.3.5.

17.6    Headings. The headings appearing at the beginning of several sections contained in this Agreement have been inserted for identification and reference purposes only and shall not be used in the construction and interpretation of this Agreement.

17.7    Currency. All dollar amounts herein are expressed in United States funds.

17.8    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of California and the parties hereby consent to the jurisdiction and venue of the state and federal courts located in Santa Clara County, California without regard to the conflicts of law provisions thereof. The United Nations Convention on Contracts for the International Marketing of Goods is specifically excluded from application to this Agreement.

17.9    Affiliates. The rights granted to HotChalk under this Agreement shall be deemed to include all affiliates and subsidiaries of HotChalk. The rights granted to Provider under this Agreement shall be deemed to include all affiliates and subsidiaries of Provider.

17.10   Compliance with Laws, Export. Each party agrees to comply with all applicable rules and regulations of the United States and other countries and jurisdictions, including those relating to the export or re-export of commodities, Online Curriculum and

technical data insofar as they relate to the activities under this Agreement. Each party agrees that commodities and technical data provided under this Agreement are subject to restrictions under the export control laws and regulations of the United States and other countries and jurisdictions, as applicable, including but not limited to the U.S. Export Administration Regulations, and will obtain any approval required under such laws and regulations whenever it is necessary for such export or re-export.

17.11   Press Release.  Neither party may issue a press release regarding the relationship of the parties without the written approval of the other party. Once a press release has been approved hereunder, such press release may be used again by any party.

17.12   No Intended Third-Party Beneficiaries.  It is the intent of the signatories of this Agreement that the only beneficiaries of this Agreement are the parties to the Agreement. Nothing in this Agreement shall be deemed to create rights in any persons, class of persons, or entities that are not parties to this Agreement.

17.13   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed to be an original and each of which together shall constitute a single instrument.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed as of the date first set forth above.

HotChalk, Inc.

By: _____
Name: Edward Fields
Title: Chairman and CEO
Address: 1999 S. Bascom Ave, Suite 1020
Campbell, CA 95008
Telephone: 888-468-2336
Facsimile:  408-369-2263

Centenary College

By: _____
Name: Roger L. Anderson
Title: CFO/COO
Address: 400 Jefferson Street
Hackettstown, NJ 07840
Telephone: 908-852-1400
Facsimile: 908-850-8313

# ONLINE DEGREE GRANTING PROGRAM ADMINISTRATIVE SERVICES AGREEMENT

Between
HotChalk and
Provider

1. <u>Duties and Services</u>.

    The duties and services of each of the parties are as follows:

    A. HotChalk's duties and services ("Bundled Services")

1. Actively promote Provider and the following Online Curriculum as follows:

    Master of Business Administration

    Masters of Leadership and Public Administration

2. Engage in "lead generation" and recruiting activities in order to identify students interested in the Online Curriculum

3. Engage in all administrative efforts reasonably necessary to initiate the application and enrollment processes of Online Curriculum for all interested persons recruited by HotChalk.

4. Aid potential students in the process of transcript submission.

5. Provide and dedicate teams to support the recruitment and retention of students for Online Curriculum while following the procedural and instructional guidelines provided by Provider; including:

    Enrollment Services:
    - Collect and maintain all enrollment deliverables, including official transcripts
    - Create Student ID
    - Conduct data entry related to student information
    - Update all enrollment coding to the point of actual enrollment of student (Provider to admit students)
    - Follow through with new student communication plan (acceptance letter, textbook information, finalizing financial obligation next steps)
    - HotChalk will be responsible for building, supporting, and hosting the online application site

    Clerical Registrar Services:

- Consult with Provider in creating the term calendar to be followed and create all terms in the student information system (SIS)
- Maintain course record number (CRN) calendar (Create all course numbers taken by online students, and track them according to start date in a formatted calendar)
- Reflect instructors assignments in SIS
- Assign course rate codes to each student's record
- Confirm student enrollment once financial obligation is met (financial aid is in place, or cash payment arrangements are made)
- Audit student grades after each class has completed and consult with Student Services, Provider's Registrar's Office and Provider's Student Financial Aid Office for action plans around failing students consistent with Provider's Satisfactory Academic Progress policies
- Perform Cohort Invoicing Audit
  - Ensure all codes are in place to streamline invoicing from HotChalk to Provider
- Coordinate with registrar when transfer credit reviews are required to be sure student is enrolled properly upon their approval of credits
- Report data around online student body to Student Services, Enrollment, and Registration as required (Reports and delivery timelines to be determined).

Student Services:
- HotChalk will be the sole provider of Student Advising
- Act as ombudsman to assist in the resolution of student issues in compliance with Provider's Student Handbook
- Develop student service content for website and newsletters
- Satisfaction survey development, implementation and improvement based on feedback
- Proactive Student Outreach (including at-risk student outreach/support)
- Resource Assistance and referrals to other departments
- Maintain ongoing student record of course completion
- Provide orientation materials consistent with Provider policies
- Provide webinars and related training, as well as Provider-branded support literature regarding the use of the learning management system ("LMS") and distance learning.

6. Ensure HotChalk's compliance with such reasonable organizational structure standards with respect to job descriptions, titles and any accreditation related personnel matters as Provider may from time to time establish.

7. HotChalk will not conduct any functions related to originating, guaranteeing, monitoring, processing, servicing, or collecting loans; claims submission; or billing. Moreover, HotChalk will not provide any of the services listed in 34

CFR 668.2, including:

- Processing student financial aid applications;
- Performing need analysis;
- Determining student eligibility and related activities;
- Certifying loan applications;
- Processing output documents for payment to students;
- Receiving, disbursing, or delivering Title IV, HEA program funds, excluding lock-box processing of loan payments and normal bank electronic fund transfers;
- Conducting activities required by the provisions governing student consumer information services in subpart D of part 668 of title 34 of the Code of Federal Regulations;
- Preparing and certifying requests for advance or reimbursement funding;
- Loan servicing and collection;
- Preparing and submitting notices and applications required under 34 CFR part 600 and subpart B of part 668 of title 34 of the Code of Federal Regulations; and
- Preparing a Fiscal Operations Report and Application to Participate.

8. The recruitment of persons who meet Provider qualifications for appointment as adjunct faculty, and upon the appointment of such persons by Provider as adjunct faculty (which appointment will be at Provider's sole discretion), the hiring, compensation and training of such persons in such manner as Provider shall approve, provided that all such adjunct faculty shall be subject to Provider's academic control and supervision and subject to removal by Provider at its sole discretion. The reviews of adjunct faculty shall be conducted by HotChalk based upon standards agreed to by HotChalk and Provider. HotChalk will share the results of such reviews with Provider. Compensation rates for any and all adjunct faculty teaching the Online Curriculum will be established by mutual agreement of Provider and HotChalk.

9. Provider and HotChalk agree that all student deliverables, including official and unofficial transcripts, applications, and other requirements, if any, will be received by HotChalk, compiled into digital records, and electronically delivered to Provider.

10 HotChalk will plan for class capacity of between 15 to 18 students per class, with 15 students per class preferred.

B. Provider's duties and services

1. Establish the curriculum and course content to be offered to students. Provider will develop, or will have developed, courses for an accelerated online delivery and will be fiscally responsible for such development. Following accreditation approval, the first start date will commence as soon as practically possible, as agreed between both parties (expected to be within 60 to 90 days following approval).

2. HotChalk will provide Provider's admissions data team with a recommended schedule of start dates and the specifics of each enrollment cycle once the start dates have been approved by Provider.

3. Communicate or establish, as appropriate, reasonable standards for student recruitment, admissions processing, enrollment management, registration, non-academic advisement, and online student course evaluation processes. Provider may also establish and communicate reasonable procedures for auditing all admissions recommendations and deliverables. All student data will be collected in the recruitment of any Provider program, online or otherwise, and cannot be used for any purpose other than the recruitment and enrollment management of Provider programs. HotChalk will provide Provider with any requested student-related data within five (5) business days of Provider's written request for such data. Provider commits to a 24 hour maximum turnaround for reviewing and accepting students.

4. Establish standards for, appointment, supervision and evaluation of all faculty involved in the offering of the programs. Provider shall approve appropriate faculty members for appointment at Provider's sole discretion. Faculty members will be adjunct faculty of the Provider. Provider shall have the sole right to appoint faculty members and may terminate such faculty members at any time in its sole and exclusive discretion and notify HotChalk after such termination.

5. Provide all customary financial aid counseling and the awarding, packaging and disbursement of Federal, State and private student financial assistance, including but not limited to that provided pursuant to Title IV of the Higher Education Act of 1965.

6. Maintenance of all official student records and the issuance of all official transcripts and diplomas.

7. Evaluation of student performance, awarding of transfer credits and grades and the award of applicable academic credentials, all at the sole and exclusive discretion of Provider. Provider's certificate and/or degree certification shall be awarded to students upon their successful completion of the Provider's complete series of courses, consistent with Provider's academic and conduct standards.

8. Maintain accreditation through Regional Accreditation body.

9. Identify and assign Lead Academic Liaison with responsibility and authority

to drive partnership programs and have final resolution authority over academic programs, content, faculty and other regulatory compliance related matters.

10. Provide HotChalk with access, as needed, to student transcripts, records, databases, systems, and reporting that involve students in Online Curriculum, as appropriate and as allowed under applicable laws and regulations; as well as provide official training on user facing and back end sides of the Provider adopted student information systems and learning management systems. Working in full compliance with FERPA, provide full, administrative credential access to SIS, LMS, Intranet, and additional relevant College systems relevant to students in the Online Curriculum within one week of Effective Date.

11. Provide an Executive Liaison who has final resolution authority for Provider on all areas in relation to the partnership.

12. Provider will provide training for HotChalk Enrollment Specialists at HotChalk's Enrollment Facility (Phoenix, AZ) between 1 to 2 weeks prior to Marketing launch of programs.

13. Provider will use its best efforts to register in all States recommended by HotChalk, so that HotChalk may market and deliver the Online Curriculum as efficiently as possible. If it is deemed uneconomical to register within a certain State, then Provider will communicate such to HotChalk. Both parties will communicate and work together to resolve any issues related to such assessment. Should Federal or state law mandate registering with individual States, HotChalk will not market or deliver the Online Curriculum in any state until Provider has advised it that registration in that state is complete or that registration is not required.

### C. Joint obligations of the parties

1 The Parties will work in good faith to carry out their duties under this Agreement, including establishing lines of communication and monitoring systems necessary to effectuate such obligations. To the extent applicable, the Parties will at all times endeavor to conduct their affairs in conformance with the Middle States Commission on Higher Education policy called "Contracts by Accredited and Candidate Institutions for Education-Related Services". The Parties will pursue all efforts with quality student learning outcomes in mind.

2. Provider and HotChalk will collaborate to create a process by which Provider determines whether it will accept transfer credits from students and such determination is communicated to HotChalk.

3. Tier 1 Technical Support: For the first year from the first start date, Provider will deliver Tier 1 Technical Support for both students and faculty. HotChalk agrees to help support this work where appropriate. Prior to the start of the first anniversary of the first start date, Parties agree to collaboratively revisit the delivery of this support for years two and beyond to ensure delivery of effective, student-centric support.
Tier 1 Technical Support includes:
- Provide first response to Student/Faculty issue
- Password/login assistance
- Orienting new, less tech savvy Students/Faculty
- Identifying course problems (broken links, missing elements in courses, etc)
- Trouble shooting issues
- Gathering user information (operating system, browser, identifying specific error messages, etc.)
- Providing help links/videos to walk students through specific areas of LMS
- Provide 7/24 phone support assistance to Students/Faculty
- Acting as the liaison between IT and the Student/Faculty users (Get specific suggestions and providing that information to the user to resolve issues)
- Escalating issues to appropriate IT support staff as necessary
- Maintaining appropriate due dates within the LMS.

### D. No Third Party Servicer Relationship

It is understood and agreed that this Agreement does not purport to render HotChalk a Third Party Servicer as that term is defined at 34 CFR 668.25 and HotChalk shall not undertake any work pursuant to this Agreement inconsistent with this provision.

2. Consideration:

In compensation for the Bundled Services provided by HotChalk hereunder, Provider will pay service fees to HotChalk equal to 80% of Net Receipts ("Bundled Service Fee").

The schedule of Bundled Service Fee payments, on a cohort by cohort basis, shall be paid as follows:

90% of all Net Receipts for all terms except the final term Net Receipts collected and the appropriate % of the final term Net Receipts collected that nets the total Bundled Service Fee to 80% of the Net Receipts collected.

In compensation for providing the Online Curriculum to students already enrolled in Provider's on-ground program, Provider will pay service fees to HotChalk equal to 20% of Net Receipts related to the fees for such Online

Curriculum.

Provider agrees to charge tuition for all courses in a term at the beginning of such term and to require payment within 1 week of class starting. Provider further agrees to process fees from students, whether paid directly by the student, a third party commercial organization, Federal Financial Aid or any other means within 2 weeks of class starting. HotChalk, however, is responsible for collecting past-due amounts. Provider recognizes that any delay past the 2-week period will significantly impact HotChalk's ability to perform under this Agreement, and any termination rights by Provider related to HotChalk performance will be waived until Bundled Service Fees, except for such Bundled Service Fees HotChalk is attempting to collect, have been caught up for amounts due to students enrolled.

Technology Fee:

If and when Provider requests HotChalk to develop technology to enhance the online learning experience for students and faculty, and if Provider chooses to implement this technology, HotChalk will make such technology available within the scope of this Agreement under appropriate license terms and conditions in return for a technology fee payable to HotChalk.

3. Scholarships

A. The parties hereby agree that for every 100 students that complete the Online Curriculum included in this Agreement, 3 scholarships will be made available for distribution to students admitted to an Online Curriculum at no charge to HotChalk or the students. The selection of the scholarship recipients will be determined by HotChalk, selection will be merit-based, as reflected in the applicant's Letter of Intent or Personal Statement, and the awarding of the scholarships will be through Provider's Financial Aid office. Recipients must meet the minimum program admissions requirements.

B. Provider will work with HotChalk to award scholarships that will enhance the ability of HotChalk to market the Online Curriculum to prospective students. These scholarships may vary depending upon the time of year. HotChalk will only offer scholarships in the market when approved by Provider's Financial Aid office.

4. Right of First Refusal

Provided HotChalk is not in default of any terms of this Agreement, HotChalk and Provider agree that HotChalk reserves the right of first refusal to promote, represent, and provide like services for all future online offerings during the term of this agreement. HotChalk shall have 30 days to inform Provider of its decision on whether to promote, represent, and provide administrative services in connection with an online offering under this Agreement. The 30 day period shall begin on the day Provider informs HotChalk of the new opportunity.

EXHIBIT "B"

MARKETING PLANS

Marketing Support from HotChalk shall include, but not be limited to, the following:

1. Newsletters
2. eBlast Ads
3. Banner Ads
4. Pop-Under Ads
5. Webinars
6. Widgets
7. Institution Page
8. Press Releases
9. Co-Registration
10. Advertorials
11. Continuing Education Survey
12. Continuing Education Blogger for certificate offerings
13. Geo-Targeted Co-Registration
14. Managing campaigns with aggregators and directory sites
15. Using e-mail, direct mail, telephone, conference exposure, speaking events
16. Social Media campaigns

## REQUIREMENTS FOR ADMISSION TO ONLINE CURRICULUM:

Requirements for: Master Business Administration:

<u>Requirements:</u>
- Application
- Unofficial transcripts (2.5 GPA)
- Letter of intent (personal statement)

<u>Conditional Incomplete Acceptance (collateral due by the end of student's 1st class):</u>
- Official transcripts

<u>Conditional Academic Acceptance (GPA 2.0-2.5)</u>
- Two letters of recommendation
- Students must receive a "B" grade or better in their first two courses to continue in the program

Requirements for: Master of Leadership and Public Administration:

<u>Requirements:</u>
- Application
- Unofficial transcripts (2.5 GPA) Letter of intent (personal statement)
- Resume

<u>Conditional Incomplete Acceptance (collateral due by the end of student's 1nd class):</u>
- Official transcripts

<u>Conditional Academic Acceptance (GPA 2.0-2.5)</u>
- Two letters of recommendation
- Students must receive a "B" grade or better in their first two courses to continue in the program

## Provider Deliverables

### Institution Information
- Mission Statement
- List Of Awards, Rankings and Merit Received By The School
- Institution Calendar
- Instructor Contact Information and Availability
- Learning Management System Used
- Minimum Technology Requirements
- Online Enrollment SOP's
- Institution Contact Information & Process For HotChalk Enrollment Team
- Institution and Program FAQ's

### Program Information
- Degree and/or Certificate Information
- Course Structure
- Core and Elective Courses
- Instructor Credentials
- Tuition Information/Price Per Unit/Total Cost For Degree and/or Certificate Program
- Discounts Offered
- Tuition Assistance from the Institution
- Quarter/Course Start And End Dates
- Drop/Add Dates
- FAFSA Deadline Dates
- All Program Info
- Career Path Based On Degree and/or Selected

### Marketing Information
- Online Curriculum Style Guide (Collaboratively developed)
- Complete Package of existing Institution Marketing Collateral
- Website Links
- School/Program Differentiators
- Demographic Information
- Enrollment Data
- Dean/Provost Contact Information and Guidelines
- Logo's (EPS version) / Graphic / Templates
- Electronic Examples Of Successful Media Campaigns And Advertising Pieces
- Other Promotional Electronic Pieces
- Prerecorded hold music and messaging
- Access to alumni marketing resources including but not limited to name, address, phone number, email address, degrees earned and other such information as mutually agreed by the parties to facilitate marketing to Provider alumni.

## Additional Online Curriculum

Provider will make best efforts to develop the materials and add the necessary resources to make the following Online Curriculum available for launch over the next 6 to 18 months subject to the time it may take for accrediting agencies and licensing bodies to approve such offerings as applicable. The Additional Online Curriculum may also be subject to change based upon mutual agreement that market demand requires either additions or deletions be made to the list. Provider will use its best efforts to register in all States recommended by HotChalk, so that HotChalk may market and deliver the Online Curriculum as efficiently as possible. If it is deemed uneconomical to register within a certain State, then Provider will communicate such to HotChalk. Both parties will communicate and work together to resolve any issues related to such assessment. Should Federal or state law mandate registering with individual States, HotChalk will not market or deliver the Online Curriculum in any state until Provider has advised it that registration in that state is complete or that registration is not required.

**Sample HotChalk Incentive Compensation Agreement**

### HotChalk Incentive Compensation Agreement

The following incentive compensation agreement is in place and has been agreed to by HotChalk and the HotChalk Covered Employee named below. A Covered Employee is one who is responsible for recruitment, admissions, or enrollment activities, or in making decisions regarding the awarding of financial aid funds.

**General Agreement:** HotChalk will not provide any commission, bonus, or other incentive payment based in any part directly or indirectly on success in securing enrollments or financial aid to any individual or entity engaged in any student recruiting or admission activities or in making decisions regarding the award of federal student financial aid funds, in accordance with the "incentive compensation" provision of Title IV of the federal Higher Education Act of 1965, as amended, set forth at 20 U.S.C. § 1094(a)(20), and the regulations of the U.S. Department of Education set forth at 34 C.F.R. § 668.14(b)(22).

**"Safe Harbors" to the General Agreement:**
- I understand that HotChalk may make profit-sharing and/or bonus payments to all or substantially all of HotChalk's workforce and that such payments would not be considered impermissible incentive payments based on the success in securing enrollments or awarding financial aid, as long as such payments were made without regard for an employee's involvement with admissions or financial aid activity.
- I understand clerical pre-enrollment activities are not considered recruitment or admission activities. Accordingly, HotChalk may make incentive payments to me if my responsibilities are limited to pre-enrollment activities that are clerical in nature as defined by the U.S. Department of Education.
- I understand that the incentive compensation restrictions apply only to individuals who are responsible for recruitment, admissions, or enrollment activities, or the financial aid awarding process, and their direct supervisors.

| | |
|---|---|
| (Covered Employee Name) | (HotChalk Manager) |
| (Date) | (Date) |

## Exhibit "F"
## Excerpts from "Implementation of Program Integrity Regulations", from the US Department of Education on March 17, 2011, Pages 1, 11, & 12



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION

THE ASSISTANT SECRETARY

**MAR 1 7 2011**

GEN-11-05

Subject: Implementation of Program Integrity Regulations

Summary: This letter provides guidance on three areas of the final regulations published on October 29, 2010, addressing program integrity issues: State authorization, incentive compensation, and misrepresentation.

Dear Colleague:

On October 29, 2010, the Department published in the Federal Register final regulations on program integrity issues (75 FR 66832). The final regulations are available at http://www.ifap.ed.gov/eannouncements/110110PubFinalRulesforTitleIVStudentAidPrgms.html. These final regulations make a number of changes to the regulations governing the programs authorized by the Higher Education Act of 1965, as amended (HEA). The regulations are generally effective July 1, 2011, except for revisions to Subpart E of part 668 of the Student Assistance General Provision regulations, Verification and Updating of Student Aid Application Information, which are effective July 1, 2012.

The enclosure to this letter provides additional guidance on three areas of these final regulations: State authorization, incentive compensation, and misrepresentation. This guidance is provided to assist institutions with understanding the changes to the regulations in these areas, and does not make any changes to the regulations. Affected parties are responsible for taking the steps necessary to comply by the effective dates established by the final regulations.

We encourage you to review the preambles to the notice of proposed rulemaking (75 FR 34806-34890, June 18, 2010) and the final regulations (75 FR 66833-66932, Oct. 29, 2010), as well as the final regulations themselves (75 FR 66946-66975, Oct. 29, 2010).

We thank you for your continued cooperation as we work to implement these regulations.

Sincerely,

Eduardo M. Ochoa

Enclosure

1990 K ST. N.W., WASHINGTON, DC 20006
www.ed.gov

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

| | |
|---|---|
| | size or academic achievement |
| | Payments to senior executives with responsibility for the development of policies that affect recruitment, enrollment, or financial aid |
| | Payments based upon securing student housing or other student services, including career counseling |
| | Volume driven arrangements based on services that are not recruitment or securing of financial aid |

Neither persons nor entities may receive direct or indirect payments of incentive compensation. The Department received numerous questions about the use of "persons" rather than "persons or entities" in some parts of the preamble to the final rule. The Department will issue a technical correction to the regulations, consistent with this letter, which will clarify that in all places in the preamble related to incentive compensation, the Department was referencing the statutory prohibition that applies to both persons and entities.

"Tuition sharing:" The Department has been informed that some third parties charge institutions a percentage of tuition as a way of assuming the business risk associated with student recruitment. Further, such third parties have typically combined student recruitment services with other services not covered by the incentive compensation prohibition, such as advertising, marketing, counseling, and support services to admitted students, and verification of student aid application information.

Section 487(a)(20) of the HEA mandates that the "institution will not provide any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." The Department generally views the payment based on the amount of tuition generated as an indirect payment of compensation based on success in recruitment and therefore a prohibited basis upon which to measure the value of the services provided. This is true regardless of the manner in which the entity compensates its employees.

However, as illustrated in the examples below, the Department does not consider payment based on the amount of tuition generated by an institution to violate the incentive compensation ban if that payment compensates an unaffiliated third party that provides a set of services that may include recruitment services. The independence of the third party (both as a corporate matter and as a decision maker) from the institution that provides the actual teaching and educational services is a significant safeguard against the abuses the Department has seen heretofore. When the institution determines the number of enrollments and hires an unaffiliated third party to provide bundled services that include recruitment, payment based on the amount of tuition generated does not incentivize the recruiting as it does when the recruiter is determining the enrollment numbers and there is essentially no limitation on enrollment.

With the statutory mandate in mind, the Department offers the following guidance with respect to certain possible business models:

### Example 2-A:

A third-party servicer provides services that do not include student recruitment or the awarding of student financial aid, such as student counseling, verification of student aid application information, advertising, and collection of contact information about enrollment applicants. The ban on incentive compensation does not apply to the entity and does not apply to the employees of the entity because no services are offered that are subject to the ban.

### Example 2-B:

A third party that is not affiliated with the institution it serves and is not affiliated with any other institution that provides educational services, provides bundled services to the institution including marketing, enrollment application assistance, recruitment services, course support for online delivery of courses, the provision of technology, placement services for internships, and student career counseling. The institution may pay the entity an amount based on tuition generated for the institution by the entity's activities for all bundled services that are offered and provided collectively, as long as the entity does not make prohibited compensation payments to its employees, and the institution does not pay the entity separately for student recruitment services provided by the entity.

### Example 2-C:

The employees at Business A ensure that enrollment applications are complete and then forward the enrollment applications to the institution for admissions decisions. In addition, Business A employees receive financial aid files along with required verification documentation, complete the verification process, then return the files to the institution. In each instance, payments by Business A to compensate its own employees based on the number of files processed by those employees would be permitted because the employees do not undertake recruiting or admitting of students, or make decisions about and award title IV, HEA program funds.

In all of these examples, the institution receiving title IV funds remains responsible for the actions of any entity that performs functions and tasks on the institution's behalf. These responsibilities include ensuring that employees are not paid for services that would convert these payments into prohibited incentive compensation because of the activity the employees engage in.

**Question 3: Does the incentive compensation prohibition apply to all employees regardless of title or position?**

Answer 3: Yes, the incentive compensation prohibition applies to all employees "with responsibility for recruitment or admission of students, or making decisions about awarding title IV, HEA program funds." (75 FR 66874 (Oct. 29, 2010).) As shown in Table 1, the Department

[College Letterhead]
[Date]

Dear Media Representative:

This letter provides authorization for HotChalk, Inc. and their designated agents ("HotChalk") to act as an Agency of Record for _____ College for interactive media placement and other advertising as requested by HotChalk, commencing on our behalf on or after _____, 2013.

All financial responsibility for payment of all media placed on our behalf as contracted by HotChalk lies solely with HotChalk.

We are confident we can expect complete cooperation from media sources in regard to requests made by HotChalk. Please refer any questions or concerns you may have to:

Segev Tsfati, VP Marketing
HotChalk, Inc.
1999 S. Bascom Ave., St. 1000
Campbell CA 95008
408.645.7759
Segev.Tsfati@HotChalk.com

Thank you for your continued support of our organization.

Sincerely,

[Signature]

[College representative name]
[College representative title]
[College representative address]
[College representative email]
[College representative phone]
[College representative fax]

### Exhibit "H"
### Annual Enrollment Goals
### (Based on current Online Curriculum)

| Years calculated from Effective Date | Enrollment Goal |
|---|---|
| Year 1 | 350 |
| Year 2 | 525 |
| Year 3 | 788 |
| Year 4 | 1181 |
| Year 5 | 1772 |
| Year 6 | 1772 |
| Year 7 | 1772 |
| Year 8 | 1772 |
| Year 9 | 1772 |
| Year 10 | 1772 |